## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Maroof Haque** | : | |
| **Plaintiff** | : | |
| **v.** | : | **CIVIL ACTION** |
| **Swarthmore College** FILED | : | **NO. 2:15-cv-01355** |
| SEP 3 0 2015 | : | |
| MICHAEL E. KUNZ, Clerk | : | **The Hon. J. Curtis Joyner** |
| By _____Dep. Clerk | : | **Jury Trial Demanded** |
| | : | |
| **Defendant** | : | **FILED UNDER SEAL** |

### THIRD AMENDED COMPLAINT

Maroof Haque ("Plaintiff") through his undersigned counsel, files this civil complaint against

defendant Swarthmore College, and in support avers as follows:

### I.   NATURE OF THIS ACTION

1. Plaintiff seeks justice against Swarthmore as it is responsible for the actions of a small

    group of administrators who discriminated against Plaintiff when they gave credence to a

    completely false, unsupported, undocumented and 607 days old allegation of sexual

    assault from Jane Doe, a white female Swarthmore student, and ignored Plaintiff's

    complaint that it was Jane who had assaulted him.

2. Plaintiff, a man of color, and Jane met at as freshmen at a Swarthmore party.

3. Later that night they had an interaction in the Swarthmore open air amphitheater that 607

    days later Jane would call assault. Jane received sex and race based preferential treatment

1

from the administration for that allegation while Plaintiff was punished when he was held

responsible for this fictional assault and when the administration acted with deliberate

indifference towards his complaint that it was Jane who had assaulted him that night.

4.  In handling the process that led to finding Plaintiff guilty of sexual assault, the

administration, specifically Joanna Gallagher, Nathan Miller, and Liz Braun deprived

Plaintiff of his rights under Title IX to a sexual harassment free and under Title VI to a

race discrimination free academic environment and violated his contractual rights.

Defendant failed to adhere to laws and to its own policies meant to protect Plaintiff.

## II.     THE PARTIES

5.  Plaintiff is a resident of California, of Southeast Asian national origin, and of modest

means.  Plaintiff was enrolled as a student at Swarthmore College.

6.  Defendant Swarthmore College (hereinafter "Swarthmore" "the Administration" or

"College") is a small, private, liberal arts college with a principal address of 500 College

Avenue, Swarthmore, Pennsylvania 19081.

## III.     JURISDICTION AND VENUE

7.  Plaintiff invokes this Court's original jurisdiction under Title IX of the Education Act

Amendments of 1972, 20 U.S.C. §1681, et seq. and 28 U.S.C.§1331. 23; and because of

the race discrimination claim under Title VI of the 1964 CRA, 42 U.S.C. § 2000d et seq.

8.  Plaintiff also invokes jurisdiction under this Court's power to prevent discrimination

based on race as codified in 42 U.S.C. §1981 which specifically prohibits against the use

of race discrimination in the enforcement of contracts in the United States.

9.  Plaintiff invokes this Court's equitable powers under 28 USC §2201.

2

10. Pursuant to 28 U.S.C. §1391, venue for this action properly lies in this district because a substantial part of the events or omissions giving rise to the claims set forth below occurred in this judicial district.

11. Plaintiff also invokes this Court's jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C.§1367. 25.

12. Plaintiff also invokes this Court's jurisdiction pursuant to 28 U.S.C.§1332, diversity of citizenship, with the amount in controversy exceeding $75,000.00, plus interest and costs.

### IV.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.**    **Agreements, Representations, Covenants and Warranties Between Plaintiff and Swarthmore College**.

13. On or about the Spring of 2011, Swarthmore offered Plaintiff and Plaintiff accepted a place in its freshman class of 2015.

14. At the time of this contract Swarthmore and Plaintiff agreed to rules of behavior included in the Swarthmore Student Handbook for 2011-2012 (**Exhibit A**) as well as to any modifications of the same via subsequent handbooks and other adopted policies.

15. Plaintiff chose Swarthmore, in part, because Swarthmore specifically represented it had a reputation for dealing with racial oppression that guaranteed all, including men of color like him, a voice.

16. Jane, on information and belief, is white and similarly accepted the same terms at or about the same time as she was also offered a spot in Swarthmore's class of 2015.

3

17. Swarthmore's sexual assault policy as stated in the Student Handbook for 2011- 2012, (**Exhibit A**) defined "consent" as an "understandable exchange of affirmative words or actions...after consent has been established, a person who changes his/her mind during the sexual activity will communicate..."

18. At the time of the investigation of the events in controversy, Swarthmore's Student Handbook for 2012-2013 (**Exhibit B**) expressly covenanted rights to respondents of sexual assault including a factual investigation, a report of this investigation, an opportunity to respond to this report, all leading to a discretionary decision on the part of defendant's administration whether or not to proceed with charges.

19. Swarthmore's Student Handbook and policy for 2012-2013 increased Swarthmore's commitment to the rights of respondents of sexual assault claims. (**Exhibit B**).

20. Finally, on information and belief, since August 28, 2013 Swarthmore has acted under its Interim Sexual Assault policy ("New Policy" hereafter) which made significant changes to the rights of respondents of sexual assault claims including a new definition of "consent" as "knowing and voluntary...from beginning to end..." (**Exhibit C**).

21. Importantly, the New Policy clearly states the duty of respondents, who are not required to read the minds of their accusers, but rather are required to act like a reasonable, sober, person would have acted at the time. (**Exhibit C**).

22. Plaintiff relied on each of the provisions of these policies to prove his very clear innocence against Jane's bald accusation that Plaintiff had assaulted her on September 10, 2011, and was unable to avail himself of these protections because he experienced Swarthmore's sex-based and race-motivated animus against him.

4

23. Plaintiff avers that he was unable to adequately rely on the provisions above due to discriminatory actions by a number of Swarthmore employees, including the suppression of evidence from the investigative and adjudicative phases of this matter-- which prevented his ability to respond to and defend against both--and the defendant's complete deliberate indifference to the Plaintiff's complaint that Jane assaulted him.

**B.** **Plaintiff and Jane Doe's Only Encounter as Freshmen at the PhiPsi Fraternity Disorientation Party of September 10, 2011.**

24. Plaintiff on September 10, 2011 attended the traditional "Disorientation Party"then hosted by the PhiPsi fraternity at their on-campus and campus-owned fraternity house.

25. Plaintiff met Jane Doe for the first time at the Disorientation Party.

26. Jane's September 14, 2011 Facebook comment on a September 10, 2011 photo of her at or right before the Disorientation Party (commenting on the state of the clothes that she borrowed ostensibly to wear at the party) **(Exhibit D)**: "Y**es...your clothes are clean and folded in my room...I'll get them to you soon**" belies later claims she made about the events of that night, including that Plaintiff had "ripped" her clothes off.

27. Again beling Jane's accusations against Plaintiff, there were no assaults during that Disorientation party. **Exhibit E** is a statement of January 29, 2015 from Student 4, a PhiPsi brother who recalls this exact party because he was there; sober, older, responsible, patrolling and watching out for assault.

28. On information and belief, it seemed to Plaintiff that Jane Doe smelled of alcohol.

29. As Plaintiff stated during the investigation of this matter, he felt compelled to dance, grinding as Jane demanded, and did not enjoy doing so but he did not show outward signs of his discomfort. Plaintiff did not enjoy when Jane forced him to grind with her

30. Jane led Plaintiff, literally pulling on his hands, from PhiPsi, to Wharton's open air courtyard and passage, and made him cross towards the open air amphitheater, located behind the Wharton dorm. (**Exhibit F**).

31. Jane told Plaintiff to sit down next to her, in the upper tiers of the amphitheater's seats.

32. At no point during this conversation did Jane show any sign of incapacitation; on the contrary, she provided lucid, conscious, active, audible, and sober responses.

33. Plaintiff never assaulted Jane at this or at any other time.

34. Plaintiff was not comfortable in the amphitheater because he did not want any interaction with Jane.

35. Jane reached under Plaintiff's shirt and Plaintiff asked Jane if she wanted him to remove it to which she replied with an active, knowing, clear and willing "yes."

36. Plaintiff further asked Jane to confirm she wanted him to remove or not remove clothes, to kiss or not kiss her, and to touch or not touch her. There was nothing other than request for consent from the Plaintiff to Jane, and consent from Jane throughout the incident.

37. But Jane did not ask Plaintiff for consent to perform a sexual act on him as he lied down.

38. A surprised and embarrassed Plaintiff immediately ended this touching.

39. Although Plaintiff was scared and confused after Jane's last sexual touching of his body, Plaintiff and Jane then had polite small talk as they dressed, sitting next to each other, in a deliberate manner, which belies Jane's later claims that she was terrified.

6

40. Jane's last touching, during which Plaintiff was assaulted, was his first sexual experience.

41. Jane left for her dorm and Plaintiff did the same.

42. Plaintiff and Jane occasionally saw and spoke to each other for the next four semesters

**C.** **The 607 Days Following the September 10, 2011 Disorientation Party.**

43. On information and belief, based on Plaintiff's recollection of the investigative file, Jane made no effort to report to tell anymore of the incident on that night or even the next days, weeks, or months.

44. Plaintiff never mentioned to anyone at Swarthmore that he had been in the amphitheater with Jane or that she had assaulted him.

45. During his sophomore year, Plaintiff and Jane Doe lived within doors of each other peacefully sharing their dorm's common areas and quotidianly communicating.

46. There is simply no evidence that Jane was assaulted or suffered any trauma from Plaintiff's presence on campus on or for the 607 days following September 10, 2011.

**D.** **Swarthmore Activists' OCR and Clery Complainants Trigger Jane Doe's Complaint Against Plaintiff.**

47. In April 2013, two white female Swarthmore students, Student Activist No. 1 and Student Activist No. 2, filed a complaint with the U.S. Department of Education ("DOE" or "Department of Education") against the administration under Title IX and the Clery Act, alleging, among other things the same complaints that Plaintiff has against defendant, namely, that the administration discourages students from filing sexual misconduct complaints, underreports incidents of sexual misconduct, and fails to appropriately discipline sexual offenders like Jane.

48. As Plaintiff recalls, Jane stated at the adjudication of this matter that she had complained because she thought it was her duty to help reform the Swarthmore administration's deliberately indifferent response to sexual assault claims.

49. Swarthmore became a sexually hostile environment for Plaintiff once Jane complained; a hostility that the administration was deliberately indifferent to and failed to stop.

## E.   Swarthmore's Administration Acting with Sex-Based and Race-Motivated Animus Mishandled the Investigation of Jane Doe's Complaint Against Plaintiff.

50. On or about May 9, 2013, 607 days after the 2011 Disorientation Party, Plaintiff was stunned to have a Swarthmore Public Safety officer summarily evict him and publicly escort him off campus, because Jane had filed an internal sexual assault complaint against him which Joanna Gallagher ("Gallagher"), a white female, was now investigating.

51. As a result, Swarthmore segregated Plaintiff from the rest of the student population; something that it did not do in the cases of other white students accused of assault.

52. Plaintiff avers that the administration treated him differently from other white students whom he will identify, and detrimentally because of his race and of his national origin.

53. Gallagher's treatment of Plaintiff because of his race and sex profoundly affected and negatively influenced her decision-making process as she biasedly documented Jane's complaint and violated investigatory protocols while discriminating against the Plaintiff.

54. During the Plaintiff's interview on or about May 9, 2013 Gallagher made a number of statements that clearly suggest she was attempting to entrap the Plaintiff, leading him towards self-incrimination, and implicitly doing this because of her bias against his sex

8

in that a man cannot be sexually assaulted by a woman. The same is averred as Gallagher's biases against Plaintiff's race.

55. Gallagher's statements to Plaintiff included:

a. **"Did you get her number?"** [Insinuating and assuming Plaintiff was sexually interested in a future relationship Jane which he said he was not].

b. **"I can't believe you couldn't get her number!"** [ Leading him and failing to accept Plaintiff's clear statement that he simply was not interested in Jane as a friend because she assaulted him].

c. And leading, false, statements that Plaintiff recalls trying to characterize Jane as a **"quite a catch"** and **"a trophy"** for Plaintiff and all of which Plaintiff flatly denied.

56. Several times Plaintiff indicated to Gallagher in an interview that he had felt **"really anxious and kind of scared"** when Jane was forcing him to grind, later when she forced him to interact with her at the amphitheater, and finally when she sexually touched him without his permission. Gallagher replied:

a. **"Scared! What was there to be scared about?"** [Responding with the clear sex bias that a man is not able to be sexually assaulted by a woman].

b. **"It seemed like you were having such a good time!"** [Referring to the actions that Plaintiff described as a sexual assault by Jane].

c. **"It seemed like a positive experience for you, don't let this hard time you are going through change that."** [A dispositive statement that shows that in Gallagher's arcane mind a heterosexual male must enjoy sexual assaults from a woman].

9

57. In addition to her biased comments, Gallagher did not accurately or factually portray Plaintiff's comments that it was actually Jane who had assaulted him. Instead Gallagher, for potentially sexist or racist reasons, refused to document this in her report altogether.

58. Gallagher also did not accurately portray third party comments regarding Plaintiff:

  a.  Gallagher suppressed all evidence of an independent psychological expert report by Allan Tepper, J.D. Psy.D., which Swarthmore commissioned, and which determined that Plaintiff was not a "threat" to himself or to others.

  b.  Gallagher  suppressed oral statements that Student No. 10 stated to Gallagher and others that she would have provided had Gallagher given her an opportunity to do so:"I was never given the opportunity to state my knowledge into the investigative record nor was I ever able to see this record to correct it." (**Exhibit K**)

59. Gallagher also inadequately investigated the event by:

  a.  Failing to document the fact that Plaintiff told her that Jane, on September 10, 2011, got drunk of her own volition and then assaulted Plaintiff.

  b.  Failing to investigate and incorporate into the report the questions of Jane's character and reputation for truthfulness which Plaintiff told her to include.

60. During her interviews with Plaintiff Gallagher specifically instructed Plaintiff to not seek the advice of a lawyer and that he could not receive psychological, legal, and academic support throughout the investigation because he was not **"the victim"** and such supports **"were reserved only for the victim." (Exhibit B).**

61. The Swarthmore administration was indifferent to Gallagher's biases towards Plaintiff.

62. In response to Plaintiff's complaint that Jane was retaliating against him by disclosing to the student body her claim of sexual assault, Gallagher told Plaintiff that retaliation could only be experienced by Jane, and that **"there are worse consequences** [for Plaintiff]" if Plaintiff disclosed to anyone his complaint of sexual assault against Jane. (**Exhibit B**).

63. Gallagher's final report showed a clear favoritism, seemingly based upon sex and motivated by race, for Jane, while showing a clear disregard for Plaintiff, as she mis-reported several facts that Plaintiff attempted to correct to no avail.

64. Further violating the 2013 Handbook, consistent with her gender based treatment of Plaintiff, Gallagher failed to inform Plaintiff of what Gallagher knew, including that:

    a. Because Plaintiff had stated that Jane had sexually assaulted him on September 10, 2011, if Plaintiff wanted to, he could and should complain against Jane including going to the police.

    b. Because Plaintiff and Jane were drunk at the Disorientation party on September 10, 2011 as well as at the amphitheater later that day, but neither of them was incapacitated, it was discriminatory to charge only Plaintiff.

65. Gallagher's biased and non-factual handingly of the report, investigation and treatment of the Plaintiff breached the promises Swarthmore had made to Plaintiff in the 2013 handbook in terms of its investigation's factual handling.

66. Had Gallagher unbiasedly handled that process the administration would have realized that there were no grounds for Jane's complaint and it would have been dismissed. In addition, Plaintiff's complaint against Jane would have been investigated.

67. Gallagher's conduct prevented Plaintiff from his right to have a "report...**factual in nature** and...**[a report that does] not make a finding** as to the student's guilt or innocence, **which is reserved exclusively for a Dean's Adjudication or the College Judiciary Committee Panel hearing the case",** both under the 2013's policy's Associate Dean (**Exhibit B**), or the New Policy's Title IX Coordinator (**Exhibit C**) provisions.

68. This violation of Plaintiff's rights triggered a disciplinary adjudication against Plaintiff.

69. The reviewing dean would rely on Gallagher's report, as would the adjudicator. Both had the ability to grant or deny Jane's charge. Both relied on Gallagher's biased report to grant it. Neither conducted an independent investigation.

70. As a result both the reviewing dean and the adjudicator found Plaintiff guilty.

71. In addition, Plaintiff avers that Gallagher's patterns of decision making as one of the managers of Swarthmore's sexual assault system exhibited her reverse discrimination towards males like Plaintiff, her racism towards men of color like Plaintiff, and her deliberate indifference towards the Title IX rights of respondents like Plaintiff.

72. Jane herself has admitted to Swarthmore's blatant disregard for Swarthmore's policy, including the protection of the complainant's anonymity, in her behavior:

> "At the beginning of her investigation, after intense conversations about confidentiality with several administrators, she said she was approached and questioned by her investigator in front of McCabe [Library] for everyone to see and hear." (**Exhibit G**).

73. During the investigative phase of this complaint, Swarthmore not only placed the presumption of guilt on Plaintiff as respondent of a sexual assault complaint, but also then prevented his ability to prove his innocence by biasing the report against Plaintiff.

74. Nathan Miller ("Miller"), a white male, then handled the rest of this matter.

75. Miller threatened and pressured Plaintiff and those who supported him to be silent, selectively and biasedly enforcing the confidentiality policy against Plaintiff.

76. He threatened Plaintiff to not speak, or ask for help, or seek information for his defense, or risk expulsion. This further biased the procedures only against Plaintiff who could not prove his innocence.

77. As a result of Miller's biased enforcement of the confidentiality rules, Plaintiff could not go to his friends to ask them to testify on his behalf.  This also prevented Plaintiff from seeking help from Swarthmore's faculty or from legal counsel, in direct violation of the promises made in Chopp's letter of July 18, 2013. (**Exhibit H**)

78. Miller, however, did not enforce confidentiality rules on Jane.

79. As a result, Jane, through Student No. 22, impermissibly published to Plaintiff's fraternity, DU, the historically black fraternity at Swarthmore College, that he had been accused of sexual assault and that he should be expelled from the fraternity.

80. In addition, Miller, like Gallagher did not give Plaintiff opportunities to review and to correct the investigative file and he ignored Plaintiff's claim that Jane assaulted him.

81. Miller handled the process with clear sex-based and race-motivated bias against Plaintiff:

    a.   Miller threatened Plaintiff with worse outcomes for his CJC and with additional disciplinary action if Plaintiff upset Jane in anw way including during cross.

13

    b.  Miller threatened Student No. 10 with severe action if she broke the gag order

        Miller had imposed only on Plaintiff and his supporters. (**Exhibit I**).

    c.  Miller prevented Plaintiff from testifying about the suppressed Tepper report.

    d.  Miller ignored Plaintiff's pleas that he was having negative ideations.

82. These acts echo the style that Miller has apparently used in previous Title IX proceedings

    at his previous job with Dartmouth. (**Exhibit J**).

83. Miller convened four disciplinary hearings for sexual assault matters between September,

    2013 through June, 2014.  Three of those students were held responsible.  Of those three,

    two are  men of color--Plaintiff and Student No. 13 who was expelled for "grinding".

84. Miller's alleged biases led or were a motivating factor for the erroneous outcome,

    selective enforcement, and arcane assumptions that violated Plaintiff's Title IX rights.

85. Specifically, Plaintiff told Miller "**you are not making the corrections because you**

    **don't care about me!**" Miller's response was an entirely inappropriate laughter episode

    that culminated with Miller loudly stating to Plaintiff "**ohohohohoh I'm very familiar**

    **with this case now**" a statement that Plaintiff took as a threat.

**F.**    **The Disciplinary Adjudication of September 27, 2013.**

86. Swarthmore's new Interim Sexual Assault Policy, "New Policy" applied during the

    hearing and required Plaintiff, as a respondent of a sexual assault claim, to act as a

    reasonable sober person would have in that situation to obtain consent. (**Exhibit C**).

87. Yet any definition of "consent" should have been dispositive: The facts on September 10,

    2011,  as far as Plaintiff could reasonably evaluate them, show that Jane consented to all

    the times Plaintiff touched her and that Plaintiff did not consent to Jane's last sexual act.

14

88. But Miller obfuscated the consent definition and tainted the adjudication, turning the adjudicator into a cat's paw influenced by Miller's sex-based and race-motivated bias.

89. Miller violated the New Policy's definition of Miller's limited role when respondents appear in front of external adjudicators as Plaintiff did on September 27. (**Exhibit C**).

90. Miller is not an attorney, yet he counseled Plaintiff on what federal and Pennsylvania law meant; advising Plaintiff: **"a trial is about finding the truth, not about arguing"**.

91. Plaintiff does not recall signing or otherwise authorizing JAMS as adjudicator.

92. Miller had an affirmative duty to help Plaintiff understand the file, correct it, include exonerating evidence in it, and to provide him with an advisor to help Plaintiff do so and for the hearing. Plaintiff specifically asked Miller for an advisor. Miller refused this.

93. Miller discriminated against Plaintiff and denied him the benefit of his bargain with Swarthmore during the hearing exhibiting sex-based and race-motivated patterns of decision making that significantly affected the outcome of the hearing, causing it to be erroneous, including cutting off and choosing to terminate the testimony of exonerating witnesses, choosing to not call witnesses who were waiting all day to be called and would have been important elements of Plaintiff's defense, and choosing to call Student No. 11 (one of Plaintiff's former male roommates) to the hearing to introduce the only hearsay allegations about Plaintiff's sexual history which painted him as a sexual predator because of his racial background.

94. Had Miller respected the new policy and not taken control of the hearing, and particularly had he not manipulated, precluded and interrupted the respondent's and his witnesses'

testimony, Plaintiff would have been able to show, through his testimony, and that of his witnesses that he is innocent and that Jane assaulted him.

95. Plaintiff does not have a history of sexual assault allegations.

96. All accusations against Plaintiff are facially absurd. As Student No. 10, Plaintiff's girlfriend at the time, states clearly in a declaration fully in support of this litigation:

> "15. … I was also blindsided by her accusations because Plaintiff Doe had good relationships with the women he had hooked up with and all the women in Swarthmore in general. **Plaintiff Doe was a very well liked member of the community until Jane Doe ruined his life. No one had ever accused him of sexually assaulting them simply because there is no reason to do so. To this day, no one else has come forward against Plaintiff Doe, even after the trial.**" (**Exhibit I**) [emphasis added].

97. Sadly, the uninformed JAMS adjudicator, retired judge Jane Greenspan, without the benefit of learning of Dr. Tepper's report, of the fact that Plaintiff obtained consent, and ignorant of all of the other suppressed, exonerating evidence clearly showing that Plaintiff is simply not a "threat," or a "predator," and is in fact a victim of Jane's sexual assault, could not and did not properly find in her final adjudication what the actual preponderance of the evidence shows: that Jane's allegations are facially absurd.

98. In that context, a cat's pawed Judge Greenspan found Plaintiff guilty of sexual assault.

**G.** **Swarthmore Discriminates Against Plaintiff's Appeal of Miller's Sex-based and Race-motivated Disciplinary Sanction.**

16

99. Following Judge Greenspan's finding Miller suspended Plaintiff for two years—or the length of time Jane would remain on campus so she would be shielded from Plaintiff.

100.   Jane was displeased; the sanction did not assuage her frustration against Swarthmore:

"**I am absolutely furious and truly cannot understand how the sanction is appropriate for the findings**."  (**Exhibit G**) [emphasis added].

101.   Jane and Plaintiff appealed the case to Liz Braun ("Braun"), the dean of Swarthmore.

102.   Jane demanded the complete and final expulsion of Plaintiff from Swarthmore.

103.   Plaintiff asked to be forgiven for something he had not done, and to be allowed to rejoin his life and his friends.

