**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MAROOF HAQUE                        :
                                    :
          Plaintiff                 : CIVIL ACTION
                                    :
     vs.                            :
                                    : NO. 15-CV-1355
SWARTHMORE COLLEGE                  :
                                    : FILED UNDER SEAL
          Defendant                 :

FILED

FEB - 3 2016

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

**MEMORANDUM AND ORDER**

JOYNER, J.                              January 28 , 2016

     This action is before the Court yet again on Motion of

Defendant to Strike, or in the alternative, to Dismiss the

Plaintiff's Third Amended Complaint and for Sanctions.  As we

explain in the pages which follow, the Motion is GRANTED IN PART[1]

and DENIED IN PART.

### Factual Background

     The instant matter arises out of an incident which occurred

on the night of September 10, 2011 on the Swarthmore College

campus in Swarthmore, Pennsylvania.  Earlier that evening,

Plaintiff, a freshman at the college, met another freshman, Jane

Doe, at an on-campus fraternity party and after dancing and

---

     [1]  In his Memorandum of Law in Opposition to Defendant's Motion to
Dismiss, Plaintiff has voluntarily withdrawn his claims for estoppel and
reliance and for negligence.  So saying, those claims, set forth as the Sixth
and Eighth Causes of Action in the Third Amended Complaint, are dismissed with
prejudice.

"grinding" for a time at the party, the pair left, walking from the fraternity house to the open air amphitheater, located behind one of the dormitories on campus.  According to the Third Amended Complaint ("TAC"), Plaintiff felt forced and did not enjoy dancing or grinding with Jane, but "did not show outward signs of his discomfort," and Jane led him, "literally pulling on his hands" from the fraternity house to the open air amphitheater.  (TAC, ¶s 29, 30).  Although "it seemed to Plaintiff that Jane Doe smelled of alcohol," "at no point during [their] conversation [at the amphitheater] did Jane show any sign of incapacitation; on the contrary, she provided lucid, conscious, active, audible and sober responses."  (TAC, ¶s 28, 32).

Plaintiff further alleges that he "was not comfortable in the amphitheater because he did not want any interaction with Jane."  (TAC, ¶ 34).  Nevertheless, the parties became more and more intimate, such that "Jane reached under Plaintiff's shirt and Plaintiff asked Jane if she wanted him to remove it to which she replied with an active, knowing, clear and willing 'yes.'"  (TAC,  ¶ 35).  "Plaintiff further asked Jane to confirm she wanted him to remove or not remove clothes, to kiss or not kiss her, and to touch or not touch her.  There was nothing other than request for consent from the Plaintiff to Jane and consent from Jane throughout the incident."  (TAC, ¶ 36).  But the intimacy came to an abrupt halt, according to Plaintiff, when Jane without

2

his consent "performed a sexual act on him as he lied down."
(TAC, ¶s 37-38).  According to Plaintiff, this was his first
sexual experience and, after making "polite small talk" afterward
while they dressed, they both returned to their respective
dormitories.  (TAC, ¶ 39-41).  Thereafter, over the course of the
next four semesters, Plaintiff and Jane saw and spoke to each
other occasionally, even living a few doors away from one another
during their sophomore year.  (TAC, ¶s 42, 45).  Plaintiff never
told anyone at Swarthmore about his encounter with Jane and to
the best of his knowledge, she made no effort to tell anyone
either.  (TAC, ¶s 43-44).

On May 9, 2013, 607 days (some 20 months) after the incident
described above, "Plaintiff was stunned to have a Swarthmore
Public Safety officer summarily evict him and publicly escort him
off campus, because Jane had filed an internal, sexual assault
complaint against him which Joanna Gallagher, [a Swarthmore
College administrator] was investigating."  (TAC, ¶s 4, 50).
Plaintiff also averred that he was interviewed that same day by
Ms. Gallagher, "a white female," during which Ms. Gallagher
ostensibly made a number of statements which Plaintiff submits
were designed to entrap him and lead him toward self-
incrimination such as asking him whether he got Jane's number,
asking him why he felt scared when Jane was forcing him to grind,
to interact with her in the amphitheater and when she sexually

touched him without his permission, and remarking that "it seemed like you were having such a good time," and "it seemed like a positive experience for you - don't let this hard time you are going through change that."   (TAC, ¶s 50, 54, 55).

In the months that followed, Ms. Gallagher continued the investigation into Jane Doe's complaint, but according to Plaintiff, this investigation was inadequate in a number of ways in that Gallagher failed to document or investigate Plaintiff's accusation that *Jane* had assaulted *him*, suppressed and/or inaccurately portrayed third party comments and statements regarding Plaintiff and an independent psychological expert report of Plaintiff, and failed to investigate and incorporate questions into Jane's character and reputation for truthfulness. Plaintiff also alleges that Ms. Gallagher specifically instructed him that he could not seek the advice of a lawyer and that he could not receive psychological or academic support throughout the investigation because he was not the victim and such supports were reserved only for sexual assault victims.   (TAC, ¶s 57-61). Plaintiff alleges that Gallagher's biased and inadequate investigation was sanctioned by the college and was motivated by her bias against his race (Bengali) and sex (male) and that had the investigation been handled in an unbiased manner, the administration would have realized that the complaint was unfounded and it would have been dismissed.   (TAC, ¶s 63, 65,

66).

Upon conclusion of Gallagher's investigation, Nathan Miller,
another Swarthmore College administrator, assumed the further
handling of Plaintiff's case which proceeded to the College
Judiciary Committee.  Plaintiff alleges that in his handling of
the matter, Miller also selectively and in a biased manner
enforced the confidentiality policies and rules and disciplinary
and hearing procedures against him on the basis of his race and
gender, which treatment was in keeping with the manner in which
Miller had purportedly handled three other disciplinary hearings
against male students of color.  (TAC, ¶s 74-83).  Plaintiff's
disciplinary hearing was held on September 27, 2013 before a JAMS[2]
adjudicator - retired Common Pleas Judge, Jane Greenspan.
According to Plaintiff, Judge Greenspan's determinations were
"cat's pawed"[3] by "Miller's sex-based and race-motivated bias"
with the result that "Judge Greenspan found Plaintiff guilty of

---

[2]   JAMS is a national private company specializing in providing retired
legal professionals, including retired judges, for alternative dispute
resolution services such as mediations and arbitrations.

[3] As explained by the Supreme Court in Staub v. Proctor Hospital, 562
U.S. 411, 416, n.1, 131 S. Ct. 1186, 1189, n.1, 179 L. Ed. 2d 144 (2011):

> The term "cat's paw" derives from a fable conceived by Aesop, put into
> verse by La Fontaine in 1679 and injected into United States employment
> discrimination law by Posner in 1990.  See, Shager v. Upjohn Co., 913
> F.2d 398, 405 (CA7).  In the fable, a monkey induces a cat by flattery
> to extract roasting chestnuts from the fire.  After the cat has done so,
> burning its paws in the process, the monkey makes off with the chestnuts
> and leaves the cat with nothing.  A coda to the fable (relevant only
> marginally, if at all to employment law) observes that the cat is
> similar to princes who, flattered by the king, perform services on the
> king's behalf and receive no reward.

sexual assault."  (TAC, ¶s 88-89, 91, 97-98).  "Following Judge Greenspan's finding, Miller suspended Plaintiff for two years - or the length of time Jane would remain on campus so she would be shielded from Plaintiff."  (TAC, ¶99).