104.   Braun informed Plaintiff in front of Miller that she was denying both appeals.  As Plaintiff states, Braun said "**this is all standard; there is nothing to appeal**." Thus, Plaintiff avers that Braun's denial of his appeal violated the New Policy, contract law, Title VI, Title IX, and due process that guaranteed to Plaintiff an effective appeal for:

   a.   Braun knew or should have known of the suppressed evidence at the investigative and adjudicative stages of this process. Plaintiff told her this as part of his appeal.

   b.   Braun knew that Plaintiff had no record or pattern of sexual assault.

   c.   Braun, as Miller's and Gallagher's ultimate supervisor, knew or should have known that they manipulated the hearing and fatally biased it against Plaintiff.

105.   Braun's denial of the appeal left Plaintiff with an unfinished semester of work, suspended from school, evicted from his home, and penniless.  He was also emotionally destroyed and dangerously depressed; he told this to Miller and others at Swarthmore.

**H. Swarthmore Discriminates Against Plaintiff in the Disciplinary Action after the Appeal**

106. Disregarding the fact that Plaintiff was a tenant of Swarthmore College, Miller had the College's security evict Plaintiff and escort him off the premises.

107. Thus, Miller, deliberately aware of Plaintiff's depression and financial need, left Plaintiff standing with his belongings in the public sidewalk of Swarthmore Borough.

108. Because Plaintiff's peers at Swarthmore knew, and still believe, that Jane had perpetrated a crime against Plaintiff, and because they saw the unfairness of the adversity that had overwhelmed Plaintiff, they provided him with food, shelter, and love during those dark days in defiance of Miller's suspension and ban.

109. On November 2, 2013, Students No. 10 and 24, Swarthmore tenants, invited a small gathering of friends, including Plaintiff (who was No. 24's former roommate and is still his best friend) over to their private rooms in a dormitory of Swarthmore.

110. Plaintiff was on campus then having sought medical help from the health center.

111. Alcohol, including a "flaming drink" were consumed at the gathering.

112. Student No. 25, a white-presenting female, complained that Plaintiff's presence in this hall placed her at risk of being sexually assaulted by Plaintiff.

113. On that complaint, Miller then proceeded to permanently expel Plaintiff.

114. Miller once again violated Plaintiff's rights under the applicable policies:

    a. Miller charged Plaintiff in a disproportionate manner with failure to comply with his campus-suspension and ban, with violating the school's alcohol policy, and treating the open flame drink event as a "major offense" even though Plaintiff was not trespassing as he was a guest at two tenants' homes.

b. Consistent with Miller's pattern of selective enforcement of rules against Plaintiff, Miller only charged Plaintiff out of the many violating students. (**Exhibit I**).

c. Miller gave Plaintiff legal advice including that he could forego the adjudicative hearing reserved for "major offenses" and confess, misleading him by stating that he would receive lower punishment as a result. Plaintiff relied on this advice.

d. Miller held a hearing where he found Plaintiff guilty of violating the requirement that he provide notice to the College when visiting, which did not include visiting tenants at their invitation, the requirement that students not serve alcohol, and the requirement that students not have open flames. As a result Miller selectively punished Plaintiff permanently expelling him from Swarthmore College.

115.   In addition to Plaintiff's, Miller prosecuted 35 other violations of Swarthmore's alcohol policy between September 2013 and June 2014.

116.   Of those 36 total infractions of Swarthmore's alcohol policy, Miller treated only Plaintiff's violation as "Major" misconduct. The 35 others were treated as what they are: minor violations. (**Exhibit K** is Swarthmore's Student Conduct Report for 2013-2014 as mandated under the Clery Act showing this data).

117.   Under Miller's conduct of the discipline in Swarthmore, only Plaintiff, a man of color, was prosecuted and convicted using the severest guidelines, those for sexual assault, applied here for the most minor violation like serving alcohol while being a guest of Swarthmore tenants while the other guests, doing the same acts, were not punished.

**I.**   **Defendant's Actions Severely Damage Plaintiff Doe's Entire Future.**

118.    As a result of defendant's actions, Plaintiff's academic career is ruined and without a
        Swarthmore degree his education and his earnings capacity are forever diminished.

119.    Currently, Plaintiff's education is substantially depreciated because of the expulsion.

120.    Plaintiff suffered and continues to suffer the most intense and profound forms of
        emotional distress as a result of the discrimination described in this complaint.

121.    Currently, Plaintiff's transferability to a comparable school has substantially ended.

122.    Plaintiff will forever have to explain why his record shows he did not graduate from
        Swarthmore College which will negatively impact his lifetime earnings.

123.    Plaintiff had received irreplaceable, 100% financial assistance to attend Swarthmore.

124.    As any person who has experienced this discriminatory trauma would, Plaintiff needs
        and will require therapy and other health care for the rest of his life.

125.    Today, in this courthouse, Plaintiff complains against Miller, Gallagher, Braun and
        seeks to hold their employer, defendant Swarthmore College, liable for these catastrophic
        injuries and asks for a jury verdict to revindicate his life.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Violation of Title IX

126.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

127.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1981, et seq. ("Title
        IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of
        sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance."

128.   Swarthmore receives extensive federal funding.

129.   Title IX is enforceable through an implied private right of action affording an individual discriminated against due to his gender damages and equitable relief.

130.   Courts recognize violations on reverse Title IX claims under several theories including erroneous outcome, selective enforcement, arcane assumptions and deliberate indifference. Plaintiff makes a claim of discrimination under each of those theories.

131.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student...complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 CFR Sec. 106.8(b) (Dep't of Ed); 28 CFR Sec. 54.135(b) (DOJ). These actions include any form of sexual touching.  See generally, U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties--Title IX (2001) at 19-20, 21 & nn. 98-101.  (Guidance)

132.   The procedures adopted by Title IX covered school, as Chopp's letter of July 18, 2013 states (**Exhibit C**), must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved."  (Guidance, id at 22).

133.   These procedures that in the view of the Guidance accord due process when well instituted and aptly followed, must include, at a minimum: "**Adequate, reliable and**

**impartial investigation of complaints, including the opportunity to present witnesses and other evidence"**. (Guidance, id at 20). [emphasis added].

134.    A school also has a Title XI mandated obligation to make sure that all persons handling these procedures "have adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults'". (Guidance, id at 21).

135.    Based on the foregoing averments of fact, defendant Swarthmore has deprived Plaintiff on the basis of his sex of his Title IX rights, of his statutory due process rights, and to equal protection through the improper, malicious, sex-based application of its policies for handling sexual assault which led to the erroneous outcome in this matter.

136.    Swarthmore initiated and conducted the investigation and subsequent hearing of Jane's complaint in a manner that was biased against Plaintiff due to his sex.

137.    Plaintiff, first to appear before the College's new judicial system in the aftermath of its New Policy, was found to have committed an offense by an uninformed third party who became a cat's paw, relied on a flawed file, absent any credible evidence of wrongdoing, through a hearing that suppressed evidence, including Plaintiff's own complaint against Jane of sexual assault.

138.    The independent adjudicator never heard "all the evidence" thus she could not rule on a "preponderance of the evidence."

139.    The very clear fact that Plaintiff complained that Jane had assaulted him on September 10, 2011 was simply ignored, suppressed, and precluded from the record.

140.   On information and belief, a female student at Swarthmore has never been

disciplined, much less expelled, for alleged sexual misconduct and now Plaintiff asks that

Jane be disciplined for sexually assaulting him on the night of September 10, 2011.

141.   Swarthmore's policies and procedures have deprived Plaintiff, on the basis of his sex,

of the right to confront and/or cross-examine his accuser.

142.   Due to Plaintiff's gender, Swarthmore imposed sanctions on Plaintiff that were

excessively severe and to the benefit of Jane because of her sex in violation of Title IX.

143.   As a direct and proximate consequence of Swarthmore's Title IX violations, Plaintiff

has sustained significant damages including expulsion from Swarthmore.

144.   Plaintiff has also suffered monetary damages, profound emotional distress, loss of

educational opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment in his

favor against Swarthmore and provide the following relief:

(a)   Mandate that Swarthmore correct Plaintiff's academic and/or disciplinary record

to remove any findings issued by the College with respect to all the charges levied

against him by Swarthmore and/or Jane which led to his suspension and to his expulsion;

(b)   Mandate that Swarthmore verify this correction by providing Plaintiff with a

notarized letter confirming that any findings with respect to these charges have been

expunged from Plaintiff's academic and/or disciplinary record;

(c)   Mandate that Swarthmore immediately allow Plaintiff to re-enroll in the College

to complete his education with his original financial aid package and with credit for the

few courses Plaintiff has taken to date;

(d)     Process Jane under the New Policy for her assault of Plaintiff on September 10,

2011 and for presenting a false claim on it 607 days later;

(e)     Award Plaintiff compensatory damages in excess of Seventy-Five Thousand

Dollars ($75,000.00), in addition to attorneys' fees, expenses and costs; and

(f)     Award Plaintiff any other and further relief that the Court deems just and proper.

## SECOND CAUSE OF ACTION

### Violation of Title VI

145.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

146.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq et seq. ("Title VI"),

provides in relevant part that "[n]o person in the United States shall, on the ground of

race, color, or national origin, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance."

147.    Based on the foregoing averments of fact, defendant Swarthmore has deprived

Plaintiff on the basis of his race and national origin of his rights to due process and to

equal protection through the improper, malicious, racist and deliberately indifferent

application of its policies for handling complaints of sexual assault against and by him.

148.    Swarthmore has discriminated against Plaintiff, on the basis of his race and national

origin, through discriminatory, race-based implementation of Swarthmore's policies and

procedures that comparators, white males also accused of assault, did not experience.

24

149.    Swarthmore has violated Plaintiff's rights to be free from race based discrimination
        under Title VI of the Civil Rights Act of 1964 including, as provided under 20 CFR Sec.
        42.101 et seq., at 42.104.(b):

        (i) Denying Plaintiff services and access to financial aid given to other students.

        (ii) Giving Plaintiff different services than those given to the other students.

        (iii) Segregating and treating Plaintiff separately from the other students.

        (iv) Treating Plaintiff differently from other students, including those white males
        facing allegations of sexual assault, in terms of his enrollment.

        (v) Denying Plaintiff's ability to participate in Swarthmore programs including
        ancillary academic activities like the sports facilities and social spaces.

150.    Swarthmore initiated and conducted the investigation and subsequent hearing of
        Jane's complaint in a manner that was biased against Plaintiff due to his race and national
        origin and which is in shocking difference from the investigation and treatment by
        Swarthmore of white male sexual assault respondents and white male employees accused
        of verbal assault of female students.

151.    All of these race motivated actions violate the Student Handbook policies and
        procedures, the New Policy, and demonstrate defendant's race-motivated discriminatory
        bias against Plaintiff, in violation of Title VI.

152.    Defendant's selective enforcement of the Swarthmore alcohol policy treated Plaintiff
        differently and detrimentally from white students who were drinking flaming alcoholic
        drinks along with Plaintiff. Swarthmore's own statistics show that Plaintiff was the only

student out of a year long and statistically significant cohort of 35 cases of alcohol policy violations in 2013-2014 who was prosecuted for it as a "major offense."

153.   The racial and national discrimination which Plaintiff seeks to redress constituted exclusion from participation in federally funded matters; practices which are made unlawful by Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d.

154.   As a direct and proximate result of Defendant Swarthmore's unlawful exclusionary practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has been deprived of economic and noneconomic benefits including, but not limited to inability to study and to finish his studies, wage loss, failure to grow academically and professionally, pain and suffering, mental anguish, humiliation, loss of fringe benefits, painful embarrassment among his friends and peers, disruption of his personal life and loss of enjoyment of life.

155.   The above-mentioned acts were willful, wanton, malicious and oppressive and done with reckless disregard for Plaintiff's federally protected rights, therefore justifying the imposition of punitive damages.

**WHEREFORE,** As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements. Plaintiff respectfully requests that this Honorable Court enter judgment in his favor against Swarthmore and provide the relief requested in the first cause of action as well as to enter any equitable relief that this court may deem proper.

## THIRD CAUSE OF ACTION

### Violation of Section 1981 of the Civil Rights Act

156.   Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

157.    Plaintiff is a male of color and a US Citizen of Bengali national origin who had a
        contract with Swarthmore College to obtain education, to be protected from sexual
        harassment both as complainant and respondent, and to receive housing.

158.    42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of
        contracts. It prohibits racial discrimination against whites as well as nonwhites. See
        McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 295 (1976) (Section 1981 was
        intended to "proscribe discrimination in the making or enforcement of contracts against,
        or in favor of, any race"). In Runyon v. McCrary, 427 U.S. 160 (1976), the Supreme
        Court held that Section 1981 regulated private conduct as well as governmental action.

159.    In violation of its own contract, as stated in the 2013 and in the New  Policy,
        Swarthmore investigated, evaluated and suspended Plaintiff based on an inherently false
        complaint from Jane, herself a white complainant, while completely ignoring Plaintiff's
        complaint of the same act against Jane.  In that process Swarthmore suppressed evidence
        and applied different standards for Plaintiff and to Jane because of his race.

160.    Swarthmore also evicted Plaintiff once and segregated him from the educational
        environment, something not done to white respondents of sexual assault claims.

161.    In all these investigations and determinations Swarthmore treated Plaintiff in a
        discriminatory manner that violated their contract under a racial motivation.

162.    Plaintiff's race and national origin were motivating factors in Swarthmore's handling
        of the sexual assault complaint from a white female, which led to Plaintiff's suspension,
        and in Swarthmore's handling of the violation of the alcohol policy complaint, which led
        to Plaintiff's expulsion.

27

163. In addition Plaintiff re-alleges and incorporates by reference all the race and national origin based averments in his second cause of action as if stated here at length.

164. Swarthmore's own numbers show how it breached its contract with Plaintiff because of his race: 50% of the cases of sexual misconduct Miller handled during his first year of employment at Swarthmore resulted in the conviction of a respondent who is a man of color. Out of 36 cases of alcohol violations that Miller handled in that same period only Plaintiff's was treated as a "major violation."

**WHEREFORE,** As a result of the foregoing, Plaintiff Plaintiff Doe is entitled to damages in an amount to be determined at trial, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements as well as to punitive damages. Plaintiff respectfully requests that this Honorable Court enter judgment in his favor against Swarthmore and provide the relief requested in the first cause of action and requests any other equitable relief that this court may deem proper to ensure that Plaintiff is not discriminated against on the basis of his race and or their national origin

## **FOURTH CAUSE OF ACTION**

### **Breach of Contract**

165. Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

166. At all times relevant hereto, a contractual relationship existed between Swarthmore and Plaintiff through, inter alia, Swarthmore's Student Handbook, the College Bulletin, Rebecca Chopp's letter to the community of July 18, 2013 and the New Policy.

167. Swarthmore was required to act in accordance with that contract.

168. For all the reasons set forth above, Swarthmore has materially breached its contracts with Plaintiff by failing to comply with policies and procedures governing sexual

28

misconduct and alcohol policy proceedings set forth in the Student Handbook, the New Policy and the Chopp letter of July 18, 2013.

169. As a direct, proximate and foreseeable consequence of Swarthmore's numerous material breaches, Plaintiff has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) indicating that he was found to have committed sexual misconduct, and a "major offense" of serving alcohol.

170. Plaintiff was also suspended and then expelled from Swarthmore as a consequence of these breaches with a resulting loss of lifetime earnings, loss of education opportunities, pain and suffering, and other direct and consequential damages.

171. Plaintiff is entitled to recover damages for Swarthmore's breach of its contractual obligations and duties including specific performance of the contract.

**WHEREFORE,** Plaintiff requests that this Honorable Court enter judgment in his favor against Swarthmore and provide the relief requested in the first cause of action and any further relief this court may deem just and proper including specific performance and any other equitable relief.

## FIFTH CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing

172. Plaintiff Doe incorporates each of the paragraphs above as if fully set forth herein.

173. Swarthmore breached and violated the covenants of good faith and fair dealing implied in its agreements with Plaintiff by mishandling the investigative, evaluative and adjudicative part of the sexual assault complaint, by ignoring Plaintiff's complaint of assault against Jane, by failing to provide Plaintiff with the assistance he requested, by suppressing evidence and threatening him during the adjudication, by meting out a

disproportionate sanction of suspension, and by ignoring the many reasons why Plaintiff's appeal should have been granted as averred in this complaint.

174. Swarthmore then breached and violated the covenants of good faith and fair dealing implied in its agreements with Plaintiff by charging him with a major violation and expelling him for it when the facts merely included Plaintiff's visit to the campus health center to get a sudafed and then his interaction at the invitation of a Swarthmore student resident with others; all of whom were drinking and none of whom were charged.

175. The fact that Miller made this the only "major violation" of Swarthmore's drug and alcohol policy during the September 2013 - June 2014 year (**Exhibit N**) is evidence of breach of this covenant because it is not good faith or fair dealing to only punish Plaintiff.

176. As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including without limitation emotional and economic distress.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in his favor against Swarthmore and provide the relief requested in the first cause of action and any further relief this court may deem just and proper including a finding of Swarthmore's breach of its covenants of good faith and fair dealing as well as specific performance and any other equitable relief.

### SIXTH CAUSE OF ACTION

#### Estoppel and Reliance

177. Plaintiff Doe incorporates each of the above paragraphs as if fully set forth herein.

178. In the event the Court were to find that no contracts exist between Plaintiff and Defendant, Swarthmore, through but not limited to its regulations, standards, procedures and policies, made representations to Plaintiff, independent of any express contractual

promises, that Swarthmore expected or should have expected would induce Plaintiff to apply to and continue to enroll at the College.

179. Similarly, Plaintiff gave up competing offers from prestigious schools because he believed on and acted based on the belief he obtained from Swarthmore's representations.

180. Plaintiff relied on Swarthmore's expressed and implied promises that he would not be discriminated against based on his sex or his race by the College and enrolled in it.

181. Plaintiff justifiably relied on Swarthmore's express and implied promises to his detriment, as Swarthmore failed to adhere to them.

182. As a direct, proximate and foreseeable consequence of Swarthmore's conduct, Plaintiff sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct.

183. Plaintiff has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor against Swarthmore and provide the relief requested in the first cause of action and any further relief this court may deem just and proper including a finding that Swarthmore induced Plaintiff to rely on its promises to achieve his enrollment and any other equitable relief.

### SEVENTH CAUSE OF ACTION

### Unfair and Deceptive Trade Practices

184. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

31

185.   The Pennsylvania Uniform Trade Practices and Consumer Protection Law, 73 P.S.

§201-1 et seq, creates a private right of action for consumers of Pennsylvania-based

services, such as Plaintiff's consumption of Swarthmore's educational and housing

services, whose characteristics have been misrepresented, including "any other fraudulent

or deceptive conduct which creates a likelihood of confusion or misunderstanding."

186.   Defendant Swarthmore has engaged in acts and practices that are deceptive or

misleading in a material way, or committed deceptive acts or practices, which were

aimed at the consumer public at large, that were a representation or omission likely to

mislead a reasonable consumer acting reasonably under the circumstances because they

create the likelihood of confusion and misunderstanding:

a.      by causing Plaintiff to believe that Swarthmore would follow its policies both as

they were provided to Plaintiff and as they were stated in the Student Handbooks.

b.      by causing Plaintiff to believe that if he accepted Swarthmore's offer of

enrollment and paid the related tuition and housing fees, Swarthmore would uphold its

obligations, covenants and warranties to Plaintiff as described in its policies.

187.   Defendant had no intention of following and in fact did not follow its own policies

and procedures nor did it uphold its obligations for Plaintiff's disciplinary actions.

188.   It is particularly deceptive, as a practice, for Defendant to prosecute the accusation

against Plaintiff while having been deliberately indifferent to Plaintiff's symmetrical

accusation against Jane which should have been equally investigated but was not.

189.   Based on the foregoing defendant Swarthmore engaged in deceptive or unfair trade

practices in violation of the UTPCPL, 73 P.S. §201-1 et seq.

190. As a direct, proximate and readily foreseeable consequence of Swarthmore's aforementioned conduct in violation of the UTPCPL, Plaintiff has sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation of sexual misconduct.

191. Plaintiff has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment in his favor against Swarthmore and provide the relief requested in the first cause of action, treble damages as allowed under the UTPCPL, attorney's fees as allowed under the UTPCPL and any further relief this court may deem just and proper including a finding that Swarthmore induced Plaintiff to rely on its promises to achieve his enrollment and any other equitable relief.

**EIGHTH CAUSE OF ACTION**

**Negligence**

192. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

193. In the event the Court were to find that no contracts exist between Plaintiff and Defendant, Swarthmore owed duties of care to Plaintiff independent of any contractual duties including, but not limited to an academic environment free of sexual hostility where sexual misconduct policies and procedures are fair and reasonable; including providing him with support through trained and non-biased administrators.

194. Based on the aforementioned facts and circumstances, Swarthmore has breached its duties of care owed to Plaintiff.

195.    As a direct, proximate and readily foreseeable consequence of Swarthmore's aforementioned conduct, Plaintiff has sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct, harassment and/or other related offense and a "major violation" of the alcohol policy.

196.    Plaintiff has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgment in his favor against Swarthmore and provide the relief requested in the first cause of action and any further relief this court may deem just and proper including a finding that Swarthmore induced Plaintiff to rely on its promises to achieve his enrollment and any other equitable relief.

## NINTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

197.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

198.    Defendant Swarthmore owed duties of care to Plaintiff as averred in the eighth cause of action

199.    Defendant Swarthmore breached its duties owed to Plaintiff.

200.    As a direct and proximate result of this this breach and of all the conduct alleged throughout this complaint, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of reputation, loss of educational opportunities, economic injuries and other direct and consequential damages.

**WHEREFORE**, as a result of the foregoing, Plaintiff is entitled to Damages in an amount to be determined at trial, plus pre-judgment interest, attorneys fees, expenses, costs and disbursements.

### TENTH CAUSE OF ACTION

#### Violation of the Pennsylvania Landlord-Tenant Act.

201. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

202. At the end of May, 2013, Swarthmore unilaterally removed Plaintiff from his room and segregated him from his peers. Next semester, upon Braun's denial of Plaintiff's appeal, Swarthmore again unilaterally evicted Plaintiff from his room.

203. Plaintiff had an executed, paid for and written housing agreement with Swarthmore.

204. The tenant (any tenant, all tenants in Pennsylvania including Plaintiff) gets notice and the eviction is processed through the local magistrate. See Landlord Tenant Act of 1951, 68 P.S. Sec. 250.101-601 at 501 (b) and (e).

205. Here Swarthmore violated the law in evicting Plaintiff from his home, twice, without notice or any process, simply because it thinks Plaintiff has no rights as a tenant.

**WHEREFORE**, Plaintiff asks for a finding of law and of fact that Swarthmore College violated his rights under the Landlord Tenant Act of 1951.

### ELEVENTH CAUSE OF ACTION

#### Equitable Relief in the Form of a Declaratory Judgment

206. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

207. Defendant has violated its contract with Plaintiff, federal, and state law.

208. Due to these violations Plaintiff's education, career and life have been damaged.

209.    Without appropriate redress, the discrimination Plaintiff endured which is described

throughout this complaint will continue to cause irreversible damages to Plaintiff's

reputation, emotions, sense of worth, academic, and professional development forever.

210.    As a result of the foregoing there exists a justiciable controversy between the parties

with respect to the outcome, permanency, and future handling of Plaintiff's formal

academic and disciplinary student record at Swarthmore and his alumn status.