Plaintiff appealed his suspension to Liz Braun, the Dean of Swarthmore.[4]  (TAC, ¶101).  Apparently, Braun summarily denied the appeal which, Plaintiff submits, was a violation of the then-existing Swarthmore policy and handbook as well as Title VI, Title IX and due process.  Plaintiff was then evicted from his residence hall and barred from the Swarthmore Campus.  According to Plaintiff, he was "penniless," and "left standing with his belongings in the public sidewalk of Swarthmore Borough."  (TAC, ¶s 105-108).  Fortunately for Plaintiff, several friends "provided him with food, shelter, and love during those dark days in defiance of Miller's suspension and ban."  (TAC, ¶108).

On November 2, 2013, Plaintiff was invited to a small gathering of friends in their private rooms in a Swarthmore dormitory at which alcohol, including a "flaming drink" was being consumed.  (TAC, ¶s 109-111).  A female student apparently complained to Miller that Plaintiff's presence purportedly placed her at risk of being sexually assaulted and Plaintiff was charged with failing to comply with his suspension and campus ban, and

---

[4]  Plaintiff avers that Jane also appealed the decision because she was "displeased; the sanction did not assuage her frustration against Swarthmore," instead demanding that Plaintiff be completely and finally expelled from the College.  (TAC, ¶s 100, 102).

with violating the college's alcohol policy. (TAC, ¶s 112, 114).
Miller again commenced disciplinary proceedings against
Plaintiff, which proceedings according to Plaintiff, were
selectively instituted and disproportionately handled because of
his gender and race, at the conclusion of which Plaintiff was
expelled from Swarthmore. (TAC, ¶s 114-117).

It is against the backdrop of these allegations[5] that
Plaintiff seeks monetary and equitable relief for what he
contends are violations of Title VI and Section 1981 of the Civil
Rights Act, 42 U.S.C. §§ 1981 and 2000d and Title IX of the
Education Act Amendment of 1972, 20 U.S.C. § 1681, and under
state law for breach of contract, estoppel, negligence, breach of
the duty of good faith and fair dealing, unfair and deceptive
trade practices, negligent infliction of emotional distress,
declaratory judgment and violation of the Pennsylvania Landlord-
Tenant Act, 68 P.S. §250.101, *et. seq*. Defendant moves to
finally strike the Third Amended Complaint with prejudice and for
sanctions for failure to file a pleading which conforms with the
Federal Rules of Civil Procedure or to alternatively dismiss this
action in its entirety for failure to state a claim upon which
relief may be granted. In his response to this motion, Plaintiff
has voluntarily withdrawn his claims for estoppel and reliance

---

[5] As is discussed *infra*, we have had to parse through much excess
verbiage contained in some 125 paragraphs over some 20 pages to distill the
essence of the facts in this matter.

7

and negligence and thus we note at the outset that those claims are dismissed.

### Standards Governing Motions to Strike and to Dismiss

Generally speaking, motions to strike are available under Fed. R. Civ. P. 12(f), which provides that:

> [t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may act:
>
>> (1) on its own; or
>>
>> (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Motions to strike are considered to be a drastic remedy which are not favored, and will usually be denied unless the allegations have no possible relation to the controversy, may cause prejudice to one of the parties, or if the allegations confuse the issues. Tippett v. Ameriprise Ins. Co., Civ. A. No. 14-4710, 2015 U.S. Dist. LEXIS 37513, *4 (E.D. Pa. March 25, 2015); The Knit With v. Knitting Fever, Inc., Civ. A. No. 08-4221, 08-4775, 2009 U.S. Dist. LEXIS 30230, *18 (E.D. Pa. April 8, 2009).  The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.  Ford-Greene v. NHS, Inc., Civ. A. No. 14-5846, 2015 U.S. Dist. LEXIS 65676, *59 (E.D. Pa. May 20, 2015); North Penn Transfer, Inc. v. Victaulic Co. Of Am., 859 F. Supp. 154, 159 (E.D. Pa. 1994).

8

Fed. R. Civ. P. 8. outlines the principles and rules for pleading in the federal courts.  Pursuant to subsection (a) of that Rule,

> **(a) Claim for Relief.** A pleading that states a claim for relief must contain:
>
>> (1) a short and plain statement of the grounds for the court's jurisdiction unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>>
>> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>>
>> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

And, under Rule 8(d)(1), "[e]ach allegation must be simple, concise, and direct.  No technical form is required."

On the other hand, motions to dismiss for failure to state a claim upon which relief can be granted are filed pursuant to Fed. R. Civ. P. 12(b)(6).  <u>Renfro v. Unisys Corp.</u>, 671 F.3d 314, 320 (3d Cir. 2011).  "The question is 'not whether plaintiffs will ultimately prevail but whether their complaint was sufficient to cross the federal court's threshold.'"  <u>Id</u>,(quoting <u>Skinner v. Switzer</u>, 562 U.S. 521, 530, 131 S. Ct. 1289, 1296, 179 L. Ed. 2d 233 (2011)).  Because Fed. R. Civ. P. 8(a)(2) requires a 'showing,' rather than a blanket assertion, of entitlement to relief, courts evaluating the viability of a complaint must look beyond conclusory statements and determine whether the complaint has alleged enough facts to state a claim to relief that is

plausible on its face.  <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929, 949 (2007); <u>In re Insurance Brokerage Antitrust Litigation</u>, 618 F.3d 300, 319 (3d Cir. 2010).

It is well settled that in conducting a review of a challenged pleading, the courts are required to accept all well-pleaded factual allegations as true and draw all reasonable inferences in the non-movant's favor.  <u>Ebert v. Prime Care Medical, Inc.</u>, No. 14-2020, 2015 U.S. App. LEXIS 1843 at *4 (3d Cir. Feb. 5, 2015); <u>Krantz v. Prudential Investments Fund Management</u>, 305 F.3d 140, 142 (3d Cir. 2002)  In so doing, reliance is placed upon "the complaint, attached exhibits, and matters of public record."  <u>Ebert</u>, <u>supra</u>, (quoting <u>Sands v. McCormick</u>, 502 F.3d 263, 268 (3d Cir. 2007)).  Indeed, it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of the proscribed conduct."  <u>Umland v. Planco Financial Services, Inc.</u>, 542 F.3d 59, 64 (3d Cir. 2008)(quoting <u>Philips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).  Examination of the context of the claim, including the underlying

substantive law is therefore necessary in order to properly assess plausibility.  Renfro, 671 F.3d at 321(citing In re Insurance Brokerage, 618 F.3d at 320, n. 18).

## Discussion

### A. Renewed Motion to Strike

Defendant first urges the Court to strike the Third Amended Complaint because it again contains redundant, immaterial, impertinent and scandalous matter.  In support of this assertion, Defendant appends various documents which "Plaintiff himself should have," arguing that they refute the veracity of the complaint and points to "numerous internal inconsistencies" contained within the challenged pleading.  (Defendant's Memorandum of Law in Support of Motion to Strike or Dismiss Third Amended Complaint, p. 6).