**WHEREFORE**, pursuant to this Court's creation of remedy powers under 28 U.S.C. §2201,

Plaintiff requests a declaration that:

a.    The outcome and findings Swarthmore made of Jane's complaint of sexual assault

against Plaintiff, both at the investigative, the adjudicative and appellate stages, be

vacated, reversed and expunged from all records.

b.    Miller's finding that Plaintiff violated the alcohol policy be vacated and reversed.

c.    Miller's expulsion of Plaintiff from Swarthmore College be vacated and reversed.

d.    The entire Board of Managers of Swarthmore College apologize in person.

e.    The Board of Managers of Swarthmore College publish their apology in the top of

the Swarthmore College web page for at least two calendar years, and once in the

Chronicle of Higher education and in two national circulation newspapers.

f.    Swarthmore correct Plaintiff''s academic and/or disciplinary record;

g.    Plaintiff be awarded damages in an amount to be determined at trial, including,

but not limited to economic damages, damages to physical well-being, emotional

damages, damages to reputation, loss of career prospects as well as prejudgment interest,

attorneys' fees, expenses, and costs; and

h.      Plaintiff be awarded any other relief that the Court deems just and proper.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgment in his

favor against Swarthmore in compensation in an amount in excess of $75,000.00 in addition to

pre-judgment interest, attorneys' fees, expenses, costs, disbursements, and any other further

relief the Court deems just and proper including equitable relief.

Respectfully submitted,

Dated:  September 30, 2015

Raul Jauregui, Esq.
Law Offices
105 Rutgers Avenue
PO Box 121
Swarthmore, PA 19081
(215) 559-9285
(610) 543-1501 fax
Raul.Jauregui@gmail.com

## PROOF OF SERVICE

**Plaintiff Doe v. Swarthmore**

**Civil No. 2:15-cv-01355**

**Third Amended Complaint with Exhibits A - K**

I certify that I am over 18 years of age and that in accordance with agreement between counsel, today I served on behalf of the plaintiff via email to the legal representative address, a true and correct copy of the above referenced documents addressed to:

Michael Baughman, Esq.
Hedya Aryani, Esq.
Pepper Hamilton Attorneys for Swarthmore College

3000 Two Logan Square

Eighteenth and Arch Streets

Philadelphia,  Pennsylvania
19103-2799

Dated: September 30, 2015                      Raul Jauregui, Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNYSYLVANIA

| | | |
|---|---|---|
| **Maroof Haque** | : | |
| | : | |
| Plaintiff | : | |
| | : | **Civil Action** |
| VS. | : | |
| | : | **NO. 2:15-cv-01355** |
| **Swarthmore College** | : | |
| | : | Jury Trial Demanded |
| | : | |
| Defendant | : | The Hon. J. Curtis Joyner |
| | : | |
| | : | **Filed Under Seal** |
| | : | |

# Third Amended Complaint

# Exhibit A

# SWARTHMORE COLLEGE
# OFFICIAL STUDENT HANDBOOK
# 2011-2012

The Swarthmore College Student Handbook is produced by the Office of the Dean and is a compilation of official policies and services of the College. Students are responsible for familiarizing themselves with the information and for abiding by the rules and regulations described. Please do not hesitate to contact any member of the Deans' staff if you need advice or interpretation of College policies. Rules and policies may be changed during the school year without notice.

## TABLE OF CONTENTS

### Academic Policies and Regulations

**Academic Regulations**
**Committee on Academic Requirements**
  Warnings
  Probation
  Required to Withdraw
**Leave of Absence**
  Withdrawal & Readmission
  Short Term Absences
  Required Evaluations
    Mental Health
    Physical Health
**Privacy of Information**
  Buckley Amendment (Family Educational Rights & Privacy Act of 1974)
    Review Your Records
    Grades
    Disclosure to College Officials
    Disciplinary Records
  Public Information
    Directory Information
  Parental Notification Policies
    Change in Status
    Transport to Hospital in Critical Situations
    Arrest
    Unexplained Absence from Campus

### Academic Support and Regulations

**Academic Advisors**
  Changing Advisors
**Academic Supports**
**Student Disability Services**

### College Services: Policies and Regulations

**Dining Services**
  Open Hours
  ID Cards
  Guests
  Menus

educational goals of the College.
   Both students and faculty will be regularly informed about
the college's academic misconduct policy in a variety of
ways such as the following: by their instructors or
advisors, by the Deans' Office, and by means of statements
in such places as the College catalogue, faculty and student
handbooks, the College web site, departmental or divisional
handouts, etc. Discussion of the policy may also be part of
such sessions as orientation for first-year students in the
Fall, orientation for new faculty, and in Writing Associates
(WA) and Student Academic Mentor (SAM) training. Students
must finally take the responsibility for understanding the
rules with respect to proper citation of sources and the
College's academic misconduct policy.

## SEXUAL MISCONDUCT

   Sexual misconduct represents a continuum of behaviors ranging
from physical sexual assault and abuse to sexual harassment and
intimidation. Both women and men can be subject to and can be
capable of sexual misconduct. It can occur between two people,
whether or not they are in a relationship, in which one has power
over the other, or are of different sexes. The College is
committed to a learning and living environment that is free of
sexual misconduct, discrimination, and harassment of any kind.
All forms of sexual misconduct are prohibited and are serious
violations of the College's code of conduct. Whenever the College
learns of allegations of sexual misconduct, it will take
appropriate action to investigate the allegations and take prompt
remedial action.
   The College has a number of programs and organizations that
address issues of sexual misconduct. The RAs, Sexual Misconduct
Advisors & Resource Team (SMART) members, and Sexual Health
Counselors are trained how to respond to sexual misconduct and
provide education to the campus about how to avoid difficulties.
Workshops for the new students during orientation explain and
explore policies and cultural norms about sexual matters. The
Clothesline Project, Take Back the Night, and other events
highlight community concerns about sexual assault and its
consequences.
   Students who are the victim of sexual misconduct are
encouraged to report the incident immediately. There are also a
number of services available at the College to support survivors
of sexual misconduct.
   A. **Definitions of Sexual Assault, Consent, Sexual Harassment,
   and Indecent Exposure**
      1. Definition of Sexual Assault
      Sexual assault is defined as any sexual contact that
occurs without the consent of the other person.
Specifically, it is intentional physical contact with an
intimate part of the body or with clothes covering intimate
body parts without the consent of the person touched. Sexual
assault includes but is not limited to sexual penetration of

2

an unwilling person's genital, anal, or oral openings;
touching an unwilling person's intimate parts such as
genitalia, groin, breasts, lips, buttocks, or the clothes
covering them; or forcing an unwilling person to touch
another person's intimate parts or clothes covering them.
When sexual assault occurs repeatedly between individuals,
it is referred to as sexual abuse.

2. Definition of Consent

   Consent is an understandable exchange of affirmative words
or actions that indicate a willingness to participate in
mutually agreed upon sexually explicit touching or sexual
penetration. Consent must be informed, and freely and
actively given. Consent is active not passive and consent is
possible only when there is equal power.

   It is incumbent upon each individual involved in the
activity to either obtain or give consent prior to any
sexual activity, and again, prior to sexual penetration. If
at any time during the sexual interaction any confusion or
ambiguity should arise on the issue of consent, it is
incumbent upon each individual involved in the activity to
stop and clarify, verbally, the other's willingness to
continue.

- A verbal "no," even if it may sound indecisive or
  insincere, constitutes lack of consent.
- When consent is requested verbally, absence of any
  explicit verbal response constitutes lack of consent.
- It is expected that, after consent has been established,
  a person who changes his/her mind during the sexual
  activity will communicate through words or actions,
  his/her decision to no longer proceed.
- Past consent to sexual activity does not imply future
  ongoing consent, and the fact that two persons are in an
  on-going relationship shall not preclude the possibility
  that sexual misconduct or sexual assault might occur
  within that relationship.
- A person who is asleep or mentally or physically
  incapacitated, either through the effect of drugs or
  alcohol, or for any other reason, is not capable of
  giving valid consent and consent is not valid if a
  reasonable person would understand that such a person is
  incapable of giving valid consent.
- A student's use of alcohol and/or other drugs shall not
  diminish a student's responsibility to obtain informed
  and freely given consent.

3. Definition of Sexual Harassment

   The following definition is based in part on those
formulated by the Federal Equal Opportunity Commission and
The Office for Civil Rights of the U.S. Department of
Education. Sexual Harassment, a form of discrimination based
on sex or gender clearly endangers the environment of mutual
respect and is prohibited. Swarthmore College also finds
that harassment based on sexual orientation, gender
identity, or gender expression is a form of sexual
harassment for purposes of the College's policies. Some

3

alerted to the presence of danger without identifying the victim. This will be done to help prevent further incidents on campus. Public Safety may also notify the Swarthmore Borough Police, providing a description of the suspect. If the Borough Police are notified, and a suspect is caught, the case may be handed to a local prosecutor for a potential trial. Public Safety will also notify Sharmaine LaMar, Director of Equal Opportunity/Title IX Coordinator.

<u>Call Swarthmore Borough Police (911)</u>

The police will interview the survivor and gather evidence. They may contact a counselor from WAR (Women Against Rape). If the survivor has been assaulted by someone s/he does not know, they will attempt to apprehend the suspect. Swarthmore Borough Police generally escort the survivor directly to the emergency room. Public Safety will have access to any call made to Swarthmore Borough Police. The College will assist a student in notifying law enforcement authorities if the student requests the assistance of these personnel.

**D. Reporting & Investigation**

Regardless of whether a victim of sexual misconduct initiates formal proceedings, where the College has reason to know about possible sexual violence or harassment, it has an independent obligation to promptly investigate the matter and then take appropriate steps to resolve the situation. Therefore, where a victim shares information about sexual misconduct with any college employee (excluding the confidential providers in the Health Center, Psychological Services, or Religious Advisors) the employee will refer the matter to the Director of Equal Opportunity/Title IX Coordinator, Sharmaine LaMar, for investigation. The College will consult with the complainant and seek their consent before beginning an investigation. If the complainant requests confidentiality or asks that the complaint not be pursued, the school will take all reasonable steps to investigate and respond to the incident consistent with the request for confidentiality or request that the matter not be investigated. In considering a request for confidentiality or a request that the investigation not be pursued, the College will consider, among other things, the seriousness of the alleged harassment, the complainant's age, and whether there have been other harassment complaints about the same individuals. Because of the College's independent obligation to ensure an educational environment free from harassment, it cannot guarantee confidentiality under all circumstances when it is requested.

**E. Filing a Complaint Involving Sexual Misconduct**

Charges of sexual misconduct may be handled according to either informal (see Conflict Resolution) or formal procedures (see Judicial Procedures). A victim of sexual misconduct is never required to engage in informal procedures, and informal procedures are never appropriate where sexual assault is involved. Regardless of whether or not options for resolution

are pursued within the College system, it is important to note that discussing concerns with or seeking clarification or support from Beth Kotarski, Director of Health Services, Sharmaine LaMar, Director of the Equal Opportunity Office/Title IX Coordinator, one of the deans, or others does not obligate a person to file a formal complaint initiating judicial procedures.

When a formal complaint is filed against a student of the College, the complaint should be filed in accordance with the Judicial Procedures outlined in another section of the Student Handbook. Complaints involving allegations of sexual misconduct will first be referred to the Director of the Equal Opportunity Office/Title IX Coordinator.

**Investigation:** The Director of EO/Title IX Coordinator, Sharmaine LaMar, will then oversee an investigation of the complaint which will be conducted either by herself or by an investigator with appropriate training in responding to allegations of sexual misconduct. The Title IX coordinator may also refer investigations to Public Safety in appropriate circumstances. The investigator will conduct the investigation in the manner appropriate in light of the circumstances of the case, which may include interviews with the complainant and the accused. Within ten business days of receiving the complaint, the investigator will issue a report setting forth the factual findings of the investigation. The report will be forwarded to the Deans' Office and included in the evidence for any judiciary action. The accused will have the opportunity to file a written response to the investigator's report, which will also be included in the evidence. The report will be factual in nature and will not make a finding as to the student's guilt or innocence, which is reserved exclusively for a Dean's Adjudication or the College Judiciary Committee Panel hearing the case.

Where the Title IX coordinator learns of allegations of sexual harassment or sexual misconduct, by or involving a student, through means other than a formal complaint, the Title IX coordinator will oversee an investigation of the allegations in the same manner described above. Where the allegations involve a student, the report of the investigation will be forwarded to the Deans' Office, which will have the discretion to institute formal proceedings against the student with the investigator's report serving as the complaint. If the allegations do not concern a student, the Title IX coordinator will nonetheless fully investigate the allegations and take whatever remedial action is appropriate, including invoking the procedures described in either the Faculty and Instructional Staff Handbook or the Staff Handbook, as appropriate, when the conduct involves a College faculty or staff member.

The Title IX coordinator will register each request for assistance in resolving a case involving charges of sexual misconduct, whether formal or informal, and will review and retain copies of all reports generated as a result of investigations. These records will be kept confidential to the

extent permitted by law.

Please review the procedures outlined in the Judicial Procedures and Conflict Resolution sections of the handbook for more detailed information about both the formal and informal processes available within the College. Complainants always have the option of filing charges in civil or criminal court or with the Office of Civil Rights.

F. **Retaliation:** Any student who files a complaint, or participates in a resolution process as a witness, has the right to freedom from intimidation and retaliation. Retaliation includes threats, intimidation, or reprisals. The College strictly prohibits retaliation by any student against a person who makes a report of sexual harassment or sexual misconduct, assists someone with a report, or participates in any aspect of the investigation or resolution of a report. Any violation of this non-retaliation policy will face serious judicial consequences.

## ALCOHOL, DRUGS, AND PARTY POLICIES

**Philosophy**

The overarching priority of the College with respect to drugs and alcohol is to help ensure the safety and well-being of Swarthmore students. The College is committed to providing guidance so that students can learn to develop a responsible approach to social challenges, including whether to use alcohol, how to do so in moderation, and how to comply with local, state, and federal laws governing alcohol consumption.

Swarthmore students are considered adults, with the adult privileges of privacy and autonomy, as well as the responsibility for their own decisions and actions. In addition, the College also believes that everyone has the right to work and study in an environment free from the effects of substance abuse and that those individuals who abuse alcohol and other drugs are a danger to themselves and others.

**Objectives**

The objectives of these policies reflect the College's desire to create an intentional community based on principles of respect for oneself and others.

The alcohol policy has several objectives:

- to promote the safety and well-being of the Swarthmore community;
- to maintain a safe campus, where students can enjoy their social lives amid a comfortable and coercion-free atmosphere;
- to provide information about alcohol so that students make responsible, healthy choices;
- to provide confidential support for community members seeking treatment for alcohol-related problems;
- to be in compliance with federal statutes, Pennsylvania laws, and Borough ordinances that regulate the consumption of alcohol.

6

semester proceeding the semester in which you would like to exchange.

**Break and Summer Housing**

**Dorm Closings:** There will be gaps in housing coverage at the end of each semester and the end of the summer housing term. The College will not allow students to stay in the residence halls during these gaps, nor store their belongings in dorm rooms. During these periods, the Facilities and Environmental Services staffs are busy making repairs, preparing the buildings for commencement, alumni weekend, summer programs, and returning students. THERE IS NO HOUSING AVAILABLE FROM THE COLLEGE between the closing of dorms in December and early January, and the end of the Spring term and the opening of summer housing, or the closing of summer housing and the opening of dorms in the Fall. Students must make arrangements for off-campus living during these periods if they must work for their employers.

**Summer Housing:** The College, as a service for faculty and their student researchers, provides limited summer housing. First priority goes to students conducting research with faculty members. Second priority goes to students working in College offices and international students not returning home during the summer. Details, availability, cost, application, etc., are publicized after spring break by the Director of Summer Programs, Patricia Maloney (610-328-8355). This housing is offered and managed by Facilities and Services Summer Programs, and not by the Deans' Office.

Students in this summer housing are not supervised by the regular College offices. There is a limited meal plan available. No access to the College's health and psychological services is available over the summer. There is only limited access to the library, information technology services, and athletic facilities.

**Winter Break Housing:** One residence hall opens soon after the New Year for some international students and athletes when students stay in other students' rooms. One week before classes, students with permission (usually externs, athletes, students working with a professor) may return to their rooms. Meals are not provided, nor are the usual health and counseling services. There is limited access to other offices/facilities and the environmental staff is working on projects and not able to help individuals.

---

## CONFLICT RESOLUTION AND JUDICIAL PROCEDURES

### Conflict Resolution

In an academic, residential community, great value is placed on the free exchange of ideas both inside and outside of the classroom. Swarthmore is a diverse community with the students coming from a variety of backgrounds and cultures. While this diversity enriches one's education by bringing together people with differing ideas and views, it is not unusual in such a community for students to find themselves in disagreement or conflict with others. Generally, clear communication, civil

discourse, and reasoned argument between the students prevail to resolve these conflicts.

However, students may at times find themselves in conflicts with others that they cannot resolve alone. The Statement of Student Rights, Responsibilities, and Code of Conduct explains student behavior which is subject to formal adjudication through the formal judicial system. However, many conflicts between individuals can be resolved informally, often by enlisting the help of an impartial third party. It is important for students to understand that help is available if they are having difficulty with another student or if they feel they have been wronged by another student, staff, or faculty member. Student complaints or concerns should be directed to the responsible office according to the identity of the alleged offender: Deans' Office for students; Provost for faculty; and Human Resources for staff. Students should not hesitate to discuss the problem with a dean, an RA, the Gender Education Advisor, the Equal Opportunity Officer, or others who are trained and knowledgeable about conflict resolution options at Swarthmore. Discussing the problem with one or more of these individuals in no way commits a student to any particular course of action. There are many creative, informal methods of conflict resolution which may appeal to the student for resolving the problem. Mediation or discussion with deans can be good tools for conflict resolution. In certain situations the best approach may be to have a dean discuss the conflict with the parties involved. Often in these cases the students agree to a particular course of action other than initiating formal judicial procedures to resolve the conflict. This course of action can take a number of forms.

## Equal Opportunity

**Sharmaine Bradham LaMar**, Equal Opportunity Officer/Title IX Coordinator, x5675

Swarthmore College's commitment to equal opportunity for all members of the community is expressed in the corporate statement adopted by the Board of Managers:

> *Swarthmore College is committed to the principle of equal opportunity for all qualified persons without discrimination against any person by reason of sex, race, color, age, religion, national origin, sexual orientation, gender identity or expression, disability, or any other legally protected status. In keeping with the long-standing traditions of the College and the spirit and letter of the federal and state equal opportunity laws, we affirm the standing policy of the College to realize equality of opportunity in education and employment; to guard against discrimination contrary to that aim; and to correct discriminatory behavior if found to exist within the College community. Consistent with maintaining an educational program of the highest quality, our standing policy includes affirmative efforts to achieve the above goals in employment and education. The above policy has been and shall be further implemented by the President and members of the faculty*

8

*and administration designated by the president for that purpose.*

The spirit of this declaration envisions a community in which diversity is not only tolerated but welcomed and viewed as a positive opportunity for learning and growth. In such a community, coercion and harassment are not tolerated, whether against the differences protected in the formal statement or against any difference of interests or life style where individual rights should be preserved.

Concerns about equal opportunity issues may be expressed in several ways. Informal consultations with the deans, the equal opportunity officer, or a College counselor may either lead to a resolution of issues in educational or student life areas, or suggest further steps to be followed. Specific complaints of harassment, intimidation, or other violations, whether verbal or physical, will be treated as serious matters. A fully developed grievance procedure for student equal opportunity concerns is also available for use when attempts at less formal resolution have not been successful. See the Equal Opportunity Grievance website at www.swarthmore.edu/eoo.xml.

All members of the Swarthmore College community are responsible for ensuring that the work and academic environment is free from discriminatory practices, including sexual and other discriminatory harassment. Living harmoniously in a residential college of Swarthmore's size, intensity, and diversity requires that each of us maintain the highest standards of respect for the individuality of all members of the community.

**Judicial System**

The formal judicial system at Swarthmore College has two main components: 1) adjudication by individual deans of minor infractions of College regulations; and 2) adjudication by the College Judiciary Committee of major infractions of College regulations. These formal procedures apply to adjudicating any violations of the Student Code of Conduct, or any rules, regulations or procedures of the College, by any current student of Swarthmore College. They are separate from the various informal methods of conflict resolution available such as facilitated discussion by a dean or other trained facilitators. It is important to remember that all possible avenues of conflict resolution be considered thoroughly when deciding upon a course of action.

The Associate Dean of Student Life supervises the judiciary system. Consultation with this dean or any other dean in no way obligates a student to file a formal complaint. Mediation or any other informal method of resolution is not a required step before proceeding with formal adjudication.

**Safety of Campus:** If either the President or the Dean decides at any point that the well-being of a student or of the College is at stake, an immediate active avoidance order, non-notational suspension, or campus expulsion may be imposed against a student who is suspected of violating the Student Code of Conduct, any rules, regulations, or procedures of the College, or otherwise poses a risk of safety to the campus, until the time a hearing is

*q*

warnings and findings of not guilty are not reported.

F. **Compliance:** Failure to abide by the decision of a dean or of the appeals committee is considered a serious offense and may result in further adjudication.

## II. Major Infractions: The College Judiciary Committee

A. **Scope:** The Dean or Associate Dean for Student Life shall determine whether a complaint represents a major infraction that should be heard by the College Judiciary Committee. They may consult a panel of three College Judiciary Committee members if there is a question about whether there are grounds for bringing a case forward. All formal charges of academic misconduct, assault, harassment, sexual misconduct, major damage, or interference with other students' educational programs are usually heard by the College Judiciary Committee. If the Associate Dean, in consultation with the Dean, determines that the events described in the complaint do not represent a serious violation of the Code of Conduct, the formal complaint shall be dismissed and other options for resolution will be discussed with the complainant.

B. **Filing a Complaint**

1. To initiate the judicial process, a written complaint must be completed by the complaining individual(s) and filed with the Associate Dean of Student Life. The complaint shall be a chronology stating as accurately as possible the date, time, and location of all events relevant to the charge(s). At the discretion of the deans, when appropriate, a written incident report from the Department of Public Safety may substitute for a written complaint. At the discretion of the deans, when appropriate, a written report from the Title IX coordinator involving allegations of sexual misconduct may substitute for a written complaint by a complainant. In the case of alleged academic dishonesty, the work in question, annotated by the complainant, shall serve as the complaint.

2. The accused student(s) shall be presented with the written complaint statement, and in turn may complete a similar statement **responding to the charges** and providing their chronology of the relevant events. This may also take the form of a conversation with a dean. From these statements, the Associate Dean shall **define the relevant charges.**

3. Complainants shall have the right to **withdraw complaints** at any time. In exceptional circumstances, based on the evidence available, the Dean may choose to continue judicial proceedings even if a complaint has been withdrawn or is absent.

4. Charges of sexual misconduct are first investigated by the Director of the Equal Opportunity Office/Title IX Coordinator, Sharmaine LaMar. The reported results of the investigation, and any response by the accused or complainant, are part of the evidence to be used at the CJC hearing.

C. **College Judiciary Committee Pre-Hearing Procedures**
The judicial procedures of Swarthmore College are administrative ones, and neither the College Judiciary Committee, the President, nor the Dean is bound to observe procedural or evidential rules required in a formal court of law. Hearings shall be based on the published rules at the time of the infraction.

1. **Confidentiality:** All persons involved in a College Judiciary Committee hearing shall have the responsibility of preserving confidentiality before, during, and after the hearing. Any breach of confidentiality by a hearing participant, including the complainant or accused, shall constitute a violation of College policy and is an adjudicable offense. The complainant and accused may disclose information in order to: 1) consult with and/or obtain advice from her/his supporter; family or guardian; physician, therapist, or counselor; or 2) prepare her/his claim(s) and/or defense(s) for presentation to the Committee. A violation of the confidentiality provision by any person shall be deemed a waiver of any right to confidentiality to which the violator would otherwise have been entitled under this section.

2. The **complainant(s) and the accused shall have the following rights** in addition to any rights listed elsewhere in the description of student judicial procedures:
   - to have all incident reports, medical records, and testimony kept confidential to the extent that there is no interference with the normal procedures of the College;
   - to receive private and confidential treatment and be examined for personal injuries, sexually-transmissible diseases, and pregnancy, when appropriate;
   - to be made aware of the options available;
   - to have access to emotional and psychological support and advocacy;
   - to initiate legal proceedings outside the College;
   - to decide of which services to take advantage;
   - to answer only those questions relevant to the event in question;
   - the freedom from harassment, intimidation, and retaliation;
   - to have past sexual history excluded from the hearing process.