While we agree with Defendant that the Third Amended Complaint is a less than model pleading and that some of its averments do appear to contradict others, we nevertheless find it to be a significant improvement over Plaintiff's earlier efforts such that it is adequate to place Defendant on notice of the claims against it and to enable it to prepare a defense. Consequently at this point in the proceedings, we shall heed the admonition that motions to strike are drastic, un-favored remedies which are usually denied.  That having been said, however, should discovery reveal that the allegations put forth

11

in this matter are false, have no possible relation to the
controversy, or that they cause genuine prejudice to any of the
parties identified therein, Plaintiff may be assured that this
Court will not hesitate to consider the imposition of appropriate
sanctions upon receipt of a renewed motion from the defendant.
At this juncture though, the motion to strike and for sanctions
shall be denied.

   B.   *Plaintiff's Title IX Claim (First Cause of Action)*

   Title IX, which is codified at 20 U.S.C. §1681, essentially
prohibits (with certain limited exceptions not applicable here)
any education program or activity receiving federal financial
assistance from excluding or discriminating against any person in
the United States on the basis of sex.  Although the Third
Circuit Court of Appeals has yet to enunciate the pleading
requirements of a Title IX claim in a case such as this one, the
Second and Sixth Circuits have done so in <u>Yusuf v. Vassar</u>
<u>College</u>, 35 F.3d 709 (2d Cir. 1994) and <u>Mallory v. Ohio</u>
<u>University</u>, 76 F. App'x. 634, 2003 U.S. App. LEXIS 19025 (6th Cir.
2003) and a number of district courts in this and other circuits
have followed their leads.  <u>See</u>, <u>e.g.</u>, <u>Doe v. Rector & Visitors</u>
<u>of George Mason University</u>, No. 1:15-cv-209, 2015 U.S. Dist.
LEXIS 125230 at *44 (E.D. Va. Sept. 16, 2015); <u>Doe v. University</u>
<u>of Massachusetts-Amherst</u>, Civ. A. No. 14-30143-MGM. 2015 U.S.
Dist. LEXIS 91995 at *24 (D. Mass. July 14, 2015); <u>Tafuto v. N.J.</u>

<u>Institute of Technology</u>, Civ. A. No., 10-4521, 2011 U.S. Dist.
LEXIS 81152 at *6 (D.N.J. July 26, 2011); <u>Doe v. University of
the South</u>, 687 F. Supp. 2d 744, 757 (E.D. Tenn. 2009).

Noting that Title IX was enacted to supplement the Civil
Rights Act of 1964's ban on racial discrimination in the
workplace and in universities and because Title IX mirrors the
substantive provisions and shares the same goals as Title VI, the
Second Circuit in <u>Yusuf</u> observed that courts have interpreted
Title IX by looking to the body of law developed under Title VI
and the caselaw interpreting Title VII.  <u>Yusuf</u>, 35 F.3d at 714.
In so doing, the <u>Yusuf</u> court further found that Title IX bars the
imposition of university discipline where gender is a motivating
factor in the decision to discipline and that cases in which a
plaintiff attacks a university disciplinary proceeding on grounds
of gender bias typically fall within two categories:

> In the first category, the claim is that the plaintiff was
> innocent and wrongly found to have committed an offense.  In
> the second category, the plaintiff alleges selective
> enforcement.  Such a claim asserts that, regardless of the
> student's guilt or innocence, the severity of the penalty
> and/or the decision to initiate the proceeding was affected
> by the student's gender.

<u>Id</u>, at 715.  The Second Circuit then went on to outline the
pleading requirements for both the "erroneous outcome" and
"selective enforcement" theories:

> Plaintiffs may plead in the alternative that they are in
> both categories, but in neither case do wholly conclusory
> allegations suffice for purposes of Rule 12(b)(6). ...
> (citation omitted).  Plaintiffs who claim that an erroneous

13

outcome was reached must allege particular facts sufficient
to cast some articulable doubt on the accuracy of the
outcome of the disciplinary proceeding.  If no such doubt
exists based on the record before the disciplinary tribunal,
the claim must fail. ... However, the pleading burden in
this regard is not heavy.  For example, a complaint may
allege particular evidentiary weaknesses behind the finding
of an offense such as a motive to lie on the part of a
complainant or witnesses, particularized strengths of the
defense, or other reason to doubt the veracity of the
charge.  A complaint may also allege particular procedural
flaws affecting the proof.

However, allegations of a procedurally or otherwise flawed
proceeding that has led to an adverse and erroneous outcome
combined with a conclusory allegation of gender
discrimination is not sufficient to survive a motion to
dismiss.  The fatal gap is, again, the lack of a
particularized allegation relating to a causal connection
between the flawed outcome and gender bias.  A plaintiff
must thus allege particular circumstances suggesting that
gender bias was a motivating factor behind the erroneous
finding.  Allegations of a causal connection in the case of
university disciplinary cases can be of the kind that are
found in the familiar setting of Title VII cases. ... Such
allegations might include, *inter alia*, statements by members
of the disciplinary tribunal, statements by pertinent
university officials, or patterns of decision-making that
also tend to show the influence of gender.  Of course, some
allegations, such as statements reflecting bias by members
of the tribunal, may suffice both to cast doubt on the
accuracy of the disciplinary adjudication and to relate the
error to gender bias.

Id.(citing Silver v. City University of New York, 947 F.2d 1021

(2d Cir. 1991)(*per curiam*); Lopez v. Metropolitan Life Ins. Co.,

930 F.2d 157 (2d Cir.), *cert. denied*, ___U.S.___, 112 S. Ct. 228,

116 L. Ed. 2d 185 (1991); Krieger v. Gold Bond Bldg. Prods., 863

F.2d 1091 (2d Cir. 1988)).

In the Mallory case, while acknowledging the erroneous

outcome and selective enforcement categories in its review of the

14

Title IX case before it, the Sixth Circuit also considered the plaintiff's request to read two other Title IX intent standards into the <u>Yusuf</u> framework: the "deliberate indifference" standard and the "archaic assumptions" standard. <u>Mallory</u>, 76 F. App'x at 638. "The 'deliberate indifference' standard is applied where a plaintiff seeks to hold an institution liable for sexual harassment and requires the plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." <u>Id</u>.(citing <u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 277, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)). Hence, the deliberate indifference standard is a means of analyzing a plaintiff's Title IX claim arising from disciplinary hearings. <u>Doe v. Case Western Reserve University</u>, No. 1:14CV2044, 2015 U.S. Dist. LEXIS 123680 at *11 (N.D. Ohio Sept. 16, 2015).

"The 'archaic assumptions' standard, which has been applied where plaintiffs seek equal athletic opportunities, finds discriminatory intent in actions resulting from classifications based upon archaic assumptions." <u>Id</u>.(citing <u>Pederson v. La. State Univ.</u>, 213 F.3d 858, 880-82 (5th Cir. 2000) and <u>Horner ex rel. Horner v. Kentucky High Sch. Ath. Ass'n</u>, 206 F.3d 685, 693, n.4 (6th Cir. 2000)). Under each of these standards, a plaintiff must demonstrate that the educational institution's challenged

15

misconduct was motivated by sex-based discrimination.   Id; Doe v.
Case Western, 2015 U.S. Dist. LEXIS 123680 at *10.