3. **Timing of the Hearing:** The hearing shall be held as expeditiously as possible while providing sufficient time for both sides to prepare for the hearing. An effort is made to schedule the hearing when the accused and complainant can reasonably attend. Supporter and witness schedules are considered, but their unavailability will not be the sole factor in selecting

the timing of the hearing. Hearings are scheduled when classes are in session and not during college breaks. In the event that a complaint is filed during a break period or within the final week prior to a break, the Associate Dean in consultation with the Dean, will determine whether the hearing will be scheduled when classes resume or if the complaint should be referred to a dean or other appropriate office for more immediate adjudication.

Whenever possible, hearings will be scheduled so that five designated Committee members may be present. If at any time a hearing must be held but fewer than five current Committee members are available to participate, former members of the Committee shall be asked by the Observer to participate. If there are still fewer than five members, deans will be asked to participate to reach a quorum of five panel members.

In the case of a lengthy hearing, the Convener may take the option of breaking the hearing as needed and then reconvening it as soon as it is practical for all involved. Normally, a hearing session shall not exceed five hours. The accused and the complainant are not to interact while the hearing is recessed.

4. **Hearing Materials:** Both the accused and the complainant(s) shall be shown a copy of the materials that will be present in the hearing in sufficient time before the hearing (normally 48 hours in advance) to prepare their cases. Copies of these materials will be at the hearing for use during the hearing. Afterwards, they will be kept for 30 days in the case that there is an appeal and then these materials will be shredded. Each complainant and accused shall also be informed that any written statement submitted by him or her may be disclosed in advance of the hearing to the other party.

5. **The Charge Letter:** The Associate Dean or designee shall define the relevant charge(s). The charges are based on the published regulations in effect at the time of the infraction. The student charged shall be informed of the charge(s) in writing in advance of the hearing and given a copy of the student judicial system procedures, generally three days in advance. Additional information shall be presented in writing or orally including the names of the appointed panel, the time, date, and location of the hearing typically 24 hours in advance of the hearing.

6. **The Observer** will meet separately with both the complainant(s) and the accused to explain procedures and give all a chance to ask questions about the judicial process.

7. **Witnesses:** Prior to the hearing, both the accused student and the complainant must submit to the Observer a list of witnesses they plan to call at the hearing along with a brief statement describing to what aspects of the incident(s) in question each witness will be

12

testifying. Written statements by the witnesses should be presented to the Observer 48 hours before the hearing. The Convener of the Panel, in consultation with the Observer, may decline to hear any and/or all witnesses if the testimony will be duplicative, irrelevant, prejudicial, or involves issues that would interfere with the fair adjudication of the hearing.

If a witness cannot or does not wish to attend the hearing, her/his signed statements may be included in the hearing materials and may be considered by the hearing Panel at the discretion of the Convener. The Committee will give greater weight to testimony given in person by a witness who can be questioned at the hearing.

Witnesses will be called individually to join the meeting as needed, but will not remain longer than their testimony and their fielding of questions. The Convener will determine the order of the witnesses.

8. **Evidence:** A file containing relevant evidence for the case will be available in the Deans' Office for review by the parties (accused, complainant, Convener, Observer, panel members) involved, but it cannot be removed or photocopied. Copies of the file will be made available to the named parties at the hearing.

The hearing panel relies on written complaints, public safety and police reports, reports from the Title IX coordinator, written witness reports, individual statements, phone and computer records, video cameras, and ID card usage. Students may be queried by deans or public safety officers as part of the evidence gathering. Cooperation and honesty are expected, even if students are admitting guilt. These conversations are used in creating a charge. Statements made during the investigation by the accused generally are not shared at the hearing unless made public by the accused.

D. **Attendance**

To preserve privacy as much as possible, attendance at the hearings will be limited to the members of the Judiciary Committee, the Convener, the Observer, the complainant(s), the accused, one supporter each for both the accused and the accuser, if requested, and the witnesses as they are called. If the student charged with the offense refuses to appear at the judicial hearing, the Dean of Students may assess a penalty on the student for not appearing and the judicial hearing may proceed as scheduled without the student present.

E. The **College Judiciary Committee** (CJC) consists of 5 or more faculty members (selected by the Committee on Faculty Procedures), 3 senior administrators (selected by the President), and 5 or more students (selected by the Student Council appointment's process). These committee members will receive appropriate training for their responsibilities, including training about College policies, judicial procedures, and precedents. Committee

members who are no longer on the Committee, but have been trained, may be called to service if current members cannot attend a particular hearing.

The **Hearing Panel** consists of a Convener, two faculty members, one staff member, two students, and the Observer. Panels are selected based on schedule availability from the Committee.

Up to 24 hours before the hearing, the complainant and/or the accused student may challenge the participation of any member of the College Judiciary Committee on the grounds of prejudice or bias. Challenges must be submitted in writing or in person to the Observer of the Committee, who shall rule on these challenges. It is expected that any member of the College Judiciary Committee who feels himself or herself to be biased will withdraw from the proceedings. If a panel member fails to attend the hearing, the complainant and accused may give permission to move forward.

The Dean of Students will serve as **Convener** unless unable to do so due to bias, previous direct involvement in the case under consideration, or schedule conflicts. If the Dean is unable to serve as Convener, she will appoint another dean from her staff to convene the hearing. If a dean is unable to convene the Hearing Panel for a given case, a faculty member on the College Judiciary Committee shall be appointed by the Dean to convene the hearing. The Convener of the Hearing Panel shall be present and participate in all hearings. During deliberations the Convener shall participate as needed, but shall not be part of the consensus or vote determining guilt or innocence except in the event of a tie vote, in which case the Convener will break the tie.

The **Observer** is the person responsible for seeing that the procedures are followed and that there is impartiality in the proceedings. The Observer does not speak at the hearing except concerning procedure and does not vote. Generally, this role is held by the Associate Dean for Student Life. If the Associate Dean is unable to serve as Observer, the Dean shall appoint another dean or CJC member to serve in this capacity.

**Accuser and accused are present:** Normally, all evidence presented at a hearing by either party shall be introduced in the presence of the other party.

If **more than one person** is accused, the Convener will generally hold separate hearings, but she retains the discretion to hold a joint hearing if the circumstances warrant and the participants consent.

If a student accused of misconduct **withdraws from the College** before a case is heard and the College therefore cannot go forward with the hearing, the student must go through the re-entry process coordinated by the Deans' Office and, except where the Dean in her sole discretion finds exceptional circumstances, the case must be heard prior to the student's readmission to the College.

14

A **supporter** must be a member of the Swarthmore College community, (a current student, faculty, or staff member). The supporter may be consulted by the student, but may not address the Committee. If the supporter is also a witness, she or he must submit written testimony to the Committee prior to the hearing.

F. **College Judiciary Committee Hearing Procedures**

In order to expedite a hearing, the Convener of the Committee, in consultation with Committee members, may take notice of **basic undisputed facts** without requiring testimony and may also limit the length of the statement and interrogation of all parties involved.

**Opening & Closing Statements:** Both the complainant and the accused shall have the right to make opening and closing statements with the complainant speaking first. These statements must be concise and the Convener may interrupt if they become repetitive.

**Questions:** Next both parties are questioned by the Panel. The Convener and the Observer shall also attempt to ensure that all questions are relevant to the specific case before the Committee and are asked in as fair and neutral a manner as possible. The complainant and the accused are not allowed to question each other during the hearing.

**Witnesses** are then called, one by one, and either party involved shall have the opportunity to question any witnesses after the Panel members have asked their questions of the witnesses.

**Impact Statement:** The complainant and the accused shall have the right to include an impact statement as part of the closing remarks. The accused may respond to the complainant's impact statement.

**Exclusion of Evidence:** The Convener has the discretion to exclude any questions, evidence, or witness, or any other material that are irrelevant, highly prejudicial, cumulative, privileged, or confidential, or otherwise would interfere with the fair adjudication of the hearing.

**Decisions** of the College Judiciary Committee will be made by consensus. In particularly difficult cases, or when it is impossible to reach a consensus, a vote may be taken to determine whether a student is guilty or not guilty. In the event of a tie vote, the Convener of the Committee will vote to break the tie.

The judicial body's determinations shall be made on the basis of <u>whether it is more likely than not</u> the accused student has violated the Student Conduct Code or any rules, regulations, or policies of the College

The issue of guilt or innocence shall be determined first. If there is a determination of guilt, the Panel will determine appropriate sanctions.

**Previous Records:** Records of previous adjudications of the accused student at the College are made available to the Hearing Panel only in the cases when a guilty verdict is achieved and shall be taken into consideration when the

Hearing Panel determines appropriate sanctions. When considering sanctions, it is appropriate to consider precedents from earlier relevant cases decided by the Committee, using confidential records provided by the Deans' Office. Repercussions for violating the terms of the sanction may also be noted in the sanction.

**Sanctions:** The College Judiciary Committee has the authority to require compensation for damages and to impose whatever sanctions it deems appropriate, including but not limited to, warnings, reprimands including fines and/or community service, restrictions, active avoidance provisions, probation, suspension, and immediate and permanent expulsion from the College.

If **active avoidance** provisions are part of the sanctions, the deans shall meet with all parties to design strict procedures that will minimize the chances for interactions among the students involved, with special attention to the needs and rights of the student whose claims were supported by the decision of the College Judiciary Committee.

**Grades** are determined by the faculty member, although the Committee may make a recommendation based on the factors of the case and precedence.

**Findings:** When possible, the confidential findings of the Committee are communicated to the accused, alone and in person, immediately after the deliberations. If the case is one where the complainant is a student, she/he may also be told the outcome, alone and in person. Other types of complainants may be called or emailed with the results.

G. **College Judiciary Committee Post-Hearing Procedures**

  1. **Written decisions:** the Convener writes and distributes the decision summaries soon after the hearing.

    a. The accused receives a confidential **findings letter** noting the accusation(s), findings, and sanctions, including relevant details of the panel's reasoning, concerning their decisions. This letter is copied to the President and, in cases of sexual misconduct, to the Title IX coordinator.

    Note: College policy dictates that parents of a student are notified when the student's status with the College is changed. The parents will receive the findings letter if the disciplinary sanction results in such a change (i.e. probation, suspension, or expulsion).

    b. Upon written request, the Convener will disclose to the alleged victim (or if deceased, to the next of kin) the results of any disciplinary hearing conducted by the College against the student who is the alleged perpetrator of a crime of violence or a non-forcible sex offense.

    c. A **public summary** of the case, excluding names and other specific references that would allow readers to identify who was involved, is sent to the complainant,

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNYSYLVANIA

| | | |
|---|---|---|
| **Maroof Haque** | : | |
| Plaintiff | : | **Civil Action** |
| VS. | : | **NO.  2:15-cv-01355** |
| **Swarthmore College** | : | Jury Trial Demanded |
| Defendant | : | The Hon. J. Curtis Joyner |
| | : | **Filed Under Seal** |

# Third Amended Complaint

# Exhibit B

SWARTHMORE COLLEGE
OFFICIAL STUDENT HANDBOOK
2012-2013

## ACADEMIC POLICIES AND REGULATIONS

### Academic Regulations

The academic information of the College can be found in a variety of published resources. The *Swarthmore College Bulletin* ("the red book") is the authoritative source for academic information, course descriptions, degree requirements, admissions procedures, and guidelines for the College community. Courses actively available each semester are listed on the Schedule of Courses and Seminars, found in the Registrar's Office. For more information see the Registrar in Parrish E124 or see the College website at www.swarthmore.edu/Admin/registrar. Individual departments have websites with course listings and department regulations.

### Committee on Academic Requirements

The Committee on Academic Requirements (CAR) is the standing committee of the faculty charged with regular review of students' academic programs and the administration of faculty regulations concerning academic standards and requirements. The committee is also empowered to recommend to the faculty waivers of certain requirements (i.e. the "20 course rule," the senior year residency requirement, etc.). Requests for waivers are carefully evaluated by the Committee and forwarded to the faculty only when a general educational advantage is perceived.

With the Dean of Students as chair, the Committee regularly meets at the end of each semester to review records of students who are not making satisfactory progress or who are under advisement from previous CAR mandates. Student records may be reviewed at other times should information arise about academic difficulties that were not available at the time of the regular committee meetings.

The committee may take one of several actions including, but not limited to:

1) Warnings: Students meet with deans' staff member as needed

2) Probation: Students may be placed on probation, continued on probation, or removed from probation. The student's parents are informed and the student meets regularly with a Dean's staff member.

3) Required to Withdraw: The student must stay away for a semester or longer and engage in meaningful activity: classes; work; volunteer activities. In order to return, the student must write a detailed letter to the Dean of Students requesting permission to return, explaining what happened, what was done while the student was away, and a plan for how the student will address these issues upon return. In some cases, the student will be required to bring back credits, pre-approved by departments, to catch up with the student's class standing. Appeals may be made to the Dean at the time of notification of the change of status. Students will return on probation and the student's parents are notified.

### Leaves from the College

**Leaves of Absence:** Student leaves of absence are freely permitted. Some fines may occur if a late notice is given. A student planning a leave of absence should consult with a dean and complete the necessary form prior to the deadline published each semester (usually December 1 and April 1). The form asks the student to specify the date of expected return; the student need only notify the Dean of his/her return if the return date changes from that originally indicated on the completed form. Please note that some leaves may affect the student's re-payment of loans.

**Withdrawal:** Withdrawal from the College may occur for academic, disciplinary, health, personal, or financial reasons, and may be voluntary or required by the College. Students withdrawing from the College before the end of the semester normally receive the grade notation "W" (withdrawal) on their permanent record for all in-progress courses.

Health-related withdrawal

In no case will a student's mental or physical condition itself be a basis for a required

withdrawal. However, the student may be required by the College to withdraw when health problems of a physical or psychological nature result in behavior that substantially interferes with a student's academic performance or the educational endeavors of other students, or poses a significant threat to the student's safety or safety of others. The decision to require withdrawal for health-related reasons is made by the Evaluation Committee, chaired by the Associate Dean for Academic Affairs and comprised of another dean, usually the Class Dean. The Evaluation Committee will review the problematic behavior and may consult with the Director of Worth Health Center, the Director of Counseling and Psychological Services, or any other appropriate College official when making its decision. Decisions of the Evaluation Committee may be appealed to the Dean of Students.

Readmission Following Withdrawal

A student who has withdrawn from the College for any reason, voluntarily or involuntarily, may apply for readmission by writing to the Dean of Students. Normally the College will not accept applications for readmission until a full semester, in addition to the semester in which the student has withdrawn, has passed. For a complete description of the readmission process, please refer to the *Swarthmore College Bulletin*.

**Short-term Health-related Absences:** Students who are hospitalized for a period during the semester are subject to the readmission procedures before they may return to campus to resume their studies. In these situations, the Evaluation Committee may also counsel and advise a student about options for how best to approach the remaining academic work in the semester. In all cases, a student returning to campus from the hospital must report to the Worth Health Center and get clearance from the appropriate healthcare professional before returning to the dormitory to ensure the student's readiness to resume college life and so that follow-up care can be discussed.

**Required Evaluations:**

**Mental Health:** If a student is exhibiting behaviors that may pose a direct threat to student safety, the Dean may request a mental health evaluation to determine whether the student can safely remain on campus. The evaluation will be conducted by the Director of Counseling and Psychological Services, or someone designated by the Director who possesses competent medical expertise. The evaluation will involve an individualized assessment, based on current medical knowledge or the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices or procedures or the provision of auxiliary aids or services will mitigate the risk. A report of this evaluation is made to the Dean of Students who will determine, based on all the evidence, if it is safe for the student to be on campus. The student will also be permitted to review the evaluation and to provide permission for the Swarthmore evaluator(s) to be in communication with an outside practitioner to get a history and more complete picture of the student's treatment and mental state, and to provide any additional information the student deems pertinent. Decisions to remove students from campus will be based on a student's observed conduct, actions, and statement and not based merely on knowledge or believe that the student suffers from a mental health impairment.

After a student has been unable to complete a semester due to mental health issues, the student must go through the same mental health evaluation process as part of the re-entry process.

**Physical Health:** similar evaluations may be required on the basis of a student's physical health, conducted through the Health Center by the director or the director's designee.

**Rights to Privacy of Information under FERPA (Administered by the Registrar's Office)**

The Buckley Amendment, or the Family Educational Rights and Privacy Act of 1974 (FERPA), as amended, and related federal regulations, establish guidelines protecting the privacy of student records and give a college student the right (subject to certain exceptions) to review his/her "**educational records**," and, within 45 days of formally requesting to do so, to challenge and/or seek to amend the contents if s/he believes the records are inaccurate, misleading, or otherwise in violation of the student's privacy rights. FERPA also gives students the right to

consent to the disclosure of personally identifiable information contained in the student's education records, except to the extent that the law authorizes disclosure without consent. FERPA provides students the right to file a complaint with the Department of Education concerning alleged failures by the College to comply with the Act. Written complaints should be directed to the Family Policy Compliance Office, U.S. Department of Education, 600 Independence Avenue, S.W., Washington D.C., 20202-4605.

The procedure to inspect and review records, or to request amendment of education records is the same: students should write and sign a letter clearly stating their request and submit the letter to the Dean of Students.

**Grades** are available online to students through a password-protected website. They are not routinely sent to parents or guardians, except that parents or guardians of students are normally informed of grades in cases of important changes of status, such as probation and requirement to withdraw. However, grades may be released when students request it. Swarthmore has traditionally been very open with students relative to the content of their records, but has followed a conservative policy regarding disclosure of personally-identifiable information to outside persons or organizations.

Education records may be **disclosed to school officials** without prior written consent of the student. School officials include persons employed by the College in administrative, supervisory, academic, or research, or support staff positions; persons serving on College governing bodies; or persons employed by or under contract to the College to perform special tasks, such as attorneys and auditors. A school official is determined to have legitimate educational interest if the information requested is necessary to perform tasks appropriate to his or her position or contract agreement, perform tasks related to the student's education, perform tasks related to the discipline of a student, or provide a service such as health care, counseling, institutional research, job placement, or financial aid.

The College will release information in education records, including **disciplinary actions** or unsatisfactory academic progress records (generally probations, suspensions, or expulsions), to educational institutions to which the student seeks or intends to enroll or is already enrolled, for purposes related to the student's enrollment or transfer including medical and law schools.

Except as stated above, **personal information**, other than "directory information" or matters of public record, is not normally released to anyone outside the College without a student's prior consent unless otherwise permitted or required by law.

There are two categories of **directory information** at Swarthmore:

1. Published student "directories" include the following:
   - A directory for the College community of enrolled students listing home addresses;
   - The telephone directory, available as a download, contains a student's name, class year, campus address, and campus telephone extension. The names, addresses, phone numbers, and class years of off-campus students also appear in the telephone directory;
   - A list of all students participating in the housing lottery and is publicly posted;
   - Each Spring Semester, the year's expected degree candidates are posted on a list outside the Registrar's Office;
   - The commencement program listing the Bachelor of Arts candidates, the Bachelor of Science candidates, Honors by level, Phi Beta Kappa, Sigma Xi, Tau Beta Pi, fellowships and prizes, and Pennsylvania Teacher Certification.
2. Other "directory (public) information" includes the following: home address, email address, date and place of birth, photographs, major(s), minor(s), dates of enrollment at Swarthmore, date of graduation or anticipated graduation, degree and honors or awards received, and participation in extracurricular activities including sports, and other similar information. Weight and height of athletic teams are also considered matters of public record.

   According to the law and Swarthmore College policy, any item of directory information may be released at any time unless the student has filed a written request that specific directory information not be released, although normally most directory information is not released outside the College community without the student's request. Students have the right to request that directory information be withheld from

disclosure, except as otherwise provided by law. Students who wish to have certain directory items withheld from any release should file their request with the Registrar's Office, where questions concerning the College policy or this notice should also be directed. Students may file this request at any time and the Registrar's Office will work to place this restriction on the student's record within 2 weeks time.

**Parental Notification Policy**

It is the College's policy to treat the student as the person primarily privileged to authorize release of personal information. This policy reflects our philosophy that an important goal of undergraduate education is to continue the student's development as an autonomous adult. The College encourages students to share information with their parents or legal guardians, but ultimately the decision of what information to share rests with the student. Hence, the vast majority of communications are directed to the student rather than to the parents/guardians. For example, grades are sent only to the student unless the student gives written authorization to the Registrar to send grades to a parent or guardian.

We recognize, however, that this commitment to fostering the development of the student must be balanced with the parents' interest in the well-being and progress of their student in the College, and we recognize that there are times in which parental involvement can be in everyone's best interests. Thus, while the general policy is to be protective of the student's privacy, there are specific instances enumerated below in which a parent or legal guardian will be notified. In such instances, we believe it is appropriate for the student to inform his or her parent or guardian directly, so whenever possible we will allow time for students themselves to do so. However, in critical situations where prompt notification is prudent, a member of the Dean's staff will contact a parent or guardian as soon as possible.

1. Change of status imposed by the College

A change in the status of a student at the College may be imposed as a result of disciplinary action or unsatisfactory academic progress. If a student is placed on probation, suspended, or expelled, parents are notified. It should be noted that less severe instances of disciplinary or academic action may result in warnings to the student, of which parents are not formally notified.

2. Transport to a hospital in critical situations

Law prohibits health care professionals from disclosing medical information to the parent or guardian of a student without the student's explicit consent. However, when a student needs to be transported to the hospital in a critical situation, the parent or guardian of the student will be notified. Following the general policy, when the situation permits we will wait until the student herself or himself has the opportunity to notify the parent or guardian or until the student gives explicit consent for a third party to do so.

3. Arrest

The parent or guardian of the student will be notified if the student is placed under arrest while on College property and detained by law enforcement officials. Note that the College does not post bail for arrested students. If a student receives a citation for a summary offense for which they are not detained, e.g., underage drinking or disorderly conduct, the College generally will not notify the parent or guardian, but the police might choose to do so themselves. In addition, if a student is arrested away from the campus the College generally will not become involved and so will not inform the parent or guardian even if the incident comes to our attention.

4. Unexplained absence from campus

If it comes to the attention of College officials that a student is inexplicably absent from campus for a prolonged period, College officials may contact a parent or guardian in order to ascertain the whereabouts of the student. However, normally, College officials will first try to contact the student's confidential contact of record to locate the student. Students are responsible for identifying their confidential contact in their online student record. The College cannot be responsible for a student's failure to be in touch with their parents.

Note: The College reserves the right to notify a parent or guardian of a student for reasons other than those listed above, based on our judgment of what is in the best interests of the student and of the College. Individual deans may contact parents when

their student is failing to make satisfactory progress or when alcohol or other illegal substances are involved.

## ACADEMIC SUPPORT REGULATIONS

### Personal Academic Advisor (www.swarthmore.edu/academicadvising.xml)

Each new student is assigned to a faculty member, a member of the dean's staff, or other professional staff who acts as academic advisor until this responsibility falls to the chair of the student's major department at the end of the sophomore year. Initial assignments are made by the Associate Dean for Academic Affairs on the basis of major interests and abilities indicated by entering students. **Changes in advisors** will be freely granted (subject only to equity in number of advisees assigned to an individual faculty member) on application to the Associate Dean. Reassignments may also be made due to faculty leaves or shifts in duties.

The formal parameters of the relation between advisor and advisee include: 1) the advisor typically approves the courses for which the student registers; 2) the advisor must approve drops or adds to the course load; 3) the advisor will receive copies of all official correspondence concerning the student's academic standing in order to better advise the student on academic and personal decisions; 4) the advisor will guide the student in meeting academic requirements and choosing classes. When the advisor is not available, the student may contact the appropriate class dean or the chair of the major department.