In applying the preceding parameters to our examination of
the Plaintiff's Third Amended Complaint, we find that while it
contains some 210 paragraphs, it alleges only the following
salient facts:

> - Plaintiff is a "man of color," "of Southeast Asian
> national origin," and "a US Citizen of Bengali national
> origin."  (TAC, ¶s 2, 5, 157).
>
> - Jane Doe is a "white female Swarthmore student"  (TAC, ¶s
> 1, 16, 50).
>
> - "Swarthmore is a small, private, liberal arts college with
> a principal address of 500 College Avenue, Swarthmore,
> Pennsylvania 19081," and "Swarthmore receives extensive
> federal funding."  (TAC, ¶s 6, 128).
>
> - As a result of Jane's complaint, Plaintiff was "summarily
> evicted" and "publicly" escorted off campus by a Swarthmore
> Public Safety officer on or about May 9, 2013.  (TAC, ¶ 50).
>
> - That Swarthmore "segregated Plaintiff from the rest of the
> student population; something that it did not do in the
> cases of other white students accused of assault."  (TAC, ¶
> 51).
>
> - "During the Plaintiff's interview on or about May 9, 2013
> Gallagher made a number of statements" to Plaintiff such as:
>
> "Did you get her number?"
>
> "I can't believe you couldn't get her number!"
>
> "Scared!  What was there to be scared about?"
>
> "It seemed like you were having such a good time!"
>
> "It seemed like a positive experience for you, don't let
> this hard time you are going through change that."

16

(TAC, ¶s 54 - 56).

- "Gallagher did not accurately or factually portray Plaintiff's comments that it was actually Jane who had assaulted him," and "refused to document this in her report altogether." (TAC, ¶ 57).

- "Gallagher suppressed all evidence of an independent psychological expert report by Allan Tepper, J.D. Psy.D., which Swarthmore commissioned and which determined that Plaintiff was not a 'threat' to himself or to others;" and that "Gallagher suppressed oral statements that Student No. 10 stated to Gallagher and others..." (TAC, ¶ 58).

- Gallagher inadequately investigated the subject event by failing to document that Plaintiff had advised her that Jane had gotten drunk of her own volition and then assaulted him and by failing to undertake any investigation into Jane's character and reputation for truthfulness. (TAC, ¶ 59).

- During her interviews with Plaintiff, Gallagher specifically instructed Plaintiff to not seek the advice of a lawyer and told him that he could not receive psychological, legal and academic support because such supports were only available to victims and he was not the victim in this case. (TAC, ¶60).

- Gallagher failed to inform Plaintiff that, based upon his report that Jane had sexually assaulted him, he could file a complaint against Jane and with the police. (TAC, ¶ 64).

- Neither the reviewing dean nor the adjudicator conducted an independent investigation into the sexual assault complaint against Plaintiff but both instead relied on Gallagher's report to find Plaintiff guilty. (TAC, ¶s 69, 70).

- Despite Swarthmore's alleged policy to keep confidential the identity of sexual assault complainants, Jane was approached and questioned by the investigator in front of the Library ostensibly within the sight and earshot of others. (TAC, ¶ 72).

- After Miller assumed the handling of the case from Gallagher, he threatened Plaintiff and those who supported him to remain silent and told Plaintiff to not speak or ask for help or seek information for his defense on threat of expulsion. Thus, Plaintiff could not ask his friends to

17

testify on his behalf and could not seek help from
Swarthmore's faculty or from legal counsel.  (TAC, ¶ 74-77).

- Miller also did not give Plaintiff the opportunity to
review and/or correct the investigative file against him and
also ignored Plaintiff's complaint that Jane had assaulted
him. (TAC, ¶ 80).

- Jane impermissibly published to another student and
Plaintiff's fraternity that Plaintiff had been accused of
sexual assault but she was not disciplined for violation of
the confidentiality policy.  (TAC, ¶s 78-79).

- Both the Department of Education and the Department of
Justice have promulgated regulations under Title IX that
require schools to adopt and publish grievance procedures
providing for the prompt and equitable resolution of student
complaints alleging any action which would be prohibited by
Title IX or its regulations, which actions include any form
of sexual touching. (TAC, ¶ 131).

- The procedures adopted by Title IX-covered schools must
not only ensure the Title IX rights of the complainant but
must also accord due process to both parties involved.  Due
process must include adequate, reliable and impartial
investigation of complaints, including the opportunity to
present witnesses and other evidence. A school also has a
Title IX - mandated obligation to make sure that all persons
handling its procedures have adequate training as to what
conduct constitutes sexual harassment, which includes
alleged sexual assaults.  (TAC, ¶s 132-134).

- Swarthmore's sexual assault policy is stated in the
Student Handbook by the terms of which students agree to
certain rules of behavior when they accept the College's
offer of a place in their class.  The student handbook
and/or the policies contained therein are subject to
modification from time-to-time.  (TAC, ¶s 14, 17).

- At the time of the investigation of the events in
controversy here, Swarthmore's student handbook for 2012-
2013 expressly covenanted rights to respondents of sexual
assault allegations such as a factual investigation, a
report of this investigation, and an opportunity to respond
to this report, all leading to a discretionary decision on
the part of the College's administration to proceed or not
to proceed with formal charges.  (TAC, ¶s 18-20).

- Between September 2013 and June 2014, Miller convened four disciplinary hearings for sexual assault matters at which three of those students were held responsible.  Of those three, two are men of color – Plaintiff and one other student.  (TAC, ¶ 83).

- Plaintiff was found guilty of sexual assault by Judge Greenspan and Miller suspended him for two years, or the length of time Jane would remain on campus. (TAC, ¶s 98-99).

- Plaintiff and Jane both appealed to Dean Liz Braun but Dean Braun denied both appeals. (TAC, ¶s 101, 104). Plaintiff was evicted from his campus housing but remained in the Swarthmore area staying at the home of friends. (TAC, ¶s 105-108).

- On November 2, 2013, Plaintiff was on the Swarthmore campus having sought medical care from the health center after which he attended "a small gathering of friends" at the "private rooms in a dormitory..."  "Alcohol, including a 'flaming drink' were consumed at the gathering."  (TAC, ¶s 109-111).  A "white-presenting female" student "complained that Plaintiff's presence in the [dormitory] hall placed her at risk of being sexually assaulted by Plaintiff" and "[o]n that complaint, Miller then proceeded to permanently expel Plaintiff."  (TAC, ¶s 109-113).

- As a result of this incident, Miller charged Plaintiff alone, "a man of color" with violating the school's alcohol policy, the prohibition against open flames in dormitory rooms, and with violating the requirement that he provide notice to the College when visiting and treated these charges as a major offense.   (TAC, ¶ 114).

- Miller gave Plaintiff legal advice that he could forego the adjudicative hearing reserved for major offenses and confess, telling Plaintiff that he would receive lower punishment as a result.  Plaintiff relied on this advice, and Miller held a hearing at which he found Plaintiff guilty of the charges and permanently expelled him from Swarthmore College. (TAC, ¶ 114).