### Academic Support (www.swarthmore.edu/academicadvising.xml)

Supports such as clinics, tutors, and Student Academic Mentors (SAMs) are provided free of charge, within the bounds of reasonable use and when a relevant resource exists. Deans, professors, and/or the Coordinator of Student Disability Services and Learning Resources can all help students access these resources.

### Student Disability Services (www.swarthmore.edu/x7687.xml)

Students with learning, medical, physical, or psychological disabilities may consult with Leslie Hempling, Coordinator of Student Disability Services and Learning Resources (located in Parrish Hall), 610-690-5014. She works with students so that they know what documentation is required for the disability and to help students access the agreed-upon, prescribed, reasonable accommodations. Students may read more detailed information on the website listed above and may also consult with the Equal Opportunity Officer, Sharmaine LaMar, if disputes arise from this process.

## COLLEGE SERVICES: POLICIES AND REGULATIONS

### Dining Services (www.swarthmore.edu/dining.xml)

**Linda McDougall,** Director of Dining Services, oversees the main dining facility in Sharples Dining Hall, the Mary Lyon's Breakfast Room, Essie Mae's Snack Bar (located in Tarble), Kohlberg Coffee Bar, and the Science Center Coffee Bar.

**Open Hours** are found at www.swarthmore.edu/dining-services/hours.xml.

All students in college housing must be on the meal plan. Students with special medical (short- and long-term), religious, or cultural needs must consult with the director of Dining Services to arrange for these special needs.

### The Necessity of Identification Cards

Students eating in Sharples Dining Hall must present their College picture identification card for every meal. Students who do not have their cards will be permitted to sign in three times per semester. Once a student has used the three signed-in opportunities, the student will be required to pay cash until the new ID card is obtained. Absolutely no meal credit is given at Essie Mae's and points may not be used in any facility without a College picture ID card. These policies are in effect to protect each student's personal meal plan account.

**Guests** are always welcomed in Sharples Dining Hall. Guests may purchase meals at the door. Declining balance cards may be purchased at the Sharples office, near the main entrance door.

**House menus** are found on the website (www.swarthmore.edu/dining-services.xml) and on the Dash.

**Group Meals**

Groups of at least 25 students may substitute a cookout or special meal for regular meals at Sharples. Food credit is given in raw ingredients from the Dining Hall, not in cash. Requests must be submitted 72 hours in advance, and the number of groups which can be accommodated is limited. Pack-outs are provided on a first-come, first-served basis. For more information, please contact the Dining Services Office at (610) 328-8181.

**Meals at Bryn Mawr and Haverford College:**

Students on a Swarthmore meal plan can obtain meal passes for the Bryn Mawr and Haverford dining halls. Meal passes can be picked up in Sharples from a checker or from the Dining Services office.

## Counseling and Psychological Services (CAPS) (www.swarthmore.edu/ student-life/counseling-and-psychological-services.xml)

**David Ramirez**, Ph.D., directs the Counseling and Psychological Services located in the Worth Health Center. It is open between 8:30 a.m. and 4:30 p.m., Monday through Friday, when school is in session. **Appointments** may be made in person or by calling the office at x8059. Emergency assistance may be obtained by going to the Health Center during off hours. Services are free, but generally students are limited to one appointment a week. Off-campus referrals are readily available. There is limited access to a psychiatrist to prescribe and monitor **medications**. All students being seen by the psychiatrist must also be engaged in therapy with one of the CAPS counselors. Students on medications are generally responsible for covering the costs of these medications. The Health Center will help students obtain the medications with proper documentation and payments.

**Confidentiality and Communications**: Like at the Health Center, students have rights to privacy of treatment. Parent and outside providers' input and information is welcome, but the student must give permission for their therapists to share any information from counseling sessions. In case of danger to self or others, a counselor may contact the student's official emergency contact and relevant College officials. Students, parents, faculty, and staff may consult with CAPS professionals about issues they are seeing in a student. The CAPS staff will help you review the concern from your perspective and how you might proceed with interactions with the student of concern.

## Health Services (www.swarthmore.edu/ student-life/health-center.xml)

**Beth Kotarski**, MSN, CRNP, directs the Worth Health Center that is open 24 hours a day, 7 days a week when school is in session.

**Confidentiality and Communications:** Under Pennsylvania law: *Any minor who is eighteen years of age or older, or has graduated from high school, or has married, or has been pregnant, may give effective consent to medical, dental, and health services for himself or herself, and the consent of no other person shall be necessary.*

*Medical, dental, and health services may be rendered to minors of any age without the consent of a parent or legal guardian when, in the physician's judgment, an attempt to secure consent would result in delay of treatment which would increase the risk to the minor's life or health.*

According to Health Center policy and in compliance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), information is not shared with parents without the explicit permission of the student. Students have the right to expect that all aspects of care will be treated as confidential. Since parents and private health providers can offer valuable insight and support during these times, nurses and campus-employed physicians encourage students to contact parents when a student's medical condition becomes prolonged or requires special testing or hospital admission. We are happy to coordinate care with family health care providers and off-campus specialists. We require a student's permission to share information with these providers.

In the case of **threat to life** of self or others, information will be shared with persons listed as **emergency contacts** as well as with relevant College officials.

**Parents** are urged to communicate all concerns to the Director or a nurse. Usually plans can

6

be developed to address these concerns or to obtain permission from students to disclose information. Nurses will assist with arrangements for local housing for parents who are summoned for a medical emergency.

Health care staff does not **communicate with faculty** or others about missed classes, activities, or assignments. Students must give permission for the Health Center staff to be in touch with the relevant class dean who will communicate with professors or other community members. These communications indicate that the student is under the care of a medical professional and will be in touch once she or he is ready to resume work or classes. Class deans can help students strategize ways to make up work, and to approach faculty or others about their situation.

Services are available ONLY to enrolled Swarthmore students. Others are directed to local resources.

**Outpatient services** include: massage therapist, nutrition counseling, allergy injections, physical examinations, gynecological and contraceptive services, sexually-transmitted infection (STI) screening and counseling, travel information and readiness, and wellness information.

**Overnight care** services, for the short term, are for students needing medical monitoring due to acute medical conditions. More serious conditions are referred to local hospital emergency rooms or to family care. Other students are expected to return to their residence hall room.

**Health Insurance**

All students must be covered by a health insurance plan that meets the minimum requirements established by the College. The College offers an insurance plan to purchase for students who have no health insurance coverage. The insurance brochure and schedule of benefits are available to view on the Health Center web page at www.swarthmore.edu/health.xml.

**Financial Services**

**Financial Aid Office:** Laura Talbot, Director of Financial Aid

Additional members of the financial aid staff can help you with specific questions: Joanne Barracliff, concerning loan processing; Kristen Moore, concerning any financial aid issues, aid decisions, or financing options; and Judy Strauser, concerning financial aid policies. At tax time this office can give you some guidance with your tax returns.

**Student Accounts Office:** Linda Weindel, Director

Students are expected to have up-to-date accounts with the College. Students who have not satisfied their financial obligations will not be permitted to return to campus, attend any classes, live in campus housing, have a meal plan, register via add/drop (or any other method) for any classes, enroll for the following semester, participate in the room lottery, obtain a transcript, or be permitted to be graduated. If bills are not at zero, keys will not be issued to rooms, registrations will be cancelled and penalties may be assessed for late withdrawal for rooms. Students may not return for the spring term if the balance is not at zero and they will not be permitted access to their rooms. Consult with the Student Accounts office in Parrish E105 if you have questions about your bill.

**Information Technology Services (ITS) (www.swarthmore.edu/its.xml)**

**Connecting to the Network:** Macintosh, Windows, Linux-based computers, and most mobile devices can be connected to the network. Swarthmore College normally grants access to its computing network and systems to currently enrolled students, to current and emeriti faculty, and to currently employed staff.

**Network Security and Safety:** Students share in the responsibility of ensuring the security of the campus network. When connecting to the network for the first time, web browsers will direct students to a registration web site. All student computers must be virus-free in order to connect to the network. Anti-virus software (provided by Swarthmore College) and operating system patches must be installed and current. Students may not use false ID s or impersonate others. There is to be no commercial usage of the network without written permission from the Chief Information Technology Officer.

**Statement on Computing Use**

Use of the Swarthmore College computer systems is governed by the general norms of

7

responsible community conduct described in the student, faculty, and staff handbooks, by local, state, and federal laws, and by College policies specific to use of the computer systems and networks. Individuals with access to the Swarthmore College network have the following **obligations and responsibilities**:

1. To respect other people and the College's intellectual environment. Use of the network may not violate federal, state, or local law, including the laws of defamation, forgery, and harassment.

2. **Copyright/trademark infringement:** The copying or serving of copyrighted material such as music, movies, and other multi-media is strictly forbidden. The Digital Millennium Copyright Act (DMCA) provides an opportunity for online service providers (OSPs) to shield themselves from liability for the actions of their subscribers that infringe on the copyrights of others. All institutions of higher education that provide Internet access fall within the scope of the definition of an OSP, with relevant subscribers being their students, faculty, and staff. Information about the Digital Millennium Copyright Act and the College's policy on copyright infringement is on the Web at www.swarthmore.edu/its_copyright.xml.

3. To protect each individual's accounts from **unauthorized use** by others. Every account is provided for the use of a specific individual, and may not be shared with nor loaned to others. Additionally, office computers are generally assigned to specific individuals for College-related work. Staff must obtain permission before using a computer not assigned to them.

4. To respect the **integrity of other users' accounts**. Individuals must not use another person's user ID without express permission or attempt to decode passwords or to access information illegitimately. For example, sending electronic mail under another person's name (forged email) is a violation of this policy.

5. To avoid engaging in any activity that may reasonably be expected to be **harmful to the systems** operated by the College including, but not limited to, attempting to disrupt, gain unauthorized access to, or damage computing and network systems (hardware and software) belonging to Swarthmore College, or to use the College's computing resources to disrupt, infiltrate, or damage systems belonging to others on campus or around the world. When system vulnerability is discovered, users are expected to report it to ITS.

6. To avoid **excess use** of shared resources, whether through monopolizing systems, overloading networks, misusing printers or other resources, or sending spam or unsolicited mass electronic mail.

**Violations** of these guidelines that come to the attention of ITS will be referred as appropriate to the offices of the Dean, the Provost, or Human Resources. Where appropriate, ITS may temporarily withhold services from students, faculty, or staff while referring the case in a timely manner to the appropriate College office. Sanctions can include termination of all ISP services.

**Telephone Services**: Each student in on-campus housing is provided a personal telephone number. Telephones may be purchased in the Bookstore. Unlimited on-campus and local calls to surrounding communities as well as to Bryn Mawr and Haverford Colleges are provided free as part of the basic telephone service. The College does not provide direct-dial long-distance calling to students.

## Library and Educational Materials

**Access:** Students may not hinder the educational opportunity of other students by behavior such as removing, hiding, or defacing educational materials. In like manner, the library will protect the **privacy** of all students with regard to any and all information contained in their library records; e.g., books they have checked out, amount or nature of fines, etc. The library adheres to the policy stated in the ALA Policy Manual section 52.4: Confidentiality of Library Records. Please refer to www.ala.org/alaorg/policymanual/libserve.html.

Payment of late-return **fines** is expected in a timely manner. Outstanding fines may affect housing selection and registration as well as access to official transcripts.

## Public Safety

**Michael J. Hill,** Director

**Headquarters:** Benjamin West House, open 24 hours a day

The department provides round-the-clock uniformed patrol of the campus buildings and grounds by professionally-trained patrol officers who can help in a variety of ways from emergency response to general advice on crime prevention. The number of officers on duty depends on the time of day and the expected level of activity. All officers are in constant radio contact with the College Communications/Reception Center and will be dispatched immediately to the scene of any emergency. Students are encouraged to call the department at x8281 any time they feel Public Safety can be of assistance.

**How to Report a Crime**

All **emergencies** should be reported by contacting the Department's emergency telephone line x8333. Any crime or suspected crime should be reported immediately to the Public Safety Department. When major incidents occur, the Swarthmore Borough police may also respond. Under most insurance policies, a formal report of loss must be filed before recovery can be made.

**College Identification Cards**

Student ID cards are issued by the Department of Public Safety. Lost ID cards can be replaced for a $10 fee at the Department of Public Safety office (Benjamin West House). Swarthmore ID cards are not transferable. Anyone found loaning an ID to another individual for use at Sharples Dining Hall or any College function will be fined $35. The borrower will also be fined $35. Misused cards will be confiscated and returned only on application to the Dean of Students.

Upon request, students are obligated to provide College personnel with accurate identification. When investigating a suspicious or unusual circumstance, a Public Safety officer may ask to see the ID card. By showing it, the student will contribute to the overall security of the campus. By not identifying oneself, the student risks being treated as a trespasser and being subject to disciplinary action for failing to cooperate with a Public Safety officer. Rude or abusive behavior in connection with ID requests will be referred to the Deans' Office.

A student may not knowingly provide false information or make misrepresentation to any College office. In addition, the forgery, alteration, or unauthorized possession or use of College documents, records, or instruments of identification, forged or fraudulent communications (paper or electronic mail) are prohibited.

Admission to the Dining Hall, all Social Affairs Committee events, College movies, Upper Tarble dances, etc., will be by valid College ID only. IDs will be checked at the door and checkers are instructed to allow no exceptions. Any guest of a student must be signed in with the name of both the host and guest recorded at the door.

**Fire Alarms & Drills**

There are two fire alarm code blasts for the Swarthmore area. The fire horn located at the top of the tower by the facilities building will issue a series of three blasts to indicate a general alarm. If the fire is on the College campus the alarm will switch the original three-blast signal to the four-blast series. The fire horn is tested during the fire company meeting every Thursday evening at 7:00 p.m. The Swarthmore Volunteer Fire Company welcomes students as members and active participants.

All building fire alarms are local. In the event of a fire emergency, ring the building fire alarm and call the Department of Public Safety emergency telephone line (x8333) immediately. If students are in a building and the alarm goes off, they should go outside by the shortest possible route and wait until permission is given to re-enter the building.

Fire drills are held periodically in each residence hall for the students' protection. They are scheduled by the RAs and monitored by officers of the Public Safety Department. Students should take the opportunity of a fire drill to learn the quickest and safest ways out of the residence hall.

**Parking on Campus**

Because of the limited number of parking spaces on campus, only those students receiving permission from the Car Authorization Committee will be issued parking permits. Students must have permission from the Car Authorization Committee and must submit a completed, on-time application in April – late permits cannot be considered. Permits are valid for the Fall and Spring

terms, and students must reapply each year. If you only need a spring permit, you should apply in December. Permit applications will be released by the Deans' Office in April and December, for the following term(s). Being granted a permit one year does not guarantee that you will receive a permit the following year. Students should plan on only being able to secure a parking permit for one of their four years at Swarthmore.

Students who live off-campus in the Swarthmore Borough can secure street parking through Borough Hall, and are not generally eligible for campus parking spots. First-year students are not permitted to bring cars to campus and should not expect to be approved for a parking permit.

Permit requests are reviewed by the Car Authorization Committee and will be awarded based on need and/or special circumstance. Factors considered first when reviewing applications include: medical need or disability, seniority, and official student organizations without a current driver. Additional factors that may be considered include jobs, internships, volunteer commitments, family needs, religious observances, personal needs, etc. We apologize that we are not able to grant a parking permit to every student who applies.

**Parking regulations are strictly enforced every day of the year, even when the College is not in session. Do not park on campus without a permit. Students who park in faculty/staff lots risk booting and/or losing future parking privileges. To avoid costly fines and towing charges for illegal parking, eligible students must obtain a parking permit *before* bringing a car to campus.**

**Borough Parking:** Students who live off-campus and/or who do not receive a campus parking spot may wish to secure parking in the surrounding neighborhoods. Overnight parking (between the hours of 2:00 a.m. and 6:00 a.m.) is prohibited on most streets in the Borough of Swarthmore, and vehicles may not be parked in any one location anywhere in the Borough for longer than 72 hours at a time.

Swarthmore Borough offers many different parking programs for residents, employees, students, and visitors. For more information, call the Borough office at 610-543-4599.

## STUDENT CONDUCT: RULES AND REGULATIONS

### STATEMENT OF STUDENT RIGHTS, RESPONSIBILITIES, AND CODE OF CONDUCT

The *Swarthmore College Bulletin* states, "Swarthmore College seeks to help its students realize their fullest intellectual and personal potential combined with a deep sense of ethical and social concern. The purpose of Swarthmore College is to make its students more valuable human beings and more useful members of society." Although the College places great value on freedom of expression, it also recognizes the responsibility to protect the values and structures of an academic community. It is important, therefore, that students assume responsibility for helping to sustain an educational and social community where the rights of all are respected. This includes conforming their behavior to standards of conduct that are designed to protect the health, safety, dignity, and rights of all. Community members also have a responsibility to protect the possessions, property, and integrity of the institution as well as of individuals. The aim of both this Statement and the Student Judicial Procedures is to balance all these rights, responsibilities, and community values fairly and efficiently.

**Jurisdiction:** Swarthmore College policies and jurisdiction normally apply only to the conduct of <u>matriculated students</u> occurring on Swarthmore College property or at College-sanctioned events or programs that take place off campus. In situations in which both the complainant and accused are matriculated Swarthmore College students, however, College policies and jurisdiction may apply regardless of the location of the incident. In the event that a <u>student organization</u> violates a college regulation, the organization, as well as its individual members, can be held accountable for the violation and sanctioned by the College. Finally, students should also realize that they have the responsibility to ensure that their <u>guests</u> do not violate College policies, rules, and regulations while visiting, and that students may be subject to disciplinary action for misbehavior of their guests.

**Complaints:** A complaint against a student may be made to the deans by a student, a Public

10

Safety officer, a member of the College's faculty or staff, or a College department. If the alleged incident represents a violation of federal, state, or local law, the complainant also has the option of initiating proceedings in the criminal or civil court system regardless of whether a complaint is filed within the College system.

The following is a summary and explanation of the rights, responsibilities, and rules governing student conduct at Swarthmore College. This Statement serves as a general framework and is not intended to provide an exhaustive list of all possible infractions. Students violating any of the following are subject to disciplinary action. All sanctions imposed by the judicial system must be obeyed or additional penalties will be levied. For a complete description of the College's judicial process, please see the section on Student Judicial Procedures.

## Academic Freedom and Responsibility

*The following is excerpted from The Handbook for Instructional Staff, Section II.A.2.*

Swarthmore College has long subscribed to the fundamental tenets of academic freedom articulated in the 1940 Statement of Principles on Academic Freedom and Tenure by the American Association of University Professors. This doctrine has been reiterated and amplified in the Association's 1970 Statement on Freedom and Responsibility. Swarthmore College adheres to the 1970 Statement, relevant portions of which are reproduced below. The complete texts of the Association's 1940 and 1970 Statements may be found in AAUP publications.

**Expression of Dissent:** Membership in the academic community imposes on students, faculty members, administrators, and trustees an obligation to respect the dignity of others, to acknowledge their right to express differing opinions, and to foster and defend intellectual honesty, freedom of inquiry and instruction, and free expression on and off the campus. The expression of dissent and the attempt to produce change, therefore, may not be carried out in ways which injure individuals or damage institutional facilities or disrupt the classes of one's teachers or colleagues. Speakers on campus must not only be protected from violence, but given an opportunity to be heard. Those who seek to call attention to grievances must not do so in ways that significantly impede the functions of the institution.

**Faculty Responsibility:** Students are entitled to an atmosphere conducive to learning and to evenhanded treatment in all aspects of the teacher-student relationship. Faculty members may not refuse to enroll or teach students on the grounds of their beliefs or the possible uses to which they may put the knowledge to be gained in a course. The student should not be forced by the authority inherent in the instructional role to make particular personal choices as to political action or her/his own part in society. Evaluation of students and the award of credit must be based on academic performance professionally judged and not on matters irrelevant to that performance, such as personality, race, religion, degree of political activism, or personal beliefs.

If a student has a grievance against a faculty member that cannot be resolved directly through the faculty member involved, the student should take her or his concerns to the department chair. If the grievance remains unresolved, the student should contact the Provost.

## Harassing Expression

The section that follows outlines the College's policy for adjudication of harassing expression. The intention in stating this policy is not to reduce complicated and painful interactions to a list of rules, which after all must be cautious and limited. On the contrary, these policies are listed in order to both facilitate the free expression of ideas and to support those who feel that they have been victimized by another's expression. The College provides several resources to help those who believe that they may have been harassed, and those resources are listed in the "Options for Resolution of Harassment" section below. Students are encouraged to seek assistance from those offices listed, and from friends and counselors already known. It is unconscionable that members of the community should suffer harassment. Since the damage done by expression is in essence a community problem, we wish to emphasize that we are committed to working out these problems as a community. We hope together to find the patience, support, discernment, and courage that it takes to combat expressive abuse, and we offer the following policy to describe our administrative response to a problem that we are determined to work through on all levels of college life. If the official policies outlined here seem daunting as the student seeks help responding to an incident that is troubling, the student is urged to come forward and talk to the members of the community who are familiar with them.

The offices named in this document can help the student to take action, to understand her/his rights and responsibilities, and ultimately to recover from the effects of harassing speech. The College's commitment to freedom of expression on this campus is in no way meant to keep individuals from getting the assistance needed if one feels that s/he may have been the subject of expressive harassment. Swarthmore College seeks to maintain an environment of mutual respect among all its members. All forms of violence, assault, intimidation, and harassment, including that based on sex, race, color, age, religion, national origin, sexual orientation, gender expression, or disability, undermine the basis for such respect and violate the sense of community vital to the College's educational enterprise. This statement of policy should not be taken to supersede the College's commitment to academic freedom, which it hereby reaffirms. The reasoned expression of different views plays a particularly vital part in a college community. Freedom of expression, fundamental to an exchange of views, carries with it corollary responsibilities equally basic to reasoned debate.

The College seeks to sustain an environment in which harassment has no place. Those who harass others will be subject to serious sanctions.

Definition, Principles, and Criteria

**Harassment** can take many forms, and it needs to be emphasized that harassment can be and often is non-physical, including words, pictures, gestures, and other forms of expression. To count as harassment, such expression must be reasonably regarded as (**a**) taunting[1], vilifying[2], or degrading[3] whether (**b**) directed at individuals or groups (subject to the clarification and qualification below) and (**c**) where reasonable people may suppose that such expression harms its target(s) by substantially interfering with their educational opportunities, peaceful enjoyment of residence and community, or terms of employment. Further, to count as harassment subject to possible formal grievance procedures, such expression must (**d**) be taken *either* with the intent to interfere with the protected interests mentioned in (c), above, *or* with reckless disregard to the nature of the conduct. Such intent or recklessness must be inferred from all the circumstances. Finally, (**e**) such expression must be repeated and persistent. To be "repeated and persistent," the offending conduct must have been brought to the attention of the defendant (though not necessarily by the complainant), be of the same kind, and repeated. There are two reasons for adding (e): first, the College wishes to have the opportunity to educate those who may not realize that certain expression constitutes harassment; second, by requiring that the expression be repeated and persistent, the College helps establish intent or recklessness. However, (**f**) before any expression can be considered for possible formal grievance procedures, it must be clear that no substantial free expression interests are threatened by bringing a formal charge of harassing expression. This strict criterion for possible formal grievance procedures must be imposed to insure that the college does nothing that would tend to diminish free expression or compromise principles of academic freedom in the vigorous and often contentious examination and criticism of ideas, works of art, and political activity that marks Swarthmore College.

Because groups have been included in (b), above, the following clarification and qualification is in order. If expression that would be regarded as harassing if directed at an individual is directed at a group — where no individuals are specifically named or referred to as targets — any member of that group will have an adjudicable complaint only if it can be established that a reasonable person would regard that offending expression as harassing each and every member of the group as individuals.