- In addition to Plaintiff's case, Miller prosecuted 35 other violations of Swarthmore's alcohol policy between September 2013 and June 2014, all of which were treated as minor violations.  Plaintiff's violation was the only one which was treated as a "major violation."  (TAC, ¶s 115-116).

- "On information and belief," Swarthmore has never disciplined a female student for alleged sexual misconduct. (TAC, ¶ 140).

- As a result of his expulsion, Plaintiff alleges that he suffered monetary and other damages to his academic record and career and trauma that requires therapy and other health care for the rest of his life. (TAC, ¶s 118-124).

Noticeably absent are the necessary averments that Swarthmore discriminated against Plaintiff *because of his sex*[6], that this discrimination was intentional and that the discrimination was a substantial or motivating factor for the defendant's actions. Doe v. Columbia University, No. 14-CV-3573, 2015 U.S. Dist. LEXIS 52370 at *22-*23 (S.D. N.Y. April 21, 2015)(citing Tolbert v. Queens College, 242 F.3d 58, 69 (2d Cir. 2001)). Stated otherwise, a male plaintiff must allege that the educational institution's actions against him were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings; wholly conclusory allegations do not suffice for purposes of Rule 12(b)(6). Tafuto, supra, (citing Doe v. University of the South, and Yusuf, both supra). While an argument may be made that the Third Amended Complaint does sufficiently allege that Swarthmore's sexual assault policies and procedures have a disparate impact on men, disparate impact claims may not be

---

[6] Although he asserts at various points that he was also targeted because of his race, we reiterate that Title IX is intended to remedy gender discrimination only.

brought under Title IX.  <u>Alexander v. Sandoval</u>, 532 U.S. 275,
280, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)(stating that no
private right of action to enforce disparate impact regulations
promulgated under Title VI is available and that Title IX was
patterned after Title VI); <u>Doe v. Columbia</u>, <u>supra</u>; <u>Yu v. Vassar
College</u>, No. 13-CV-4373, 2015 U.S. Dist. LEXIS 43253 at *10
(S.D.N.Y. March 31, 2015); <u>Weser v. Glen</u>, 190 F. Supp. 2d 384,
395 (E.D.N.Y. 2002).  Consequently,  Plaintiff's Title IX claim
is properly dismissed.

   C.  *Plaintiff's Title VI Claim (Second Cause of Action)*

   Under Title VI of the Civil Rights Act of 1964, 42 U.S.C.
§2000d:

> No person in the United States shall, on the ground of race,
> color, or national origin, be excluded from participation in,
> be denied the benefits of, or be subjected to discrimination
> under any program or activity receiving Federal financial
> assistance.

This section, §601, prohibits only intentional discrimination and
thus private individuals who bring suits under Title VI may not
recover compensatory relief unless they show that the defendant
engaged in intentional discrimination.  <u>Alexander v. Sandoval</u>, 532
U.S. at 280, 121 S. Ct. at 1516; <u>Blunt v. Lower Merion School
District</u>, 767 F.3d 247, 272 (3d Cir. 2014)(citing <u>Guardians Assoc.
v. Civil Service Commission of New York</u>, 463 U.S. 582, 597, 607,
103 S. Ct. 3221, 3230, 3235, 77 L. Ed. 2d 866 (1983)).
Additionally, under Title VI, a plaintiff must show: (1) that

21

there is racial or national origin discrimination; and (2) the
entity engaging in discrimination is receiving federal financial
assistance.  <u>Lei Ke v. Drexel University</u>, Civ. A. No. 11-6708,
2015 U.S. Dist. LEXIS 118211 at * 36 (E.D. Pa. Sept. 4, 2015).  To
prove intentional discrimination by a policy which is facially
neutral, a plaintiff must show that the relevant decisionmaker
adopted the policy at issue "because of," not merely "in spite
of," its adverse effects upon an identifiable group.  <u>Pryor v.
National Collegiate Athletic Ass'n.</u>, 288 F.3d 548, 562 (3d Cir.
2002)(quoting <u>Personnel Administrator of Massachusetts v. Feeney</u>,
442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979)).  A
mere awareness of the consequences of an otherwise neutral policy
will not suffice.  <u>Id</u>.

Although never formally adopted by the Third Circuit in the
educational context, the burden-shifting, prima facie test
articulated for employment discrimination claims in <u>McDonnell
Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d
668 (1973) has nevertheless been recognized by the Third Circuit
and applied by district courts in this and other circuits and by
other Circuit Courts of Appeals to actions alleging discrimination
in education under Title VI and Section 1981.   <u>Manning v. Temple
University</u>, No. 05-1215, 2005 U.S. App. LEXIS 26483, 157 Fed.
Appx. 509, 513 (3d Cir. 2005); <u>Bell v. Ohio State University</u>, 351
F.3d 240 (6th Cir. 2003).  <u>See also</u>, <u>L.L. and K.L. v. Evesham</u>

Township Board of Education, Civ. A. No. 13-3696, 2015 U.S. Dist. LEXIS 133502 (D. N.J. Sept. 30, 2015); Lei Ke v. Drexel University, Civ. A. No. 11-6708, 2015 U.S. Dist. LEXIS 118211 (E.D. Pa. Sept. 4, 2015); Blunt v. Lower Merion School District, 826 F. Supp. 2d 749 (E.D. Pa. 2011); Koumantaros v. City University of New York, No. 03 Civ. 10170, 2007 U.S. Dist. LEXIS 19530 at *23 (S.D. N.Y. March 19, 2007); Manning v. Temple University, Civ. A. No. 03-4012, 2004 U.S. Dist. LEXIS 26129 (E.D. Pa. Dec. 30, 2004). Under that test, to make out a prima facie case under Title VI a plaintiff must prove that: (1) he is a member of a protected class; (2) he suffered an adverse action at the hands of the defendants in his pursuit of his education; (3) he is qualified to continue his pursuit of his education; and (4) he was treated differently from similarly situated students who are not members of a protected class. Lei Ke, 2015 U.S. Dist. LEXIS at *53; L.L. and K.L., 2015 U.S. Dist. LEXIS at *18; Serodio v. Rutgers, The State University of New Jersey, 27 F. Supp. 3d 546, 554-555 (D. N.J. 2014); Blunt v. Lower Merion, 826 F. Supp. 2d at 758; Releford v. Pennsylvania State University, No. 10-cv-1621, 2011 U.S. Dist. LEXIS 25546 at *12 (M.D. Pa. March 14, 2011). If the plaintiff establishes a prima facie case, the burden will shift back to the defendant to put forth a legitimate, nondiscriminatory reason for its actions and, once a nondiscriminatory reason is proffered, the onus again shifts to

the plaintiff to provide direct or circumstantial evidence from which a jury could reasonably either disbelieve the articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the action.  <u>Blunt</u>, 826 F. Supp. 2d at 758 (citing, *inter alia*, <u>McDonnell Douglas</u>, <u>supra</u>, and <u>Sheridan v. E.I. DuPont deNemours & Co.</u>, 100 F.3d 1061, 1067 (3d Cir. 1996)).