**Stalking** is a form of harassment, which, following Pennsylvania Criminal Code occurs when a person engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances that demonstrate either of the following:
a) placing the person in reasonable fear of bodily injury; or,
b) reasonably causing substantial emotional distress to the person.

**Uncivil and Demeaning Non-Harassing Expression**

---

[1] Derisive, mocking, ridiculing, or jeering expression.

[2] Forceful defaming or degrading expression with intent to make the target of the offending expression vile or shameful, recklessly disregarding the effects of one's expression in these respects.

[3] Subjecting one to public shame that normally cause feelings of inferiority or loss of self-respect.

12

As a member of Swarthmore College, one's moral responsibilities extend beyond formally-sanctionable conduct. All of us, therefore, have a responsibility not to indulge in gratuitous offensive expression just because it may not be subject to official sanctions. Anonymous offensive expression is generally inexcusable, but the risk of harm in making adjudicable all forms of offensive expression would not only outweigh the benefits of official proscription, it would also seriously endanger academic freedom. When individuals (or groups) admit authorship they act irresponsibly if they are unwilling to engage in a defense of their views, especially with those targeted. Anonymous posters, chalkings, and electronic communications may be removed by College officials.

Perpetrators of alleged non-adjudicable but uncivil expression should engage the objects of their attacks through discussion and, possibly, mediation. If they do not, however, no disciplinary action will be taken, though College officials or anyone else may publicly decry the content and manner of such expression.

It needs stressing again that the College will in no way formally discourage any argument, provided it does not include threats of violence, though what is said may be deplorable and very possibly more diatribe than argument.

Case materials will be reviewed in light of the AAUP statement On Freedom of Expression and Campus Speech Codes (adopted 1994).

## Options for Resolution of Harassment

Charges of harassment may be handled according to either informal or formal procedures. In general, opportunities for education and awareness are important elements in the resolution of harassment issues, sexual or otherwise. Individuals who have concerns about questionable behavior are encouraged to speak with a dean or the EO officer. Regardless of whether or not options for resolution are pursued within the College system, complainants always have the option of seeking formal legal redress.

**Role of the Equal Opportunity Officer:** In cases of alleged harassing expression, the Equal Opportunity Officer (EO) will decide whether the offense merits adjudication. If the EO Officer determines the offense should be adjudicated, the case materials must first be reviewed by three or more faculty members of the College Judiciary Committee (CJC), who shall determine whether any substantial free expression issues are at stake. If the CJC faculty members find that formal grievance procedures of the case would violate individual rights to free expression or the College's commitment to academic freedom, the case will not go forward. Instead, the case will be referred back to the EO Officer who may discuss with the complainant(s) other options for resolution. If, on the other hand, it is determined by the faculty members of the CJC that the case represents no infringement on the right to free expression, the grievance will be allowed to go forward.

**Adjudication:** If the decision is made to adjudicate, and the perpetrator(s) is found guilty, the determination of the degree of harm caused will affect the level of punishment up to and including expulsion. It will not be a defense that one did not intend the harm caused —that it was reckless. Lack of intent, however, may be a mitigating factor in determining the degree of punishment.

**Mediation:** When adjudication is not deemed appropriate, mediation may be suggested, and it will normally be preferred as a first step anyway. In particularly egregious cases, however, the Equal Opportunity Officer may recommend adjudication without mediation. (Note: Mediation at Swarthmore College is never required: all parties involved must willingly agree to participate in the mediation process.)

**Status distinctions:** In cases in which grievants and alleged offenders are from different parts of the community (students, staff, or faculty), complaints should be directed to the responsible office according to the identity of the alleged offender: Human Resources for staff, Deans' Office for students, and Provost for faculty. The formal grievance procedures are specified in the relevant sections of the corresponding Handbooks. Assistance and information are available from the offices listed below.

Provost's Office
Deans' Office
Human Resources Office
Equal Opportunity Office

13

**Records:** It is important to note that discussing concerns with or seeking clarification or support from College officers does not obligate a person to initiate either formal legal procedures or judicial procedures at the College, nor do such discussions preclude a person from doing so. The College officer to whom a complaint is made will record each request for assistance in resolving a case involving charges of harassment, whether formal or informal; these records will be kept confidential to the extent permitted by law.

**Communication:** Often perceived harassment is subtle; it cannot be assumed that the perceived offenders are aware of the way in which their behavior has been interpreted and the responsibility for resolution is shared by both parties. Either directly or through a third party, grievants should make their discomfort known to perceived harassers. Perceived harassers have a responsibility to attempt to understand both the intentional and unintentional effects of their behavior and to respond in a thoughtful, sensitive manner to those perceived effects. The grievant can consider all the informal and formal means available for resolution and choose what seems most useful and workable in a particular case. The grievant must also weigh the fact that the perceived harasser may continue the offensive behavior until being made aware of his/her actions. In the most serious instances of harassment, it is unreasonable to expect grievants to confront their perceived harassers; in these cases the grievant should enlist the help of a trained third party.

**Investigations:** Swarthmore College is an educational institution, not a civil society with the responsibilities or resources of a civil society. It makes no promises or guarantees, express or otherwise, that it will undertake efforts to ferret out those who act to violate the proscriptions set out above. Those who regard themselves as having been targets of fraudulent or degrading expression, of course, may avail themselves of legal remedies at their own initiation and expense; e.g., regarding libel or slander.

**Other Misconduct**

**Disorderly Conduct:** Students at Swarthmore College have the right to express their views, feelings, and beliefs inside and outside the classroom and to support causes publicly, including by demonstrations and other means.

These freedoms of expression extend so far as conduct does not impinge on the rights of other members of the community or the orderly and essential operations of the College. Disorderly conduct is not permitted.

Violation of the orderly operation of the College includes, but is not limited to:
1. Excessive noise, which interferes with classes, College offices, dorm neighbors, or other campus and community activities;
2. Unauthorized entry into or occupation of a private work area;
3. Conduct that restricts or prevents faculty or staff from performing their duties;
4. Failure to maintain clear passage into or out of any College building or passageway.

**Intimidation:** Verbal, written, or electronic threats of violence or other threatening behavior directed toward another person or group that reasonably leads the person or persons in the group to fear for their physical well-being constitutes intimidation and is prohibited. Anyone who attempts to use intimidation or retaliation against someone who reports an incident, brings a complaint, or participates in an investigation in an attempt to influence the judicial process will be subject to serious sanctions.

**Reckless Conduct:** Conduct – whether reckless or intentional – that a person knows, or which any reasonable person under the circumstances would know, places oneself or another at risk of bodily harm is subject to disciplinary action, whether or not the risk is realized. The Dean will review the conduct and the circumstances in which it occurred and decide – at her discretion – whether it falls under a minor or major adjudication, or to refer it to the College Judicial Committee (CJC) for adjudication. Examples include, but are not limited to, swinging a baseball bat in a narrow dormitory hallway, putting a slippery substance underfoot to cause someone to slip and fall (reckless), and punching, biting, kicking another to cause pain, or any other violent act (intentional). The more reckless the conduct and the greater the risk of serious bodily harm and/or the greater the actual bodily harm caused, the greater the likelihood of a severe sanction.

**Physical Assault:** A purposeful action meant to hurt another person. Examples include, but are not exclusive to kicking, punching, hitting with or throwing an object, or biting. Verbal

14

assault is regulated in the section covering Expression.

## College and Personal Property

### 1. Illegal Entry

Unauthorized entry into or presence within enclosed and/or posted College buildings or areas, including student rooms or offices, even when unlocked, is prohibited and may subject a student to fines and other sanctions.

### 2. Locks and Keys

Tampering with locks to College buildings, unauthorized possession or use of College keys, and alteration or duplication of College keys is against College policy.

### 3. Theft or Damage

Theft and negligent or intentional damage to personal or College property will subject a student to paying for the repair or replacement of the damaged property as well as to disciplinary action. In the event that damage occurs in a residence hall for which no one assumes responsibility, payment for damages will be divided equally among all residents of that hall. For damage that occurs during a student event in a space other than a residence hall and for which no individual student(s) accept(s) responsibility, the sponsoring students and/or organization will be held accountable for the money for replacement or repair of the damaged property and may be subject to further disciplinary action. Splicing into cable lines can result in fines and other penalties.

### 4. Unauthorized Possession

Students may not possess College records, official communications, stationary or other official documents or blank official materials. Personal academic materials such as tests and personal electronic messages are included in unauthorized possession.

## Actions Potentially Injurious to Oneself or Others

### 1. Smoking

Smoking is prohibited in all public spaces throughout the College: meeting rooms, lounges, offices, and residence halls. A $25 fine in addition to other potential penalties, including exclusion from campus housing will be charged for violating this policy. Smoking is allowed outdoors at a minimum distance of 25 feet from all buildings.

### 2. Fires, Fire Safety Equipment, and Alarms

Tampering or interference with, as well as destruction or misuse of, fire safety and fire prevention equipment is prohibited and is a violation of state law. An automatic fine of $125 for each piece of equipment plus the cost of replacement of equipment is charged to any student violating this regulation, and further disciplinary action may be taken. Any student who causes an alarm to be set off for improper purposes is liable for the expenses incurred by the fire department(s) in responding to the alarm. If no individuals accept responsibility when a violation of this policy occurs in a residence hall, all residents of that residence hall are subject to fines and charges for costs incurred by the College and/or fire department(s).

**Open flames** are not permitted in residence halls. Any student with an open flame (e.g., candle, incense) will be subject to a $500 fine. Students are financially responsible for damages resulting from reckless conduct or violation of College rules regulating residence hall safety.

### 3. Weapons and Fireworks

No student may possess or use a firearm on Swarthmore College property or its environs. Firearms, including rifles, shotguns, handguns, air guns, and gas-powered guns and all ammunition or hand-loading equipment and supplies for the same, are not allowed. No student may possess or use fireworks on Swarthmore College property or its environs. Items such as knives that could be viewed as weapons are forbidden. Requests for exceptions must be made to the Dean.

### 4. Climbing on College Buildings or Structures

Climbing on any College building, or being present on building roofs is not allowed. In unusual circumstances, arrangements to climb pre-designated locations may be coordinated through the Department of Public Safety.

## Violation of Local, State, or Federal Law

15

Whether local, state, federal or (when on foreign study) foreign, violation of the laws of any jurisdiction may at the discretion of the Dean subject a student to College disciplinary action. A pending appeal of a conviction shall not affect the application of this rule.

## ACADEMIC MISCONDUCT

*The following procedures were adopted by the faculty on Feb. 16, 2001, and are excerpted from Section II.B.7 of The Handbook for Instructional Staff.*

1. **Definitions:** Academic misconduct is defined as a violation of the College's standards of academic integrity whether these violations are intentional or unintentional. Academic misconduct consists of cheating on an exam, plagiarism on a paper, lab reports, problem sets, or honors work.

2. **Evidence:** Good evidence may include, but is not limited to, the following:
   a. Some of the student's work coincide with or closely paraphrases a source that is not properly acknowledged. Sources that must be acknowledged include, but are not limited to, lab manuals, books, articles in books, journal articles, web pages, graphs, charts, tables, data sets, etc., in any of the sources just mentioned. Proper acknowledgment must indicate both the source and how it served as a source for any specific portions of the student's work that have been based on it.
      Standard Citation Practices
         Writers may refer to a handbook on scholarly writing for information about correct citation procedures. The MLA Handbook for Writers of Research Papers is particularly useful since it also provides examples of plagiarism. Supplementary departmental regulations governing joint projects, etc., may be found on file in departmental offices. The informal nature of some writing may obviate the necessity of rigorously formal citation, but still requires honest attribution to original authors of all borrowed materials. Students should feel free to consult with instructors whenever there is doubt as to proper documentation.
         Fear of being charged with plagiarism need not inhibit anyone from appropriately using another's ideas or data in a piece of writing or creative work. Even direct quotation frequently serves as an effective device in developing an argument. Academic honesty requires only that writers properly acknowledge their debts to other authors at least by means of quotation marks, footnotes, and references, if not also with in-text phraseology like "Einstein argued in 1900 that..." or "As Melville implies in Chapter 3 of Moby Dick..." Such usage is fully within the tradition of forthright academic work.
      b. Glaring coincidences in the work of students on exams, papers, problem sets, etc., where cooperation in producing the work was not permitted. Faculty members have access to TurnItIn.com to review student work.
      c. Submission of the Same Work in More than One Course. When submitting any work to an instructor for a course, it is assumed that the work was produced specifically for that course. Submission of the same work in more than one course without prior approval is prohibited. If the courses are being taken concurrently, approval of the professors for both courses is required. If a student wishes to submit a paper which was written for a course taken in a previous semester, the student need only obtain the permission of the professor teaching the current course involved.

3. **Procedures**
   a. An instructor who has good evidence to suspect a student or students of academic misconduct will, at the instructor's discretion, consult the department chair about the case. Mere suspicion on the part of a faculty member that the student's work does not sound right is normally not by itself sufficient grounds to bring a case forward in the absence of good evidence.
   b. In any event, the instructor will meet with the student (or students) to present evidence to the student and may, at the instructor's discretion, invite the department chair to be present.

16

c. After this meeting, if the instructor's suspicions are not allayed, the instructor will submit a report to the Associate Dean for Student Life. The report will include a narrative of the incident and evidence supporting the charge. The College Judiciary Committee (CJC) will adjudicate academic misconduct cases.

d. The regular procedures of the Judicial System, as noted later in this Handbook, are followed.

4. **Sanctions**

a. The College Judiciary Committee will consider the case, make a finding of guilty or not guilty on the basis of the preponderance of the evidence, and will determine an appropriate sanction if a finding of guilty is reached.

b. In determining a sanction the Committee will consider all the circumstances of the case including the intent of the student, the character and magnitude of the offense, the considered evidential judgment of the faculty member bringing the accusation, and mitigating circumstances.

i. In academic misconduct cases, the CJC makes the determination on the issue of probation, suspension, or expulsion. The CJC may recommend to the faculty member the sanction relating to the grade penalty, citing precedence. The faculty member has final determination in this area. It is the opinion of the faculty as a whole that for an intentional first offense failure in the course and probation normally is appropriate. Suspension for a semester or deprivation of the degree in that year may also be appropriate when warranted by the seriousness of the offense.

ii. For a second offense, the penalty normally should be a year-long suspension or expulsion.

5. **Education and Information**

The integrity of a liberal arts education depends on the principle of academic integrity. Educating the community about the academic misconduct policy is essential to the educational goals of the College.

Both students and faculty will be regularly informed about the college's academic misconduct policy in a variety of ways such as the following: by their instructors or advisors, by the Deans' Office, and by means of statements in such places as the College catalogue, faculty and student handbooks, the College web site, departmental or divisional handouts, etc. Discussion of the policy may also be part of such sessions as orientation for first-year students in the Fall, orientation for new faculty, and in Writing Associates (WA) and Student Academic Mentor (SAM) training. Students must finally take the responsibility for understanding the rules with respect to proper citation of sources and the College's academic misconduct policy.

---

## SEXUAL MISCONDUCT

Sexual misconduct represents a continuum of behaviors ranging from physical sexual assault and abuse to sexual harassment and intimidation. Anyone can be subject to and can be capable of sexual misconduct. It can occur between two people, whether or not they are in a relationship, in which one has power over the other, or are of different sexual identities. The College is committed to a learning and living environment that is free of sexual misconduct, discrimination, and harassment of any kind. All forms of sexual misconduct are prohibited and are serious violations of the College's code of conduct. Whenever the College learns of allegations of sexual misconduct, it will take appropriate action to investigate the allegations and take prompt remedial action.

The College has a number of programs and organizations that address issues of sexual misconduct. The RAs, Sexual Misconduct Advisors & Resource Team (SMART) members, and Sexual Health Counselors are trained how to respond to sexual misconduct and provide education to the campus about how to avoid difficulties. Workshops for the new students during orientation explain and explore policies and cultural norms about sexual matters. The Clothesline Project, Take Back the Night, and other events highlight community concerns about sexual assault and its consequences.

17

Students who are the victim of sexual misconduct are encouraged to report the incident immediately. There are also a number of services available at the College to support survivors of sexual misconduct.

A. **Definitions of Sexual Assault, Consent, Sexual Harassment, and Indecent Exposure**

1. Definition of Sexual Assault

Sexual assault is defined as any sexual contact that occurs without the consent of the other person. Specifically, it is intentional physical contact with an intimate part of the body or with clothes covering intimate body parts without the consent of the person touched. Sexual assault includes but is not limited to sexual penetration of an unwilling person's genital, anal, or oral openings; touching an unwilling person's intimate parts such as genitalia, groin, breasts, lips, buttocks, or the clothes covering them; or forcing an unwilling person to touch another person's intimate parts or clothes covering them. When sexual assault occurs repeatedly between individuals, it is referred to as sexual abuse.

2. Definition of Consent

*Consent* is an understandable exchange of affirmative words or actions that indicate a willingness to participate in mutually agreed upon sexually explicit touching or sexual penetration. Consent must be informed, and freely and actively given. Consent is active not passive and consent is possible only when there is equal power.

It is incumbent upon each individual involved in the activity to either obtain or give consent prior to any sexual activity, *and again,* prior to sexual penetration. If at any time during the sexual interaction any confusion or ambiguity should arise on the issue of consent, it is incumbent upon each individual involved in the activity to stop and clarify, verbally, the other's willingness to continue.

- A verbal "no," even if it may sound indecisive or insincere, constitutes lack of consent.
- When consent is requested verbally, absence of any explicit verbal response constitutes lack of consent.
- Once consent has been established, if a person decides to no longer participate in the sexual activity, it is expected that the person will communicate through words or actions, the decision to no longer proceed.
- Past consent to sexual activity does not imply future ongoing consent, and the fact that two persons are in an on-going relationship shall not preclude the possibility that sexual misconduct or sexual assault might occur within that relationship.
- A person who is asleep or mentally or physically incapacitated, either through the effect of alcohol or drugs, or for any other reason, is not capable of giving valid consent and consent is not valid if a reasonable person would understand that such a person is incapable of giving valid consent.
- A student's use of alcohol and/or other drugs shall not diminish a student's responsibility to obtain informed and freely given consent.

3. Definition of Sexual Harassment

The following definition is based in part on those formulated by the Federal Equal Opportunity Commission and The Office for Civil Rights of the U.S. Department of Education. Sexual Harassment, a form of discrimination based on sex or gender clearly endangers the environment of mutual respect and is prohibited. Swarthmore College also finds that harassment based on sexual orientation, gender identity, or gender expression is a form of sexual harassment for purposes of the College's policies. Some behavior that constitutes sexual harassment within this policy may also be a violation of law (Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Swarthmore Borough Ordinance on Non-Discrimination) and students always have the option of pursuing claims through other options, including law enforcement or civil claims.

Sexual harassment is of two basic types:

a. **Intimidating, Hostile, or Demeaning Environment**: Any unwelcome action, verbal expression, usually repeated or persistent, or series of actions or expressions that have either the intent, or are reasonably perceived as having the effect, of creating an intimidating, hostile, or demeaning educational, employment, or living

18

environment for a student or College employee, either by being sexual in nature or by focusing on a person's gender, sexual orientation, gender identity, or gender expression. An intimidating, hostile, or demeaning environment is defined as one that is so severe, pervasive, or objectively offensive that it interferes with a person's ability to learn, exist in living conditions, work (if employed by the College), or have access and opportunity to participate in all and any aspect of campus life.

b. **Quid Pro Quo Harassment** - Any action in which:

i. submission to conduct of a sexual nature is made either explicitly or implicitly a term or condition of an individual's education, grades, recommendations, opportunities or employment, or

ii. submission to or rejection of such conduct is used as the basis for academic or employment decisions affecting that individual.

**Sexual misconduct committed by faculty or staff:** The College prohibits sexual misconduct by a faculty or staff member against a student. The College policy governing staff and the related grievance procedures can be found in the Staff Handbook. The College policy governing faculty and the related grievance procedure can be found in The Faculty and Instructional Staff Handbook. Please contact the Title IX Coordinator to discuss your concerns and have your options for resolution explained to you.

Because at Swarthmore it is not unusual for students to supervise other students, or for students to have actual or perceived power or influence over another student's academic performance (e.g., student graders, student laboratory assistants, and student writing associates), there can exist a power imbalance between students that makes it possible for quid pro quo harassment to occur between them.

4. Descriptions of Sexual Harassment

Sexually harassing behaviors differ in type and severity and can range from subtle verbal harassment to unwelcome physical contact. Sexual harassment includes but is not limited to:

a. Unwelcome verbal or physical advances, persistent leers, lewd comments.

b. The persistent use of irrelevant references that insult or degrade a person's gender, or the use of sex stereotypes to insult or degrade.

c. The use by a person in authority of his/her position to coerce another person to do something of a sexual nature that s/he would not otherwise do. Coercion need not involve physical force.

d. **Stalking** is a form of harassment, which, following Pennsylvania Criminal Code, occurs when a person engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances that demonstrate either of the following:

i. placing the person in reasonable fear of bodily injury; or,

ii. reasonably causing substantial emotional distress to the person.

There is a wide range of behaviors that falls within the general definition of sexual harassment and many differing notions of what behaviors are and are not acceptable. **Key determining factors** in instances of sexual harassment are that the behavior is unwelcome, is gender-based, and is reasonably perceived as offensive and objectionable. Such behavior need not produce or threaten some tangible loss to the receiver in order to be deemed harassment. If it is unclear that the behavior constitutes harassment, the effected person should not spend considerable time struggling alone with this issue. Students are strongly encouraged to bring their issues to the Title IX Coordinator LaMar, the head of the Worth Health Center Beth Kotarski, a dean, or others trained in this area for support, clarification, and to discuss options for informal resolution or formal adjudication. For copies of the "Sexual Misconduct Resources" chart, see the Dean's office.

**Making the harasser aware**: It cannot be assumed that the offending persons are aware of the ways in which their behavior constitutes sexual harassment. It is important to understand that without in some way being made aware of the offensive actions, the harasser may continue the offensive behavior. The grievant is never under any obligation to come into contact with the harasser in ways that are uncomfortable. Instead, the

19

grievant can consider all the informal and formal means available for resolution and choose what seems most useful and workable in the particular case. In the most serious instances of sexual harassment, it is unreasonable to expect grievants to confront their perceived harassers; in these cases, the grievant should enlist the help of a trained third party such as the Title IX coordinator, a dean, or another person trained in this area. Students are never required to work out problems directly with the alleged harasser, and while voluntary mediation or informal dispute resolution may be appropriate in certain types of disputes, not involving sexual violence, a victim always has the right to file a formal complaint under the process described below.

It is important to remember that any member of the community can be guilty of sexually harassing any other member regardless of position of authority or status. Although students have often found it difficult to come forward when the perceived harasser is in a position of authority or is threatening, procedures are in place to respond and to provide support throughout the resolution process. Further, as explained below, it is a violation of College policy for anyone to retaliate against a person for reporting acts of sexual misconduct and the College will promptly respond to any acts of retaliation.

5. Indecent Exposure

Pennsylvania law regulates nudity and indecent exposure. Severe consequences can occur from breaking this law including being placed on the registry of sexual offenders. College policy follows the state laws and does not permit public nudity.

## B. Support Services in the Event of a Sexual Assault

The College has several major concerns in the event of a sexual assault: to provide physical safety, emotional support and medical care to the survivor. The College will also help the survivor seek resolution through internal and/or criminal methods if that is desired and will take whatever actions are necessary and appropriate to investigate and resolve situations involving sexual misconduct which create a hostile environment at the College.