In this case, after parsing the Third Amended Complaint for relevant facts, we find that Plaintiff has adequately alleged sufficient facts to make out a potential Title VI claim and that dismissal at the present time is inappropriate.  Indeed, Plaintiff pleads that Swarthmore receives federal funding, that he is a member of a protected class, that had it not been for the allegations of sexual misconduct, Plaintiff would still be enrolled as a student at Swarthmore and was thus qualified to continue with his education there, that he suffered an adverse action (*to wit*, suspension and ultimately, expulsion) at the hands of the Defendant and that he was treated differently than other, white males who were also accused of assault (TAC, ¶s 2, 5, 15, 51, 115-116, 128, 147-148).  Inasmuch as these allegations are sufficient to aver a Title VI cause of action, the motion to dismiss as to Count 2 (a/k/a "Second Cause of Action") is denied.

D.  *Plaintiff's Section 1981 Claim (Third Cause of Action)*

In addition to the preceding federal claims, Plaintiff also

24

avers a violation of 42 U.S.C. §1981, which provides:

### § 1981.  Equal rights under the law

(a) Statement of equal rights.  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined.  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment.  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

To establish a right to relief under §1981, a plaintiff must show (1) that he belongs to a racial minority; (2) "an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in" §1981, including the right to make and enforce contracts." Pryor, 288 F.3d at 569 (quoting Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001)).  Insofar as both Title VI and §1981 provide a private cause of action for intentional discrimination, the standard for establishing an "intent to discriminate on the basis of race" is identical in the Title VI and §1981 contexts. Id.; Lei Ke, 2015 U.S. Dist. LEXIS at *36-*37.  Accordingly, given our conclusion that the facts as pled are sufficient to

25

plead a potentially viable Title VI claim, our ruling is the same with respect to Plaintiff's claim under Section 1981 and the motion to dismiss is denied as to the Third Cause of Action as well.

   E. *Breach of Contract (Fourth Cause of Action)*

   In addition to his federal claims, Plaintiff also seeks relief under several theories of Pennsylvania common law, the first of which is breach of contract. In this regard, Plaintiff submits that a contractual relationship was established between he and Swarthmore College through Swarthmore's Student Handbook, the College Bulletin, then-College President Rebecca Chopp's letter to the community of July 18, 2013 and the so-called "New Policy" governing the handling of sexual assault claims promulgated on August 28, 2013. (TAC, ¶s 14-20, 166). It is this contractual relationship which Plaintiff avers was materially breached by Swarthmore's purported failure to comply with the designated policies and procedures governing the handling of the sexual assault allegation against him and his prosecution for serving alcohol on campus. (TAC, ¶ 168).

   It has been noted that while the law is fairly well established with regard to disciplinary sanctions at state-owned colleges and universities that due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct, the law pertaining to judicial

26

review of disciplinary proceedings at private colleges and universities is not so well settled.  Boehm v. University of Pennsylvania School of Veterinary Medicine, 392 Pa. Super. 502, 573 A.2d. 575, 578, 579 (1990)(quoting Dixon v.  Alabama State Board of Education, 294 F.2d 150, 158-159 (5th Cir. 1961), *cert. denied*, 368 U.S. 930, 82 S. Ct. 368, 7 L. Ed. 2d 193 (1961)).  See also, Goss v. Lopez, 419 U.S. 565, 572, 574, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975).  Generally, however, the relationship between a private educational institution and an enrolled student is deemed to be contractual in nature such that a student can bring a cause of action against the institution for breach of contract where the institution ignores or violates portions of the written contract. Reardon v. Allegheny College, 2007 PA Super 160, 926 A.2d 477, 480 (PA. Super. 2007); Swartley v. Hoffner, 1999 PA Super 168, 734 A.2d 915, 919 (Pa. Super. 1999).  *In accord*, Thode v. Ladany, 2014 Pa. Super. Unpub. LEXIS 386 at * 11 - *12, 113 A.3d 342(Pa. Super. 2014).

Typically, "[t]he contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." Swartley, 734 A.2d at 919.  Agreements between students and their institutions concerning disciplinary procedures contained within a portion of a student handbook and other

27

documents are reviewed by the courts in the same manner as any other agreement between private parties.  Gati v. University of Pittsburgh, 2014 PA Super 99, 91 A.3d 723, 730 (2014), *appeal denied*, 2014 Pa. LEXIS 3351, 105 A.3d 737 (Pa. 2014)(citing Reardon, supra).  When a writing is clear and unequivocal, its meaning must be determined by its contents alone and only where its language is ambiguous may parol or extrinsic evidence be considered to determine the intent of the parties.  Murphy v. Duquesne University, 565 Pa. 571, 777 A.2d 418, 429 (Pa. 2001)(citing, *inter alia*, Felte v. White, 451 Pa. 137, 302 A.2d 347, 351 (1973)).

Thus, in ascertaining whether a viable cause of action for breach of contract has been pled by Plaintiff here, we look to the law of Pennsylvania for guidance and find that it requires that the following elements be alleged: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.  Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003)(quoting CoreStates Bank, N.A. v. Cutillo, 1999 PA Super 14, 723 A.2d 1053, 1058 (Pa. Super. 1999); Walsh v. University of Pittsburgh, Civ. A. No. 13-189, 2015 U.S. Dist. LEXIS 2563 at *17 - *18 (W.D. Pa. Jan. 8, 2015).

Once again after applying the preceding principles to our examination of the Plaintiff's Third Amended Complaint, we find

that it alleges sufficient facts to warrant allowing the breach of contract claim to move forward.  Briefly, Mr. Haque contends that certain rules, regulations, policies and procedures regarding sexual assault and the investigation and handling of sexual assault complaints and other disciplinary actions were outlined in the Swarthmore Student Handbook, College Bulletin and the College President's communiques such that he was entitled to certain rights as a student and that the College violated those rights by failing to adhere to the prescribed procedures.  This alleged failure resulted in what Plaintiff submits was his unjust suspension and eventual expulsion as a student of the College which caused him to suffer certain emotional injuries and monetary damages.  Given that his claim for breach of contract has been adequately pled, the motion to dismiss the Fourth Cause of Action is denied.

> F.   *Breach of the Covenant of Good Faith and Fair Dealing*
>       *(Fifth Cause of Action)*

For his fifth cause of action, Plaintiff asserts that:

> Swarthmore breached and violated the covenants of good faith
> and fair dealing implied in its agreements with Plaintiff by
> mishandling the investigative, evaluative and adjudicative
> part of the sexual assault complaint, by ignoring Plaintiff's
> complaint of assault against Jane, by failing to provide
> Plaintiff with the assistance he requested, by suppressing
> evidence and threatening him during the adjudication, by
> meting out a disproportionate sanction of suspension and by
> ignoring the many reasons why Plaintiff's appeal should have
> been granted as averred in this complaint.

> Swarthmore then breached and violated the covenants of good
> faith and fair dealing implied in its agreements with

29

Plaintiff by charging him with a major violation and expelling him for it when the facts merely included Plaintiff's visit to the campus health center to get a sudafed and then his interaction at the invitation of a Swarthmore student resident with others; all of whom were drinking and none of whom were charged.

(TAC, ¶s 173, 174).