If you are assaulted you should:

1. Go to a safe place
2. Seek support from someone you trust
3. Seek medical attention

### Obtaining Medical Care
Go to Worth Health Center (x8058)

Worth is staffed 24 hours a day to assist students. The survivor will be examined by a nurse who will assess the survivor's injuries. Once stable, the survivor has the option of going to the hospital for care, or seeing a nurse practitioner at the Health Center. The primary purpose of the medical evaluation is to check for physical injuries, presence of sexually transmitted diseases, and pregnancy as a result of the rape. The survivor will be encouraged to have evidence collected. If the survivor chooses to have evidence collected, the survivor will be escorted to the nearest hospital by Public Safety. The survivor can later return to Worth Health Center for follow-up medical care. Another resource available is Counseling and Psychological Services (CAPS). While at the Health Center, the survivor may request to speak with a CAPS counselor.

Go to the Emergency Room of the nearest hospital

At the emergency room an examination and collection of evidence will take place. The hospital will either complete a rape kit or transfer you to a nearby hospital that will do so. The survivor should not shower, bathe, douche, smoke, drink, or change clothes between the time of the incident and the time of the collection of evidence. The survivor should bring a change of clothes including underwear. The police and Women Against Rape (WAR) will be notified. WAR will be present to provide support for the survivor. Most hospitals have a policy to report all rapes. Going to collect evidence does not mean that the survivor must press charges.

### Confidential Supportive Resources

In the event that the survivor desires **confidential consultation** with someone on campus for support, professionals of the following departments can provide confidential support:

- Worth Health Center
- Counseling and Psychological Services
- Alcohol and Drug Intervention Specialist
- Religious Advisors

**Reporting by Confidential Resource Personnel**

Because these relationships involve privileged conversations, employees of these departments will **not** refer the survivor's concerns to the Title IX Coordinator for investigation UNLESS the survivor specifically consents for them to do so. Worth Health Center personnel will make an anonymous statistical Clery report to Public Safety, where appropriate. Annual Clery reporting to the U.S. Department of Education is required by educational institutions for certain offenses that have been reported at campus locations. The information contained in the Clery report only tracks the number of Clery reportable offenses occurring at campus locations, but does not include the names of any other information about the persons involved in the incident. In accordance with the U.S. Department of Education regulations, Clery statistics do not include incidents shared solely with CAPS or Religious Advisors/Clergy personnel.

**Additional Support Services**

In addition to medical support, a survivor can also seek out the deans for specific support related to academics and help in communicating with faculty and they can specifically talk with the Assistant Dean of Residential Life about a new room assignment, if this is appropriate. The Title IX Coordinator, the RAs, and SMART Team members are also available for support and comfort.

The survivor may use any of these support options, without choosing to press charges or making a formal complaint. However, the survivor should know that when contacting any support option that is not specifically listed as a confidential resource above, a referral will be made to the Title IX Coordinator, Sharmaine LaMar, for investigation.

**C. Reporting a Sexual Assault to Public Safety or the Borough Police**

Call Public Safety

If the sexual assault has been by a person who is not known or if there is danger the assailant may make an immediate escape from campus, the victim or someone else should call Public Safety at 610-328-8333 immediately. The person answering the phone will have a list of questions to ask, will get a description of the suspect, and will immediately mobilize help for the survivor. They will rush to detain the suspect and publish an immediate security brief. It is important to note that the community may be alerted to the presence of danger without identifying the victim. This will be done to help prevent further incidents on campus. Public Safety may also notify the Swarthmore Borough Police, providing a description of the suspect. If the Borough Police are notified, and a suspect is caught, the case may be handed to a local prosecutor for a potential trial. Public Safety will also notify Sharmaine LaMar, Title IX Coordinator.

Call Swarthmore Borough Police (911)

Promptly reporting incidents to the police will enable the authorities to gather important evidence for investigations and potential hearings. The police will interview the survivor and gather evidence. They may contact a counselor from WAR (Women Against Rape). If the survivor has been assaulted by someone s/he does not know, they will attempt to apprehend the suspect. Swarthmore Borough Police generally escort the survivor directly to the emergency room. Public Safety will have access to any call made to Swarthmore Borough Police. The College will assist a student in notifying law enforcement authorities if the student requests the assistance of these personnel. Reporting promptly will enable police authorities to gather evidence needed for potential future hearings.

**D. Reporting & Investigation**

Regardless of whether a victim of sexual misconduct initiates formal proceedings, where the College has reason to know about possible sexual misconduct, it has an independent obligation to promptly investigate the matter and then take appropriate steps to resolve the situation. Therefore, where a victim shares information about sexual misconduct with a college employee (excluding the confidential providers in the Health Center, CAPS, the

21

Alcohol and Drug Intervention Specialist, or Religious Advisors) the employee will refer the matter to the Title IX Coordinator, Sharmaine LaMar, for investigation. The College will consult with the complainant and seek their consent before beginning an investigation. If the complainant requests confidentiality or asks that the complaint not be pursued, the school will take all reasonable steps to investigate and respond to the incident consistent with the request for confidentiality or request that the matter not be investigated. In considering a request for confidentiality or a request that the investigation not be pursued, the College will consider, among other things, the seriousness of the alleged harassment, the complainant's age, and whether there have been other harassment complaints about the same individuals. Because of the College's independent obligation to ensure an educational environment free from harassment, it cannot guarantee confidentiality under all circumstances when it is requested.

Investigation Process: Once a report of sexual misconduct is made to the Title IX Coordinator, she will then oversee an investigation of the complaint, which will be conducted either by herself, Public Safety, or another investigator with appropriate training in responding to allegations of sexual misconduct. The investigator will conduct the investigation in the manner appropriate in light of the circumstances of the case, which may include interviews with the complainant, the accused, and any witnesses. Once the investigation is complete, the investigator will issue a report setting forth the factual findings of the investigation. This report will usually be completed within 20 (twenty) business days of receiving the complaint, but may take longer or shorter depending on the complexity of the circumstances of each case. In no case will an investigation last longer than 60 days. The report will be forwarded to the Dean's Office and included in the evidence for any judiciary action. The accused and accuser will have the opportunity to file a written response to the investigator's report, which will also be included in the evidence. The report will be factual in nature and will not make a finding as to the student's guilt or innocence, which is reserved exclusively for a Dean's Adjudication or the College Judiciary Committee Panel hearing the case.

Where the allegations involve a student, the Dean's Office, will have the discretion to institute formal proceedings against the student with the investigation report serving as the complaint. In making this determination, the Dean's Office will, among other things, take into consideration whether the accusing student has requested confidentiality, whether the accusing student wants to participate in a formal complaint, the severity and impact of the sexual misconduct, whether the accused admits to the sexual misconduct, whether the accused has a pattern of committing sexual misconduct, the extent of prior remedial methods taken with the accused. Even if formal proceedings are not pursued, the Dean's Office will have the discretion to require the accused to participate in remedial measures that ensure sufficient education and counseling of the College's policies. Disciplinary action may also be taken in the absence of formal proceedings, where the accused admits to the misconduct and there is no discernible dispute in the relevant facts of the investigation report.

If the allegations do not concern a student, the Title IX Coordinator will nonetheless fully investigate the allegations and take whatever remedial action is appropriate, including invoking the procedures described in either the Faculty and Instructional Staff Handbook or the Staff Handbook, when the conduct involves College faculty or staff members.

The Title IX Coordinator will register each request for assistance in resolving a case involving charges of sexual misconduct, whether formal or informal, and will review and retain copies of all reports generated as a result of investigations. These records will be kept confidential to the extent permitted by law.

Please review the procedures outlined in the Judicial Procedures and Conflict Resolution sections of the handbook for more detailed information about both the formal and informal processes available within the College. Complainants always have the option of filing a complaint in civil or criminal court or with the Office of Civil Rights.

E. **Filing a Complaint Involving Sexual Misconduct**

Charges of sexual misconduct may be handled according to either informal (see Conflict Resolution) or formal procedures (see Judicial Procedures). A victim of sexual misconduct is

22

never required to engage in informal procedures, and informal procedures are never appropriate where sexual assault is involved. Regardless of whether or not options for resolution are pursued within the College system, it is important to note that discussing concerns with or seeking clarification or support from Beth Kotarski, Director of Health Services, Sharmaine LaMar, Title IX Coordinator, one of the deans, or others does not obligate a person to file a formal complaint initiating judicial procedures.

When a formal complaint is filed against a student of the College, the complaint should be filed in accordance with the Judicial Procedures outlined in another section of the Student Handbook. Complaints involving allegations of sexual misconduct will be referred first to the Title IX Coordinator for investigation.

F. **Retaliation:** Any student who files a complaint, or participates in a resolution process as a witness, has the right to freedom from intimidation and retaliation. Retaliation includes threats, intimidation, or reprisals. The College strictly prohibits retaliation by any student against a person who makes a report of sexual harassment or sexual misconduct, assists someone with a report, or participates in any aspect of the investigation or resolution of a report. Any violation of this non-retaliation policy will face serious judicial consequences.

## ALCOHOL, DRUGS, AND PARTY POLICIES

**Philosophy**

The overarching priority of the College with respect to alcohol and drugs is to help ensure the safety and well-being of Swarthmore students. The College is committed to providing guidance so that students can learn to develop a responsible approach to social challenges, including whether to use alcohol, how to do so in moderation, and how to comply with local, state, and federal laws governing alcohol consumption.

Swarthmore students are considered adults, with the adult privileges of privacy and autonomy, as well as the responsibility for their own decisions and actions. In addition, the College also believes that everyone has the right to work and study in an environment free from the effects of substance abuse and that those individuals who abuse alcohol and other drugs are a danger to themselves and others.

**Objectives**

The objectives of these policies reflect the College's desire to create an intentional community based on principles of respect for oneself and others.

The alcohol policy has several objectives:

- to promote the safety and well-being of the Swarthmore community;
- to maintain a safe campus, where students can enjoy their social lives amid a comfortable and coercion-free atmosphere;
- to provide information about alcohol so that students make responsible, healthy choices;
- to provide confidential support for community members seeking treatment for alcohol and/or drug-related problems;
- to be in compliance with federal statutes, Pennsylvania laws, and Borough ordinances that regulate the consumption of alcohol.

**Available Assistance for Abuse Problems**

Students needing help responding to alcohol or drug problems are encouraged to speak with Tom Elverson, Alcohol and Drug Intervention Specialist; Health Center personnel; CAPS counselors; deans; and/or RAs. These professionals can help review the situation and make referrals to outside agencies or inside resources that respond to alcohol and drug abuse. Alcohol and drugs can interfere with academics, friendships, jobs, family, and, most importantly, one's health. They can create legal problems including warnings, citations, arrest, and jail.

Students worried about others with these problems are encouraged to contact the above-mentioned resources for counsel and support.

**Regulation of Alcohol at Swarthmore**

The presence of alcoholic beverages on campus is limited in two ways. First, it is limited by

23

Students in this summer housing are not supervised by the regular College offices. There is a limited meal plan available. No access to the College's health and psychological services is available over the summer. There is only limited access to the library, information technology services, and athletic facilities.

## CONFLICT RESOLUTION AND JUDICIAL PROCEDURES

### Conflict Resolution

In an academic, residential community, great value is placed on the free exchange of ideas both inside and outside of the classroom. Swarthmore is a diverse community with the students coming from a variety of backgrounds and cultures. While this diversity enriches one's education by bringing together people with differing ideas and views, it is not unusual in such a community for students to find themselves in disagreement or conflict with others. Generally, clear communication, civil discourse, and reasoned argument between the students prevail to resolve these conflicts.

However, students may at times find themselves in conflicts with others that they cannot resolve alone. The Statement of Student Rights, Responsibilities, and Code of Conduct explains student behavior which is subject to formal adjudication through the formal judicial system. However, many conflicts between individuals can be resolved informally, often by enlisting the help of an impartial third party. It is important for students to understand that help is available if they are having difficulty with another student or if they feel they have been wronged by another student, staff, or faculty member. Student complaints or concerns should be directed to the responsible office according to the identity of the alleged offender: Deans' Office for students; Provost for faculty; and Human Resources for staff. Students should not hesitate to discuss the problem with a dean, an RA, the Gender Education Advisor, the Equal Opportunity Officer, or others who are trained and knowledgeable about conflict resolution options at Swarthmore. Discussing the problem with one or more of these individuals in no way commits a student to any particular course of action. There are many creative, informal methods of conflict resolution which may appeal to the student for resolving the problem. Mediation or discussion with deans can be good tools for conflict resolution. In certain situations the best approach may be to have a dean discuss the conflict with the parties involved. Often in these cases the students agree to a particular course of action other than initiating formal judicial procedures to resolve the conflict. This course of action can take a number of forms.

### Equal Opportunity

**Sharmaine Bradham LaMar,** Equal Opportunity Officer/Title IX Coordinator, x5675

Swarthmore College's commitment to equal opportunity for all members of the community is expressed in the corporate statement adopted by the Board of Managers:

> *Swarthmore College is committed to the principle of equal opportunity for all qualified persons without discrimination against any person by reason of sex, race, color, age, religion, national origin, sexual orientation, gender identity or expression, disability, or any other legally protected status. In keeping with the long-standing traditions of the College and the spirit and letter of the federal and state equal opportunity laws, we affirm the standing policy of the College to realize equality of opportunity in education and employment; to guard against discrimination contrary to that aim; and to correct discriminatory behavior if found to exist within the College community. Consistent with maintaining an educational program of the highest quality, our standing policy includes affirmative efforts to achieve the above goals in employment and education. The above policy has been and shall be further implemented by the President and members of the faculty and administration designated by the president for that purpose.*

The spirit of this declaration envisions a community in which diversity is not only tolerated but welcomed and viewed as a positive opportunity for learning and growth. In such a community, coercion and harassment are not tolerated, whether against the differences protected in the formal statement or against any difference of interests or life style where individual rights should be preserved.

Concerns about equal opportunity issues may be expressed in several ways. Informal consultations with the deans, the equal opportunity officer, or a College counselor may either lead to a resolution of issues in educational or student life areas, or suggest further steps to be followed. Specific complaints of harassment, intimidation, or other violations, whether verbal or physical, will be treated as serious matters. A fully developed grievance procedure for student equal opportunity concerns is also available for use when attempts at less formal resolution have not been successful. See the Equal Opportunity Grievance website at www.swarthmore.edu/eoo.xml.

All members of the Swarthmore College community are responsible for ensuring that the work and academic environment is free from discriminatory practices, including sexual and other discriminatory harassment. Living harmoniously in a residential college of Swarthmore's size, intensity, and diversity requires that each of us maintain the highest standards of respect for the individuality of all members of the community.

## Judicial System

The formal judicial system at Swarthmore College has two main components: 1) adjudication by individual deans of minor infractions of College regulations; and 2) adjudication by the College Judiciary Committee of major infractions of College regulations. These formal procedures apply to adjudicating any violations of the Student Code of Conduct, or any rules, regulations or procedures of the College, by any current student of Swarthmore College. They are separate from the various informal methods of conflict resolution available such as facilitated discussion by a dean or other trained facilitators. It is important to remember that all possible avenues of conflict resolution be considered thoroughly when deciding upon a course of action.

The Associate Dean of Student Life supervises the judiciary system. Consultation with this dean or any other dean in no way obligates a student to file a formal complaint. Mediation or any other informal method of resolution is not a required step before proceeding with formal adjudication.

**Safety of Campus:** If either the President or the Dean decides at any point that the well-being of a student or of the College is at stake, an immediate active avoidance order, non-notational suspension, or campus expulsion may be imposed against a student who is suspected of violating the Student Code of Conduct, any rules, regulations, or procedures of the College, or otherwise poses a risk of safety to the campus, until the time a hearing is held and a decision is delivered by the College Judiciary Committee. This action assumes no determination of guilt, and the hearing will be held as soon as possible.

### I. Minor Infractions: Adjudication by Deans

A. **Scope:** Minor infractions of the College's rules and regulations, where a finding of guilt would result in a sanction less severe than suspension, are addressed by the deans. However, if this infraction is after the student has already been placed on probation, the student admits guilt, and it is a major violation, the adjudicating dean may suspend the student. The deans have the authority to require compensation for damages and may impose any sanction a dean deems appropriate short of suspension or expulsion, including, but not limited to, warnings, reprimands, fines and/or community service, restrictions, and probation. If, during the course of a Deans' adjudication meeting with the student, the Dean determines the incident being discussed is more serious than was originally believed, the meeting will be stopped immediately, and the incident referred to the College Judiciary Committee.

B. **Complaints:** Complaints involving minor infractions may be initiated by Public Safety Reports, Police Reports, and/or through written statements by members of the community (faculty, staff, students).

C. **Appeal:** A student may appeal a dean's finding of guilt involving a minor infraction to a panel of three members of the College Judiciary Committee within ten days of the written decision by filing a written appeal with the Deans' Office. The panel will the hold a hearing on the appeal. This panel may uphold or reverse a Deans' decision. If the Deans' decision is upheld by the panel, the sanction may be increased but not decreased. During the hearing of the appeal the hearing dean may be present as a resource, but will not take part in the deliberations of the appeals committee. Decisions made by the appeals committee are final. If there is a tie vote, the Deans' earlier finding

25

will stand.

D. **Record Keeping:** In all cases of adjudication, whether by a dean or by the College Judiciary Committee, the deans will keep records of the violation(s) and of the sanction(s) imposed on a student. Sexual misconduct matters are reviewed by the Title IX coordinator at the College and may be further investigated.

E. **Record Reporting:** Medical and law schools and some governmental agencies require disclosure by the College of any judicial findings. Students who transfer to other colleges or participate in off-campus study programs may also be required to provide such information. With a student's consent, Swarthmore reports out finding of probation, suspension, or expulsion. If a student withholds consent, that may be reported to the school or agency, or may have implications for the level of support Swarthmore provides in the application process. Generally, warnings and findings of not guilty are not reported.

F. **Compliance:** Failure to abide by the decision of a dean or of the appeals committee is considered a serious offense and may result in further adjudication.

II. **Major Infractions: The College Judiciary Committee**

A. **Scope:** The Dean or Associate Dean for Student Life shall determine whether a complaint represents a major infraction that should be heard by the College Judiciary Committee. They may consult a panel of three College Judiciary Committee members if there is a question about whether there are grounds for bringing a case forward. All formal charges of academic misconduct, assault, harassment, sexual misconduct, major damage, or interference with other students' educational programs are usually heard by the College Judiciary Committee. If the Associate Dean, in consultation with the Dean, determines that the events described in the complaint do not represent a serious violation of the Code of Conduct, the formal complaint shall be dismissed and other options for resolution will be discussed with the complainant.

B. **Filing a Complaint**

1. To initiate the judicial process, a written complaint must be completed by the complaining individual(s) and filed with the Associate Dean of Student Life. The complaint shall be a chronology stating as accurately as possible the date, time, and location of all events relevant to the charge(s). At the discretion of the deans, when appropriate, a written incident report from the Department of Public Safety may substitute for a written complaint. At the discretion of the deans, when appropriate, a written report from the Title IX coordinator involving allegations of sexual misconduct may substitute for a written complaint by a complainant. In the case of alleged academic dishonesty, the work in question, annotated by the complainant, shall serve as the complaint.

2. The accused student(s) shall be presented with the written complaint statement, and in turn may complete a similar statement **responding to the charges** and providing their chronology of the relevant events. This may also take the form of a conversation with a dean. From these statements, the Associate Dean shall **define the relevant charges**.

3. Complainants shall have the right to **withdraw complaints** at any time. In exceptional circumstances, based on the evidence available, the Dean may choose to continue judicial proceedings even if a complaint has been withdrawn or is absent.

4. Charges of sexual misconduct are first investigated by the Director of the Equal Opportunity Office/Title IX Coordinator, Sharmaine LaMar. The reported results of the investigation, and any response by the accused or complainant, are part of the evidence to be used at the CJC hearing.

C. **College Judiciary Committee Pre-Hearing Procedures**

The judicial procedures of Swarthmore College are administrative ones, and neither the College Judiciary Committee, the President, nor the Dean is bound to observe procedural or evidential rules required in a formal court of law. Hearings shall be based on the published rules at the time of the infraction.

1. **Confidentiality:** All persons involved in a College Judiciary Committee hearing

26

shall have the responsibility of preserving confidentiality before, during, and after the hearing. Any breach of confidentiality by a hearing participant, including the complainant or accused, shall constitute a violation of College policy and is an adjudicable offense. The complainant and accused may disclose information in order to: 1) consult with and/or obtain advice from her/his supporter, family or guardian; physician, therapist, or counselor; or 2) prepare her/his claim(s) and/or defense(s) for presentation to the Committee. A violation of the confidentiality provision by any person shall be deemed a waiver of any right to confidentiality to which the violator would otherwise have been entitled under this section.

2. The **complainant(s) and the accused shall have the following rights** in addition to any rights listed elsewhere in the description of student judicial procedures:
   - to have all incident reports, medical records, and testimony kept confidential to the extent that there is no interference with the normal procedures of the College;
   - to receive private and confidential treatment and be examined for personal injuries, sexually-transmissible diseases, and pregnancy, when appropriate;
   - to be made aware of the options available;
   - to have access to emotional and psychological support and advocacy;
   - to initiate legal proceedings outside the College;
   - to decide of which services to take advantage;
   - to answer only those questions relevant to the event in question;
   - the freedom from harassment, intimidation, and retaliation;
   - to have past sexual history excluded from the hearing process.

3. **Timing of the Hearing**: The hearing shall be held as expeditiously as possible while providing sufficient time for both sides to prepare for the hearing. An effort is made to schedule the hearing when the accused and complainant can reasonably attend. Supporter and witness schedules are considered, but their unavailability will not be the sole factor in selecting the timing of the hearing. Hearings are scheduled when classes are in session and not during college breaks. In the event that a complaint is filed during a break period or within the final week prior to a break, the Associate Dean in consultation with the Dean, will determine whether the hearing will be scheduled when classes resume or if the complaint should be referred to a dean or other appropriate office for more immediate adjudication.

   Whenever possible, hearings will be scheduled so that five designated Committee members may be present. If at any time a hearing must be held but fewer than five current Committee members are available to participate, former members of the Committee shall be asked by the Observer to participate. If there are still fewer than five members, deans will be asked to participate to reach a quorum of five panel members.

   In the case of a lengthy hearing, the Convener may take the option of breaking the hearing as needed and then reconvening it as soon as it is practical for all involved. Normally, a hearing session shall not exceed five hours. The accused and the complainant are not to interact while the hearing is recessed.

4. **Hearing Materials**: Both the accused and the complainant(s) shall be shown a copy of the materials that will be present in the hearing in sufficient time before the hearing (normally 48 hours in advance) to prepare their cases. Copies of these materials will be at the hearing for use during the hearing. Afterwards, they will be kept for 30 days in the case that there is an appeal and then these materials will be shredded. Each complainant and accused shall also be informed that any written statement submitted by him or her may be disclosed in advance of the hearing to the other party.

5. **The Charge Letter**: The Associate Dean or designee shall define the relevant charge(s). The charges are based on the published regulations in effect at the time of the infraction. The student charged shall meet with the Observer and be informed of the charge(s) and directed to a copy of the student judicial system procedures, generally three days in advance. The formal charge letter shall be presented in

27

writing including the names of the appointed panel, the time, date, and location of the hearing typically 24 hours in advance of the hearing.

6. **The Observer** will meet separately with both the complainant(s) and the accused to explain procedures and give all a chance to ask questions about the judicial process.

7. **Witnesses**: Prior to the hearing, both the accused student and the complainant must submit to the Observer a list of witnesses they plan to call at the hearing along with a brief statement describing to what aspects of the incident(s) in question each witness will be testifying. Written statements by the witnesses should be presented to the Observer 48 hours before the hearing. The Convener of the Panel, in consultation with the Observer, may decline to hear any and/or all witnesses if the testimony will be duplicative, irrelevant, prejudicial, or involves issues that would interfere with the fair adjudication of the hearing.

   If a witness cannot or does not wish to attend the hearing, her/his signed statements may be included in the hearing materials and may be considered by the hearing Panel at the discretion of the Convener. The Committee will give greater weight to testimony given in person by a witness who can be questioned at the hearing.