As the Third Circuit succinctly stated in <u>Burton v. Teleflex, Inc.</u>, 707 F.3d 417, 432 (3d Cir. 2013):

> Pennsylvania courts have defined the duty of good faith and fair dealing as "honesty in fact in the conduct or transaction concerned," and have held that "where a duty of good faith arises, it arises under the law of contracts, not under the law of torts."...(citation omitted). Moreover, under Pennsylvania law, a "claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim." ... Therefore, while Pennsylvania law generally recognizes a duty of good faith in the performance of contracts, this duty "does not create independent substantive rights."

(quoting, *inter alia*, <u>LSI Title Agency, Inc. v. Evaluation Services, Inc.</u>, 2008 PA Super 126, 951 A.2d 384, 392 (Pa. Super. 2008), <u>Heritage Surveyors & Engineers, Inc. v. National Penn Bank</u>, 2002 PA Super 194, 801 A.2d 1248 (Pa. Super. 2002)). As a consequence, in Pennsylvania, an alleged breach of the duty of good faith and fair dealing does not give rise to a cause of action separate and apart from a breach of contract cause of action and parties are generally precluded from raising a breach of the duty of good faith and fair dealing claim separate and apart from the underlying breach of contract claim. <u>Kantor v. Hiko Energy, LLC</u>, 100 F. Supp. 3d 421, 430 (E.D. Pa. 2015); <u>Nova Financial Holdings, Inc. v. Bancinsure</u>, Civ. A. No. 11-7840, 2012

U.S. Dist. LEXIS 53800 at *9 (E.D. Pa. April 17, 2012); Wulf v. Bank of America, N.A., 798 F. Supp. 2d 586, 594 (E.D. Pa. 2011).

In reviewing the allegations set forth above and in view of the well-settled Pennsylvania caselaw, it is clear that the breach of good faith and fair dealing claim is nothing more than another iteration of the breach of contract claim. As such, it does not lie and is properly dismissed.

G. *Unfair and Deceptive Trade Practices (7th Cause of Action)*

Plaintiff next endeavors to state a claim for damages under the Pennsylvania Uniform Trade Practices and Consumer Protection Law, 73 P.S. §201-1, *et. seq.* ("UTPCPL"), which Defendant likewise moves to dismiss.

It has been recognized that the purpose of Pennsylvania's UTPCPL is "to protect the public from fraud and deceptive business practices." Belmont v. MB Investment Partners, Inc., 708 F.3d 470, 497 (3d Cir. 2013)(quoting Gardner v. State Farm Fire & Cas. Co., 544 F.3d 553, 564 (3d Cir. 2008)). Specifically, the statute makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (I) through (xxi) of clause (4) of section 2 of this act and regulations promulgated under section 3.1 of this act."[7]  73 P.S. §201-3.   The commencement of a

_____

[7] Thus, the definition of unfair methods of competition and unfair or deceptive acts or practices is very broad under the act, which also prohibits as a "catch-all" the "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S.

31

private action by "[a]ny person who purchases or leases goods or services for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by Section 3[8]," is authorized by §201-9.2 of the Act.  The Pennsylvania Supreme Court has stated that the law should be liberally construed in order to effectuate the legislative goal of consumer protection.  Ash v. Continental Insurance Co., 593 Pa. 523, 932 A.2d 877, 881 (2007); Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC, 2012 PA Super 60, 40 A.3d 145, 151 (Pa. Super. 2012)(citing Commonwealth by Creamer v. Monumental Properties, Inc., 459 Pa. 450, 459, 329 A.2d 812, 816 (1974)).

Generally speaking, "[i]n order for a private individual to bring a cause of action" under the UTPCPL, "that individual must first establish the following: (1) that he or she is a purchaser or lessee; (2) that the transaction is dealing with goods or services; (3) that the good or service was primarily for personal, family, or household purposes; and (4) that he or she suffered damages arising from the purchase or lease of goods or services." Morrison v. Wells Fargo Bank, N.A., 711 F. Supp. 2d 369, 384 (M.D. Pa. 2010)(quoting Keller v. Volkswagen of America, Inc., 1999 PA

---

§201-2(xii).

[8]   73 P.S. §201-3

Super 153, 783 A.2d 642, 646 (Pa. Super. 1999). *In accord*,
Pellegrino v. State Farm Fire & Casualty Co., Civ. A. No. 12-2065,
2013 U.S. Dist. LEXIS 105511 at *23-*24 (E.D. Pa. July 29, 2013).
"In order to establish liability under the catch-all provision of
the UTPCPL, 'a plaintiff must present evidence showing: (1) a
deceptive act that is likely to deceive a consumer acting
reasonably under similar circumstances; (2) justifiable reliance;
and (3) that the plaintiff's justifiable reliance caused
ascertainable loss.'" Angino v. Santander Bank, N.A., Civ. A. No.
1:15-CV-438, 2015 U.S. Dist. LEXIS 16313 at *22-*23 (M.D. Pa. Dec.
3, 2015)(quoting Slapikas v. First Am. Title Ins. Co., 298 F.R.D.
285, 292 (W.D. Pa. 2014)).

Here, the Third Amended Complaint asserts that Defendant
Swarthmore engaged in deceptive and/or materially misleading acts
and practices "which were aimed at the consumer public at large,
that were a representation or omission likely to mislead a
reasonable consumer acting reasonably under the circumstances
because they create the likelihood of confusion and
misunderstanding: (a) by causing Plaintiff to believe that
Swarthmore would follow its policies both as they were provided to
Plaintiff and as they were stated in the Student Handbooks" and
"(b) by causing Plaintiff to believe that if he accepted
Swarthmore's offer of enrollment and paid the related tuition and
housing fees, Swarthmore would uphold its obligations, covenants

and warranties to Plaintiff as described in its policies." (TAC, ¶186). Thus, as a consequence of "Plaintiff's consumption of Swarthmore's educational and housing services," he contends that he has standing under the UTPCPL. While these averments are indeed conclusory in nature, we do find that when reading the complaint in its entirety there are sufficient facts pled, albeit barely, to allege a claim for a violation of the UTPCPL at this stage of the proceedings. See, e.g., Kantor v. Hiko Energy, LLC, 100 F. Supp. 3d 421, 429 (E.D. Pa. 2015); Harris v. St. Joseph's University, Civ. A. No. 13-3937, 2014 U.S. Dist. LEXIS 65452 at *22 - *25 (E.D. Pa. May 13, 2014). Accordingly, the motion to dismiss as to Plaintiff's Seventh Cause of Action is denied.

### H.   9th Cause of Action - Negligent Infliction of Emotional Distress

For his ninth cause of action, Plaintiff contends that he suffered tremendous damages, including emotional distress and psychological damages "[a]s a direct and proximate cause of" Defendant's breach of the duties which it owed to him. In addition to finding these allegations to be unacceptably conclusory in nature given the absence of any clear averment as to what duties were owed or specifically how they were breached, we also find that this claim is clearly barred by Pennsylvania's gist of the action doctrine.

More particularly, the gist of the action doctrine prevents plaintiffs from recasting ordinary breach of contract claims as

tort claims.  Hart v. Arnold, 884 A.2d 316, 339 (Pa. Super. 2005).
This is because despite their common origins, distinct differences
exist between civil actions for tort and contractual breach: tort
actions lie for breaches of duties imposed by law as a matter of
social policy, while contract actions lie only for breaches of
duties imposed by mutual consensus agreements between particular
individuals.  Id.  "To permit a promisee to sue his promisor in
tort for breaches of contract inter se would erode the usual rules
of contractual recovery and inject confusion into our well-settled
forms of actions."  Id.