   Witnesses will be called individually to join the meeting as needed, but will not remain longer than their testimony and their fielding of questions. The Convener will determine the order of the witnesses.

   Witnesses who fail to cooperate with investigations or hearings may be sanctioned. Witnesses do not have to reveal information harmful to themselves. However, truth and full disclosure is expected of all participants.

8. **Evidence:** A file containing relevant evidence for the case will be available in the Deans' Office for review by the parties (accused, complainant, Convener, Observer, panel members) involved, but it cannot be removed or photocopied. Copies of the file will be made available to the named parties at the hearing.

   The hearing panel relies on written complaints, public safety and police reports, reports from the Title IX coordinator, written witness reports, individual statements, phone and computer records, video cameras, and ID card usage. Students may be queried by deans or public safety officers as part of the evidence gathering. Cooperation and honesty are expected, even if students are admitting guilt. These conversations are used in creating a charge. Statements made during the investigation by the accused generally are not shared at the hearing unless made public by the accused.

D. **Attendance**

   To preserve privacy as much as possible, attendance at the hearings will be limited to the members of the Judiciary Committee, the Convener, the Observer, the complainant(s), the accused, one supporter each for both the accused and the accuser, if requested, and the witnesses as they are called. If the student charged with the offense refuses to appear at the judicial hearing, the Dean of Students may assess a penalty on the student for not appearing and the judicial hearing may proceed as scheduled without the student present.

E. The **College Judiciary Committee** (CJC) consists of 5 or more faculty members (selected by the Committee on Faculty Procedures), 3 senior administrators (selected by the President), and 5 or more students (selected by the Student Council appointment's process). These committee members will receive appropriate training for their responsibilities, including training about College policies, judicial procedures, and precedents. Committee members who are no longer on the Committee, but have been trained, may be called to service if current members cannot attend a particular hearing.

   The **Hearing Panel** consists of a Convener, two faculty members, one staff member, two students, and the Observer. Panels are selected based on schedule availability from the Committee.

   Up to 24 hours before the hearing, the complainant and/or the accused student may challenge the participation of any member of the College Judiciary Committee on the grounds of prejudice or bias. Challenges must be submitted in writing or in person to

28

the Observer of the Committee, who shall rule on these challenges. It is expected that any member of the College Judiciary Committee who feels himself or herself to be biased will withdraw from the proceedings. If a panel member fails to attend the hearing, the complainant and accused may give permission to move forward.

The Dean of Students will serve as **Convener** unless unable to do so due to bias, previous direct involvement in the case under consideration, or schedule conflicts. If the Dean is unable to serve as Convener, she will appoint another dean from her staff to convene the hearing. If a dean is unable to convene the Hearing Panel for a given case, a faculty member on the College Judiciary Committee shall be appointed by the Dean to convene the hearing. The Convener of the Hearing Panel shall be present and participate in all hearings. During deliberations the Convener shall participate as needed, but shall not be part of the consensus or vote determining guilt or innocence except in the event of a tie vote, in which case the Convener will break the tie.

The **Observer** is the person responsible for seeing that the procedures are followed and that there is impartiality in the proceedings. The Observer does not speak at the hearing except concerning procedure and does not vote. Generally, this role is held by the Associate Dean for Student Life. If the Associate Dean is unable to serve as Observer, the Dean shall appoint another dean or CJC member to serve in this capacity.

**Accuser and accused are present:** Normally, all evidence presented at a hearing by either party shall be introduced in the presence of the other party.

If **more than one person** is accused, the Convener will generally hold separate hearings, but she retains the discretion to hold a joint hearing if the circumstances warrant and the participants consent.

If a student accused of misconduct **withdraws from the College** before a case is heard and the College therefore cannot go forward with the hearing, the student must go through the re-entry process coordinated by the Deans' Office and, except where the Dean in her sole discretion finds exceptional circumstances, the case must be heard prior to the student's readmission to the College.

A **supporter** must be a member of the Swarthmore College community, (a current student, faculty, or staff member). The supporter may be consulted by the student, but may not address the Committee. If the supporter is also a witness, she or he must submit written testimony to the Committee prior to the hearing.

F. **College Judiciary Committee Hearing Procedures**

In order to expedite a hearing, the Convener of the Committee, in consultation with Committee members, may take notice of **basic undisputed facts** without requiring testimony and may also limit the length of the statement and interrogation of all parties involved.

**Opening & Closing Statements:** Both the complainant and the accused shall have the right to make opening and closing statements with the complainant speaking first. These statements must be concise and the Convener may interrupt if they become repetitive.

**Questions:** Next both parties are questioned by the Panel. The Convener and the Observer shall also attempt to ensure that all questions are relevant to the specific case before the Committee and are asked in as fair and neutral a manner as possible. The complainant and the accused generally are not allowed to question each other during the hearing.

**Witnesses** are then called, one by one, and either party involved shall have the opportunity to question any witnesses after the Panel members have asked their questions of the witnesses.

**Impact Statement:** The complainant and the accused shall have the right to include an impact statement as part of the closing remarks. The accused may respond to the complainant's impact statement.

**Exclusion of Evidence:** The Convener has the discretion to exclude any questions, evidence, or witness, or any other material that is irrelevant, highly prejudicial, cumulative, privileged, or confidential, or otherwise would interfere with the fair adjudication of the hearing.

29

**Decisions** of the College Judiciary Committee will be made by consensus. In particularly difficult cases, or when it is impossible to reach a consensus, a vote may be taken to determine whether a student is guilty or not guilty. In the event of a tie vote, the Convener of the Committee will vote to break the tie.

The judicial body's determinations shall be made on the basis of whether it is more likely than not that the accused student has violated the Student Conduct Code or any rules, regulations, or policies of the College

The issue of guilt or innocence shall be determined first. If there is a determination of guilt, the Panel will determine appropriate sanctions.

**Previous Records:** Records of previous adjudications of the accused student at the College are made available to the Hearing Panel only in the cases when a guilty verdict is achieved and shall be taken into consideration when the Hearing Panel determines appropriate sanctions. When considering sanctions, it is appropriate to consider precedents from earlier relevant cases decided by the Committee, using confidential records provided by the Deans' Office. Repercussions for violating the terms of the sanction may also be noted in the sanction.

**Sanctions:** The College Judiciary Committee has the authority to require compensation for damages and to impose whatever sanctions it deems appropriate, including but not limited to, warnings, reprimands including fines and/or community service, restrictions, active avoidance provisions, probation, suspension, and immediate and permanent expulsion from the College.

If **active avoidance** provisions are part of the sanctions, the deans shall meet with all parties to design strict procedures that will minimize the chances for interactions among the students involved, with special attention to the needs and rights of the student whose claims were supported by the decision of the College Judiciary Committee.

**Grades** are determined by the faculty member, although the Committee may make a recommendation based on the factors of the case and precedence.

**Findings:** When possible, the confidential findings of the Committee are communicated to the accused, alone and in person, immediately after the deliberations. If the case is one where the complainant is a student, she/he may also be told the outcome, alone and in person. Other types of complainants may be called or emailed with the results.

**Non-Compliance:** In general, refusal to abide by decisions of the College Judiciary Committee or the President on appeal is grounds for immediate suspension or expulsion as determined by the deans.

**Obstruction** of normal judicial procedures is a serious offense making a student liable to any penalty at the disposal of that Committee up to and including expulsion. Obstruction of judicial procedures covers not only disruptive events that occur within the hearing but also behavior before or after the hearing, including the intimidation of or retaliation directed toward any person involved in the case.

G. **College Judiciary Committee Post-Hearing Procedures**

1. **Appeals:** Either party may request an appeal in writing, addressed to the President, within ten days following the written decision by the College Judiciary Committee. The appeal shall be limited to considering new evidence or procedural error by the Hearing Panel. If the President decides that the appeal should be granted, she will appoint a new panel of three community members (typically a faculty member, a student, and a senior administrator) to hold a new hearing of the case. The President or her designee will serve as the Convener and she will appoint a new Observer. The decision of the appeal committee is final. The appeal panel may confirm the decision of the Hearing Panel, make a new finding, or reduce or increase the original sanctions. In exceptional circumstances, the President may dismiss the charges without further hearing if it is clear that the conduct alleged would not constitute a violation of the Student Code of Conduct or the College's rules, regulations, and policies. Hearing materials are kept for one month after the hearing

in case there is an appeal. If an appeal is filed, the President may ask for the Convener and/or Observer to contribute additional statements concerning the hearing and events connected to the hearing.

2. **Written decisions:** the Convener writes and distributes the decision summaries soon after the hearing.

a. The accused receives a confidential **findings letter** noting the accusation(s), findings, and sanctions, including relevant details of the panel's reasoning, concerning their decisions. This letter is copied to the President and, in cases of sexual misconduct, to the Title IX coordinator.

Note: College policy dictates that parents of a student are notified when the student's status with the College is changed. The parents will receive the findings letter if the disciplinary sanction results in such a change (i.e. probation, suspension, or expulsion).

b. A **public summary** of the case, excluding names and other specific references that would allow readers to identify who was involved, is sent to the complainant, the *Phoenix* and *Daily Gazette*, Public Safety, and is posted on the College Judiciary Committee bulletin board outside the Office of the Dean.

Note: In cases of appeal, the public notice is not posted until the appeal is resolved. Cases where the appeal is upheld are not generally posted. If there is a new hearing, the results of that hearing will be posted.

3. **Record Keeping:** In all cases of adjudication, whether by a dean or by the College Judiciary Committee, the deans will keep records of the violation(s) and of the sanction(s) imposed on a student. Sexual misconduct matters are reviewed by the Title IX coordinator at the College and may be further investigated.

4. **Record Reporting:** Medical and law schools and some governmental agencies require disclosure by the College of any judicial findings. Students who transfer to other colleges or participate in off-campus study programs may also be required to provide such information. With a student's consent, Swarthmore reports out finding of probation, suspension, or expulsion. If a student withholds consent, that may be reported to the school or agency, or may have implications for the level of support Swarthmore provides in the application process. Generally, warnings and findings of not guilty are not reported.

31

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNYSYLVANIA

| | | |
|---|---|---|
| **Maroof Haque** | : | |
| | : | |
| Plaintiff | : | |
| | : | **Civil Action** |
| VS. | : | |
| | : | **NO.  2:15-cv-01355** |
| **Swarthmore College** | : | |
| | : | Jury Trial Demanded |
| | : | |
| Defendant | : | The Hon. J. Curtis Joyner |
| | : | |
| | : | **Filed Under Seal** |
| | : | |

# Third Amended Complaint

# Exhibit C

# Swarthmore College »
# Sexual Misconduct Prevention & Response

## Procedures for Resolution of Complaints Against Students
### Procedural Options | Title IX Assessment | Remedies-based Resolution | Investigation | Student Sexual Misconduct Complaint Process

## I. Procedural Options

As outlined in the reporting section of the Sexual Assault and Harassment Policy, an individual who wishes to make a report of sexual misconduct is encouraged to make a report directly to the Title IX coordinator. In every report of sexual misconduct, the College, through the coordinated efforts of the Title IX team, will conduct an initial Title IX assessment. At the conclusion of the Title IX assessment, the report will be referred for remedies-based resolution or investigation to determine if there is sufficient information to proceed with judicial resolution. Remedies-based resolution does not involve disciplinary action against a respondent. Student Conduct resolution is a sanctions-based approach that may involve discipline up to and including expulsion.

## II. Title IX Assessment

Upon receipt of a report, the College, through the coordinated efforts of the Title IX team, will conduct an initial Title IX assessment. The first step of the assessment will usually be a preliminary meeting with the complainant with the Title IX coordinator or a member of the Title IX team. The purpose of the preliminary meeting is to gain a basic understanding of the nature and circumstances of the report; it is not intended to be a full investigation interview. At this meeting, the complainant will be provided with information about resources, procedural options, and interim remedies.

This initial review will proceed to the point where a reasonable assessment of the safety of the individual and of the campus community can be made. Thereafter, an investigation may continue depending on a variety of factors, such as the complainant's wish to pursue disciplinary action, the risk posed to any individual or the campus community by not proceeding, and the nature of the allegation.

In the course of this assessment, the College will consider the interest of the complainant and the complainant's expressed preference for the manner of resolution. Where possible and as warranted by an assessment of the facts and circumstances, the College will seek action consistent with the complainant's request.

As part of the initial assessment of the facts, the Title IX Coordinator or designee(s) will:

* assess the nature and circumstances of the allegation;
* address immediate physical safety and emotional well-being of the complainant;
* notify the complainant of the right to contact law enforcement and seek medical treatment;
* notify the complainant of the importance of preservation of evidence;
* enter the report into the College's daily crime log;
* assess the reported conduct for the need for a timely warning under the Clery Act;
* provide the complainant with information about on- and off-campus resources;
* notify the complainant of the range of interim accommodations and remedies;
* provide the complainant with an explanation of the procedural options, including remedies-based resolution and judicial resolution;
* identify an adviser, advocate, and/or support person for the complainant;
* assess for pattern evidence or other similar conduct by respondent;
* discuss the complainant's expressed preference for the manner of resolution and any barriers to proceeding; and
* explain the College's policy prohibiting retaliation.

Procedures for Resolution of Complaints Against Students :: Sexual Misconduct Prevent...

Where a complainant requests that a name or other identifiable information not be shared with the respondent or that no formal action be taken, the College will balance this request with its dual obligations to provide a safe and non-discriminatory environment for all College community members and to afford a respondent fundamental fairness by providing notice and an opportunity to respond before action is taken against a respondent.

In the event that a complainant does not wish to proceed with an investigation or judicial resolution, the Title IX coordinator, in consultation with the Title IX team, will determine, based on the available information, including any investigative report, whether the investigation or judicial resolution proceedings should nonetheless go forward. In making this determination, the College will consider, among other factors, whether the complainant has requested confidentiality; whether the complainant wants to participate in an investigation or judicial hearing; the severity and impact of the sexual misconduct; the respective ages of the parties; whether the complainant is a minor under the age of 18; whether the respondent has admitted to the sexual misconduct; whether the respondent has a pattern of committing sexual misconduct; the existence of independent evidence; and the extent of prior remedial methods taken with the respondent.

The College will take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation, but its ability to do so may be limited based on the nature of the request by the complainant. The College will assess any barriers to proceeding, including retaliation, and will inform the complainant that Title IX prohibits retaliation and the College will take strong responsive action to protect the complainant. Where the College is unable to take action consistent with the request of the complainant, a member of the Title IX team will communicate with the complainant about the College's chosen course of action.

At the conclusion of the Title IX assessment, the Title IX team will determine the appropriate manner of resolution and, if appropriate, refer the report for remedies-based resolution or investigation to determine if there is sufficient information to pursue judicial resolution.

The determination as to how to proceed will be communicated to the complainant in writing. Depending on the circumstances and requested resolution, the respondent may or may not be notified of the report or resolution. A respondent will be notified when the College seeks action that would impact a respondent, such as protective measures that restrict the respondent's movement on campus, the initiation of an investigation or the decision to involve the respondent in remedies-based resolution.

Even if judicial resolution is not pursued, the College will have the discretion to require the respondent to participate in remedial measures that ensure sufficient education and counseling of the College's policies.

## III. Remedies-based Resolution

*[handwritten: What = the determining factor b/4 remedies & judicial?]*

Remedies-based resolution is a non-judicial approach designed to eliminate a hostile environment without taking disciplinary action against a respondent. Where the Title IX assessment concludes that remedies-based resolution may be appropriate, the College will take immediate and corrective action through the imposition of individual and community remedies designed to maximize the complainant's access to the educational and extracurricular activities at the College.

*[handwritten: monitor]*

*[handwritten in margin: minor]*

Examples of potential individual remedies are provided in the <u>interim measures section</u> of this policy. Other potential remedies include targeted or broad-based educational programming or training, direct communication with the respondent by the complainant, communication with the respondent by the Title IX coordinator or a College administrator, or appropriate forms of restorative justice. Depending on form of remedies-based resolution used, it may be possible for a complainant to maintain anonymity.

**The College will not compel a complainant to engage in mediation, to directly communicate with the respondent, or to participate in any particular form of remedies-based resolution.** Mediation, even if voluntary, may not be used in cases involving sexual assault. The decision to pursue remedies-based resolution, which may occur at any time, will be made when the College has sufficient information about the nature and scope of the conduct. Participation in remedies-based resolution is voluntary, and a complainant can request to end remedies-based resolution at any time.

11/24/2014    2

The Title IX coordinator will maintain records of all reports and conduct referred for remedies-based resolution. Remedies-based resolution will typically be commenced within thirty (30) business days

## IV. Details of the Investigation

*from when?*

Where the Title IX assessment concludes that disciplinary action may be appropriate, the College will initiate an investigation. The College may designate an investigator of its choosing, provided that the investigator has specific training and experience investigating allegations of sexual misconduct. Any investigator chosen to conduct the investigation must be impartial and free of any conflict of interest. The College will typically designate a deputy Title IX coordinator and/or a member of the Department of Public Safety, although the College may also choose to engage an external investigator at its discretion.

*how is this divided*

*let's align do this*

The investigator will conduct the investigation in a manner appropriate in light of the circumstances of the case. The investigator will coordinate the gathering of information from the complainant, the respondent, and any other individuals who may have information relevant to the determination. The investigator will also gather any available physical or medical evidence including documents, communications between the parties, and other electronic records as appropriate. The investigator may consider prior allegations of, or findings of responsibility for, similar conduct by the respondent. The complainant and respondent will have an equal opportunity to be heard, to submit evidence, and to identify witnesses who may have relevant information.

*what type?*

The investigation is designed to provide a fair and reliable gathering of the facts. The investigation will be thorough, impartial, and fair, and all individuals will be treated with appropriate sensitivity and respect. As described in the privacy section of this policy (see section IV), the investigation will be conducted in a manner that is respectful of individual privacy concerns.

The investigation will usually be completed within 30 (thirty) business days of receiving the complaint, but this time frame may be extended depending on the complexity of the circumstances of each case. At the conclusion of the investigation, the investigator will prepare a report setting forth the facts gathered. The report will be factual in nature and will not make a finding of responsibility or an assessment of credibility. The complainant and respondent will have the opportunity to file a written response to the investigation report.

The Title IX coordinator, in consultation with the student conduct administrator, will review the investigation report and make a threshold determination as to whether the allegations, if proven, would provide sufficient information upon which a hearing panel could find a violation of this sexual misconduct policy. The student conduct administrator is typically the senior class dean and director of student conduct, although another dean may serve as the designee. If the Title IX coordinator determines that this threshold has been reached, the student conduct administrator will issue a notice of charge to begin the sexual misconduct complaint process.

*what is the criteria for this threshold*

If the Title IX coordinator determines that this threshold has not been reached, the complainant and respondent will be notified in writing. The complainant will have the opportunity to seek review by the dean of students by filing a written request for review within five (5) business days. The dean of students may affirm the threshold finding of the Title IX coordinator, reverse the finding of the Title IX coordinator, or remand the matter for additional investigation, as warranted. The dean of students will render a decision in writing, to both parties, within five (5) business days of receipt of the request for review. The decision of the dean of students is final.

## V. Student Sexual Misconduct Complaint Process

Student complaints of the Sexual Assault and Harassment Policy will occur through the use of an administrative hearing or the use of an external adjudicator.

*From when & what time is reasonable?*

*Conflict if Title 9 coordinator is evaluating their depnt's work*

### Administrative Hearing | External Adjudicator | Pre-Hearing Procedures | Hearing Procedures | Appeals | Records

## A. Administrative Hearing

A complaint under this policy will typically be resolved by an external adjudicator. A complainant or respondent, however, may request resolution through an administrative hearing, in which the student conduct administrator will meet with the complainant and respondent to determine responsibility and render a decision as to what sanctions, if applicable, may be implemented. Both parties must agree to resolution by administrative hearing. The investigative report will serve as the primary evidence in making a determination of responsibility. Both parties must have notice, the opportunity to review the investigative report in advance, and the opportunity to present relevant information to the student conduct administrator.

An administrative hearing is particularly appropriate when the respondent has admitted to the sexual misconduct and there is no discernible dispute in the relevant facts of the investigation report; however, at the discretion of the student conduct administrator, it may also be used when the facts are in dispute. In reaching a determination as to whether the Sexual Assault and Harassment Policy has been violated, the student conduct administrator will reach a determination by a preponderance of the evidence—that is, whether the conduct was more likely than not to have occurred as alleged. Depending upon the nature and severity of the allegations, the student conduct administrator may decline to handle the matter administratively and refer the case to an external adjudicator at any time.

## B. External Adjudicator

Typically, the College will retain an external adjudicator, to assume the role of convener of a hearing panel.

The external adjudicator, will be a neutral party outside of the College, usually an attorney or seasoned student conduct administrator, who is trained and experienced in dispute resolution, the dynamics of sexual misconduct, and is trained in the College's policies and procedures. The external adjudicator is supported by the student conduct administrator, who will be present during the hearing, to serve as a resource for the external adjudicator on issues of policy and procedure, and to see that policy and procedure are appropriately followed throughout the hearing.

If the external adjudicator determines, by a preponderance of the evidence, that the respondent has violated the Sexual Assault and Harassment Policy, the student conduct administrator, in consultation with the external adjudicator, will determine the appropriate sanction.

## D. Pre-Hearing Procedures for Student Sexual Misconduct Complaint Process

### 1. Initiation of Charges

The College is responsible for investigating allegations of sexual misconduct, determining if a threshold has been reached, and initiating charges. If the Title IX coordinator makes the threshold determination to resolve the complaint through the student conduct process, the student conduct administrator will issue a letter to both parties, typically within ten (10) business days, indicating that a formal charge has been issued by the College.

Both the complainant and the respondent will be given notice of the specific charges and the opportunity to be heard before a final determination of the case is reached.

## 2. Group Infractions

When members of a student group, organization, or team or individuals acting collusively operate in concert in violation of the Sexual Assault and Harassment Policy, they may be charged as a group or as individuals, and a hearing may proceed against the group as joint respondents or against one or more involved individuals as appropriate given available information and the circumstances.

## 3. Advisers and Support Persons

**Adviser.** In any hearing, the complainant and respondent have the right to be assisted by a trained adviser, who will be a person made available by and through the College. The adviser may accompany the student to any meeting with a College employee and to the hearing. The adviser may not speak during the hearing.

**Support person.** The complainant and respondent have the right to be assisted by a support person of their choice. The support person typically is a member of the Swarthmore College community (current student, faculty member, staff member, or administrator), but is not limited.

To serve as a support person, the individual will be required to meet with the student conduct administrator in advance of any participation in the proceedings.

The support person cannot be a witness in the proceedings. The support person is a silent and non-participating presence who is there solely to observe and provide moral support during the hearing and meetings leading to the hearing. This person is not to address the panel, except to ask for a short recess if one of the parties requires some time to compose her/himself or collect her/his thoughts. The student conduct administrator has the right at all times to determine what constitutes appropriate behavior on the part of a support person and whether the person may remain at the proceedings.

Absent extenuating circumstances, witnesses and others involved in an investigation or hearing are not entitled to have a support person.

## 4. Role of the Attorney/Outside Agreements

A complainant or respondent may choose to seek the advice and assistance of an attorney at their own expense. An attorney may serve as a support person but must abide by the Advisor and support person guidelines (see above). Additionally, the College will not recognize or enforce agreements between the parties reached outside of these procedures. If the support person is an attorney, the College's attorney may also attend the hearing.

## 5. Pre-Hearing Meeting with Complainant and Respondent

When a hearing is deemed necessary based on the review of the investigation report, the student conduct administrator, grievance advisor, and/or the violence prevention educator and advocate will contact the complainant and/or respondent to schedule separate meetings with each party. At this pre-hearing meeting, each party will receive an explanation of the hearing process and have the opportunity to ask any questions before the hearing occurs. If the complainant and/or respondent have elected to have advisers or a support person throughout the hearing process, that person is encouraged to be present at this initial meeting.