Thus, under Pennsylvania law, a cause of action framed as a
tort but reliant upon contractual obligations will be analyzed to
determine whether the cause of action properly lies in tort or
contract.  Autochoice Unlimited, Inc. v. Avangard Auto Finance,
Inc., 9 A.3d 1207, 1212 (Pa. Super. 2010).  Hence: (1) where a
tort claim arises solely from the contractual relationship between
the parties; (2) when the alleged duties breached were grounded in
the contract itself; (3) where any liability stems from the
contract; and (4) when the tort claim essentially duplicates the
breach of contract claim or where the success of the tort claim is
dependent on the success of the breach of contract claim, it will
be barred by the gist of the action doctrine.  Reardon v.
Allegheny College, 926 A.2d at 486 (citing Etoll, Inc. v.
Elias/Savion Advertising, Inc., 811 A.2d 10, 19 (Pa. Super.

2002)).  In other words, "[t]he gist of the action is contractual 'if the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts.'" <u>Gouda v. Harcum Junior College</u>, Civ. A. No. 1405456, 2015 U.S. Dist. LEXIS 72562 at *12 (E.D. Pa. June 4, 2015)(quoting <u>Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79, 104 (3d Cir. 2001)).

In application of the foregoing, it is clear from the Third Amended Complaint that the duties which Plaintiff alleges Defendant purportedly owed to him all arose out of his enrollment as a student at the college.  It therefore follows that the gist of his negligent infliction of emotional distress claim emanates from what Plaintiff contends in his previous causes of action is his contractual agreement to purchase educational and housing services from Swarthmore and Swarthmore's alleged agreement to abide by its policies and procedures in disciplining and/or ultimately terminating him as a student at the college.  We therefore find that the negligent infliction of emotional distress claim is properly dismissed at this time.

I.   *Violation of the Pennsylvania Landlord Tenant Act*
     *(Tenth Cause of Action)*

Plaintiff next endeavors to raise a claim against Defendant for violating the Pennsylvania Landlord Tenant Act, 68 P.S. §250.101, *et. seq.* for Swarthmore's "unilaterally removing Plaintiff from his room and segregat[ing] him from his peers."

36

(TAC, ¶202). According to Plaintiff, he had "an executed, paid for and written housing agreement with Swarthmore," entitling him to notice and processing of his eviction through the local magistrate. (TAC, ¶203). Defendant submits that Pennsylvania's Landlord Tenant Act does not apply here and it therefore acted within its authority in removing him from his dormitory room.

The Landlord Tenant Act itself does not specifically identify college dormitories as included within its coverage and in fact it is unclear whether Pennsylvania's Landlord Tenant Act is applicable to dormitories. See, American Future Systems, Inc. v. Pennsylvania State University, 522 F. Supp. 544, 554 (M.D. Pa. 1981). As Defendant points out, however, Plaintiff fails to plead any lease or other written housing agreement such as might fall within the ambit of the Landlord Tenant law or any facts to refute the provisions contained within the Swarthmore Student Handbook that:

> "Living in College housing is a privilege and not a right. The Deans' Office may, at any time in its own discretion, withdraw this privilege due to behavior which does not rise to the standards set forth herein. Students who lose their housing privileges are not entitled to a refund of their room payments for the remaining weeks of the semester."

In fact, Plaintiff takes no position and makes no argument in opposition to Defendant's motion to dismiss this count of the complaint. Inasmuch as it appears that Plaintiff has abandoned this claim and that in light of the terms of the Student Handbook it cannot stand in any event, the motion to dismiss Plaintiff's

37

Tenth Cause of Action is granted.

> ### J.   *Equitable Relief in the Form of a Declaratory Judgment*
> ### *(Eleventh Cause of Action)*

For his final claim against the defendant, Plaintiff purports to state a cause of action under the Declaratory Judgment Act, 28 U.S.C. §2201, that Swarthmore was wrong and/or acted improperly in adjudicating Jane Doe's sexual assault complaint against him, in finding that he violated the school's alcohol policy and in expelling him from the College.  Plaintiff also seeks to have the entire Board of Managers of Swarthmore College apologize to him in person and publish this apology in the Chronicle of Higher Education, two national newspapers of general circulation and on the Swarthmore website for at least two calendar years.  Finally, he demands that his academic and disciplinary records be corrected and that he be awarded damages in excess of $75,000 plus attorney's fees, costs and interest.

The Declaratory Judgment Act reads as follows in pertinent part:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
>
>       ...

28 U.S.C. §2201(a).

This language has been said to "place a remedial arrow in the

district court's quiver" thereby creating "an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants. <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 288, 115 S. Ct. 2137, 2143, 132 L. Ed.2d 214 (1995). Thus, the determination of whether to act on a declaratory judgment complaint is left to the sound discretion of the district court. <u>Id</u>. A declaratory judgment action is appropriate when the declaration will settle the question presented and terminate the entire controversy; courts are to avoid using declaratory judgment to make abstract determinations or to try a controversy in piecemeal fashion. <u>Pennsylvania Video Operators v. United States</u>, 731 F. Supp. 717, 719 (W.D. Pa. 1990), *aff'd w/o opinion*, 919 F.2d 136 (3d Cir. 1990).

Moreover, a plaintiff's request for declaratory judgment cannot create a private right of action that does not otherwise exist. <u>In re Comcast Corp. Cable TV Rate Regulation</u>, Civ. A. No. 93-6628, 1994 U.S. Dist. LEXIS 16044 at *19 (E.D. Pa. Nov. 10, 1994), *aff'd w/o opinion*, 77 F.3d 462 (3d Cir. 1996). Equitable relief, like legal relief, depends on congressional intent to provide for private enforcement. <u>Id</u>. A claim for injunctive relief pleads for a remedy, but does not constitute an independent cause of action. <u>Strikeforce Technologies, Inc. v. Whitesky, Inc.</u>, Civ. A. No. 13-1895, 2013 U.S. Dist. LEXIS 96832 at *29 (D. N.J. July 11, 2013); <u>Hammer v. Vital Pharmaceuticals, Inc.</u>, Civ.

39

A. No. 11-4124, 2012 U.S. Dist. LEXIS 40632 at *37-*38 (D. N.J. March 26, 2012).  Accordingly, the requirements of pleading require more than a mere prayer for declaratory relief to set forth a cause of action for a declaratory judgment.  <u>Standard Oil Co. v. Tide Water Associated Oil Co.</u>, 55 F. Supp. 274, 276 (D. Del. 1943).

In this case, Plaintiff's so-called Eleventh Cause of Action clearly fails to plead a separate claim.  Indeed, it pleads only for remedies based on the preceding causes of action and there are no facts pled which in any way suggest that there are any questions before the Court which a judicial declaration would either appropriately or finally resolve.  For these reasons, the motion to dismiss is also granted as to this final count for "equitable relief in the form of a declaratory judgment."

Based upon all of the foregoing, the motion to dismiss is granted in part and denied in part pursuant to the attached Order.